UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LE BONITAS S.P.A.,<br><br>                    Plaintiff,<br><br>        - against -<br><br>PARIS HILTON ENTERTAINMENT INC.,<br><br>                    Defendant. | Case No. 10 Civ 9350 (AKH)<br>ECF Case<br><br>**Oral Argument Requested** |
| PARIS HILTON ENTERTAINMENT INC.,<br><br>                    Counter-Claimant,<br><br>        - against -<br><br>LE BONITAS S.P.A.,<br><br>                    Counter-Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT/COUNTER-CLAIMANT
PARIS HILTON ENTERTAINMENT, INC.'S MOTION FOR SUMMARY JUDGMENT
OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY ADJUDICATION**

This Memorandum of Law is submitted by Defendant/Counter-Claimant Paris Hilton Entertainment, Inc. ("PHE") in support of its Motion for Summary Judgment and/or Partial Summary Adjudication.

## TABLE OF CONTENTS

INTRODUCTION………………………………………………………………………………1

FACTUAL BACKGROUND...........................................................................................3

    A.    The License Agreement.............................................................................3

           1.    The Approval Terms (Exh. A, Section 5.1)...........................................3

                  (a)    Le Bonitas Covenants Not To Sue Regarding Approvals.....4

                  (b)    The "Deemed Disapproval" Clause……………………………4

           2.    Le Bonitas Agrees To Pay PHE Bi-Annual Minimum Guaranteed Royalties (Exh. A, Section 3.3 and Exh. 6 Thereto)........................5

           3.    Le Bonitas' Distribution Requirements (Exh. A, Sec. 14)..............6

           4.    PHE's Right of Termination and Acceleration of Payments Due, and Right to Attorneys Fees (Exh. A, Sec's 13.1 & 9.2)..................6

           5.    The Integration Clause……………………………………………7

    B.    Through No Fault of PHE, Le Bonitas Fails in the Manufacture and Distribution of the First Season of Product (the Spring/Summer Line)......7

    C.    Le Bonitas Submits The Mood Boards for the 2010 Fall/Winter Season on October 8, 2009- Without the Required Approval Form………………9

    D.    Consistent with PHE's Contractual Approval Rights, Beanstalk Responds with Questions to the Submission of the Fall/Winter Mood Boards as Early as October 13, 2009......................................................10

    E.    Unbeknownst To PHE, in October 2009, Le Bonitas Decides Not To Proceed with a Fall/Winter Line, Terminates Its Distributors and Puts All Manufacturing on Hold......................................................12

    F.    Also Unbeknownst to PHE, Le Bonitas Completed the Detailed Designs for the Fall/Winter Line by Mid-October 2009, But Did Not Send Them to PHE for Approval..............................................................14

    G.    Ms. Hilton Considers the Mood Boards on or About November 4 and Declines Approval............................................................15

H.    Although Dissatisfied, Ms. Hilton Ultimately Approves the Mood
      Boards as a Favor to Its Licensee.................................................16

I.    Le Bonitas Fails To Pay; PHE Terminates The Contract.........................16

J.    The Allegations of Le Bonitas' Complaint......................................18

K.    Le  Bonitas' Claimed Damages Are Based On Wildly Inaccurate
      Projections...................................................................19

L.    PHE's Counterclaim............................................................20

ARGUMENT...........................................................................21

A.    Le Bonitas' Complaint Should be Summarily Dismissed As Barred By
      An Unambiguous Covenant Not To Sue...........................................22

B.    Le Bonitas' Claims Should Be Dismissed For The Additional Reason
      That It Cannot, As A Matter Of Law, Establish A Breach........................23

C.    Judgment Should Be Entered In Favor Of PHE On Its Counterclaim.......25

D.    In the Event the Court Declines to Dismiss Le Bonitas' Complaint,
      Le Bonitas' Claim for Lost Profits Should be Dismissed as Unduly
      Speculative..................................................................26

E.    Le Bonitas Has Waived its Claim for Rescission, and Has No Legal
      Basis To Seek Return of Its Initial Minimum Guarantee Payment To
      PHE.........................................................................28

CONCLUSION.........................................................................31

## DECLARATIONS AND EXHIBITS

DECLARATION OF OLIVER HERZFELD IN SUPPORT OF PHE'S
MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY
ADJUDICATION

    Exhibit A – License Agreement dated February 1, 2009 between
        Paris Hilton Entertainment Inc. and Le Bonitas S.p.A.

    Exhibit B – Letter dated July 16, 2010 from Miri Frankel, Associate
        General Counsel of Beanstalk Group to Gianni Busanna of
        Le Bonitas S.p.A.

DECLARATION OF MICHAEL E. WEINSTEN IN SUPPORT OF
DEFENDANT PARIS HILTON ENTERTAINMENT INC.'S MOTION
FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY
ADJUDICATION

    Exhibit C – Excerpts of Videotaped Deposition of Gianni
        Busanna, Vol. I, taken on November 14 and 15, 2011

    Exhibit D – Excerpts of Videotaped Deposition of Gugliemo
        Muratori, Vol. I, taken on November 17, 2011

    Exhibit E – Excerpts of Videotaped Deposition of Elisabetta
        Maria Argia Balli taken on November 16, 2011

    Exhibit F – Email dated August 26, 2009 from Wendy Abbott to
        Francesco Borchi

    Exhibit G – Initial Disclosures by Plaintiff

    Exhibit H – Letter dated January 11, 2011 from Michael E. Weinsten
        to Martin Garbus and Le Bonitas S.p.A.

    Exhibit I – Currency Converter (Euro to U.S. Dollar)

    Exhibit I (a) – Letter dated November 25, 2009 from Le Bonitas S.p.A.
        to The Beanstalk Group UK Ltd.

K:\4955-2\PLE\motionfor summary judgment 102011.doc
PHE's Motion for Summary Judgment and/or Partial Summary Adjudication
iii

DECLARATION OF SERENA SIBBALD IN SUPPORT OF PHE'S
MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY
ADJUDICATION.........................................................................................

     Exhibit J -- Email dated September 8, 2009 from Johanna Brambring to
          Serena Sibbald

     Exhibit K -- Email dated October 9, 2009 from Gianni Busanna to
          Johanna Brambring (with a copy to Serena Sibbald)

     Exhibit L -- Email dated October 21, 2009 from Gianni Busanna to
          Johanna Brambring (with a copy to Serena Sibbald)

     Exhibit M – The Beanstalk Group's Licensee Welcome Pack

     Exhibit N -- Email dated March 12, 2009 from Johanna Brambring to
          Gianni Busanna  (with a copy to Serena Sibbald)

     Exhibit O -- Email dated October 19, 2009 from Johanna Brambring to
          Gianni Busanna (with a copy to Serena Sibbald)

     Exhibit P -- Email dated October 21, 2009 from Johanna Brambring to
          Gianni Busanna (with a copy to Serena Sibbald)

     Exhibit Q -- Email dated November 25, 2009 from Serena Sibbald to
          Gianni Busanna (with a copy to Johanna Brambring)

     Exhibit R -- Email dated June 24, 2009 from Johanna Brambring to
          Gianni Busanna

DECLARATION OF FILIPPO MARCHINO IN SUPPORT OF PHE'S
MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY
ADJUDICATION.........................................................................................

     Exhibit S -- Email dated March 31, 2009 from Marco Adami to
          Romina Cristodero

DECLARATION OF MEGAN D'AMICO IN SUPPORT OF PHE'S
MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY
ADJUDICATION.........................................................................................

DECLARATION OF PARIS HILTON IN SUPPORT OF PHE'S
MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY
ADJUDICATION.........................................................................................

## TABLE OF AUTHORITIES

### FEDERAL CASES

Allen v. WestPoint-Pepperell, Inc.,
   945 F.2d 40 (2d Cir. 1991) ..................................................................28, 29

Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242 (1986) ..................................................................21

Apex Pool Equip. Co. v. Lee,
   419 F.2d 556 (2d Cir. 1969) ..................................................................29

Ballow, Brasted, O'Brien & Rusin, P.C. v. Logan,
   435 F.3d 235 (2d Cir. 2006) ..................................................................28

Bigda v. Fischbach Corp.,
   898 F. Supp. 1004 (S.D.N.Y.1995) ..................................................................30

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986)..................................................................21

CSI Inv. Partners II, L.P. v. Cendant Corp.,
   507 F. Supp. 2d 384 (S.D.N.Y. 2007), ..................................................................30

David v. Glemby Co.,
   717 F. Supp. 162 (S.D.N.Y. 1989) ..................................................................26

DuPont Flooring Sys., Inc. v. Discovery Zone, Inc.,
   No. 98 Civ. 5101 (SHS), 2004 WL 1574629 (S.D.N.Y. July 14, 2004) ..................................................................27

ESPN, Inc. v. Office of the Comm'r of Baseball,
   76 F. Supp. 2d 383 (S.D.N.Y.1999) ..................................................................29

First Investors Corp., et al. v. Liberty Mutual Insurance Co.,
   152 F.3d 162 (2d Cir 1998) ..................................................................23

Gross v. National Broad. Co., Inc.,
   232 F. Supp. 2d 58 (S.D.N.Y. 2002) ..................................................................21

Joao v. Cenuco, Inc.,
   376 F. Supp. 2d 380 (S.D.N.Y. 2005) ..................................................................22

Kamfar v. New World Restaurant Group, Inc.,
   347 F. Supp. 2d 38 (S.D.N.Y. 2004) ..................................................................22

Lazard Freres & Co. v. Crown Sterling Management, Inc.,
   901 F. Supp. 133 (S.D.N.Y. 1995) ...............................................................29
Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
   475 U.S. 574 (1986)....................................................................................21

Net2Globe International, Inc. v. Time Warner Telecom of New York,
   273 F. Supp. 2d 436 (S.D.N.Y. 2003) ...................................................29, 30

Schonfeld v. Hilliard,
   218 F.3d 164 (2d Cir. 2000) ...................................................................26, 27

Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.,
   103 F. Supp. 2d 711(S.D.N.Y. 2000) ..........................................................29

V.S. International S.A., et al. v. Lopez,
   862 F. Supp. 1188 (S.D.N.Y. 1994) ............................................................29

**STATE CASES**

Ashland Mgmt. Inc. v. Janien,
   82 N.Y.2d 395 (1993)...................................................................................27

Chieco v. Paramarketing, Inc.,
   228 A.D.2d 462, 643 N.Y.S.2d 668 (2d Dept. 1996)....................................22

Cont'l Ins. Co. v. Helmsley Enters., Inc.,
   211 A.D.2d 589 (1st Dep't 1995)..................................................................30

Emigrant Indus. Sav. Bank v. Willow Builders, Inc.,
   290 N.Y. 133, 48 N.E.2d 293 (1943)............................................................30

Freund v. Wash. Sq. Press, Inc.,
   34 N.Y.2d 379(1974) ...................................................................................27

Green Harbour Homeowners' Ass'n, Inc. v. G.H. Development & Const., Inc.,
   789 N.Y.S.2d 319 (2005) .............................................................................24

Kenford Co. v. Cnty. of Erie,
   67 N.Y.2d 257 (1986)...................................................................................26

Muzak Corp. v. Hotel Taft Corp.,
   1 N.Y.2d 42 (1956).......................................................................................24

Tedesco v. Triboro Bridge and Tunnel Authority,
   250 A.D.2d 758, 673 N.Y.S.2d 181 (2d Dept. 1998)....................................22

Waldman v. New Phone Dimensions, Inc.,,
  109 A.D. 702 (1985)...............................................................................................24

Zink v. Mark Goodson Prods., Inc.,
  261 A.D.2d 105 (1st Dep't 1999)...............................................................................26

## RULES

Fed. R. Civ. P. 56(c) ...............................................................................................21

## INTRODUCTION

If contracts mean what they say, this case is ripe for summary judgment. In 2009, Italian clothing manufacturer Le Bonitas S.p.A. ("Le Bonitas") entered into a five-year license agreement with Paris Hilton Entertainment ("PHE") promising to pay PHE over $1.8 million for the right to produce a *Paris Hilton*-branded line of lingerie and swimwear, *and* that it would commence actual sales of product in *every* licensed territory by January 1, 2010. It is *undisputed* that Le Bonitas failed to meet either obligation. Instead, faced with a downturn in the economy (coupled with some poor business decisions having nothing to do with PHE), Le Bonitas simply threw in the towel and abandoned the contract after just one sales season.

Le Bonitas' *only* purported defense to these breaches (and the premise of its Complaint) is the misplaced claim that PHE failed to approve certain design submissions (called "mood boards") within ten business days, and that the alleged delay somehow prevented it from producing sales samples in time for the start of the next market. Even if true (and it is not), the claim is waived as a matter of law. Le Bonitas expressly and unambiguously agreed in its contract that it would not sue or have "any rights" against PHE "by reason of [PHE's] failure or refusal to grant any approval" of Le Bonitas' design submissions. (Exh. A, Sec. 5.1(8)). This clause was intended to support the very broad and unfettered approval rights granted to PHE in the contract, and to avoid expensive litigation over whether or not PHE has exercised its approvals (which are inherently subjective in nature) in good faith. As demonstrated below, New York has long recognized the enforceability of such covenants not to sue.

However, even if the contract did not include a covenant not to sue, judgment can and should be made in favor of PHE for the additional reason that Le Bonitas has not and cannot as a matter of law establish *any* breach by PHE. Contrary to the allegations of the complaint, the *undisputed evidence* is that: (1) PHE (through its

licensing agent, Beanstalk) *responded* almost immediately to the mood board submission, with questions about the presentation; (2) thereafter, Beanstalk actively engaged Le Bonitas in a dialogue about the mood boards, including a meeting in London on November 4, 2009; (3) Ms. Hilton herself reviewed the mood boards as soon as she physically received them on November 4, but was not satisfied and decided to withhold her approval *as permitted by PHE's contract*; and (4) despite her dissatisfaction, Ms. Hilton ultimately approved the boards as a favor to Le Bonitas.

Le Bonitas cannot point to a single provision of the license agreement that was violated in this case. PHE was not contractually obligated to approve anything; nor was it obligated to provide a response in ten business days as alleged. In fact, as acknowledged by Le Bonitas in depositions, the parties' expressly contemplated that PHE might not respond to a design submission within ten business days and, in such event, the designs would be deemed "disapproved." (Exh. A, Sec. 5.1(2)). In other words, PHE had the express contractual right to voice its disapproval through silence, and Le Bonitas waived any right to question a disapproval made in this manner.

For these reasons, and those stated below, the Court can and should dismiss Le Bonitas' claims with prejudice *and* enter judgment in favor of PHE on its Counterclaim in the full amount of the contract price, with interest, attorneys fees and costs.

If, however, the Court finds there are material factual issues to be tried, then PHE respectfully requests that partial summary adjudication be made dismissing Le Bonitas' claim for lost profits, and its claim for return of the initial contract installment payment of €97,500. Le Bonitas' claim for lost profits is based on wildly inaccurate sales projections (made in 2008) on a product that has not even been designed. As a matter of law, the claim is too speculative to proceed. Le Bonitas' claim for rescission (and return of the €97,500) is waived as a matter of law, because Le Bonitas elected, *after the alleged breach*, to proceed with the contract, deliver product and collect on sales. The agreement cannot now be unwound.

PHE's Motion for Summary Judgment and/or Partial Summary Adjudication                    2

## FACTUAL BACKGROUND[1]

### A.    The License Agreement.

In early 2009, PHE and Le Bonitas entered into a five-year License Agreement (dated as of February 1, 2009) pursuant to which PHE agreed to license the *Paris Hilton* name and brand to Italian clothing manufacturer Le Bonitas in connection with a line of lingerie, sleepwear and beachwear. (Cmplt ¶¶ 7-8; Herzfeld Dec. ¶ 2, Exh. A). The licensed territory included every country worldwide outside of North America and South America. (Exh. A, Sec. 1.3 & exh. 2 therein at pp. 1 & 31).

Le Bonitas' manager of marketing and sales, Gianni Busanna, negotiated the License Agreement on behalf of Le Bonitas, with input from Le Bonitas' owner Guglielmo Muratori, outside American lawyers and an outside consultant who specializes in licensing. (Weinsten Decl. ¶ 2, Exh. C, Busanna Depo pp. 8, 10 & 11). PHE's licensing agent, Beanstalk, negotiated for PHE. (Herzfeld Decl. ¶ 2).

### 1.    The Approval Terms (Exh. A, Section 5.1).

To protect Ms. Hilton's image and brand, and to ensure the quality of products sold under her name, the License Agreement provided PHE with strict and unfettered approval rights at every stage of the design process, including: (a) the "Concept" stage, i.e., mood boards (also called inspiration boards); (b) the "Final Art" stage, i.e., detailed designs; and (c) "Final Physical," e.g., physical samples of the product. (Herzfeld Decl. ¶ 3; Exh. A, Sec. 5.1, p. 10.)   In the lingerie/swimwear business, there are typically two

---

[1] Although *all* facts stated herein are undisputed and/or indisputable, certain facts are provided for context only and are not truly material to the legal issues at hand. Specifically, those facts contained in sections B, E & F below, while supported with citations to evidence, are not included in PHE's separate statement of material facts.

design seasons, one for Spring/Summer and one for Fall/Winter.  (Herzfeld Decl. ¶ 4).

(a)   **Le Bonitas Covenants Not To Sue Regarding Approvals.**

PHE's approval rights were to be exercised in accordance with PHE's "Sole and absolute discretion." (Exh. A, Sec. 5.1, p. 10).  Indeed, Section 5.1(8) of the License Agreement expressly states that "*LICENSEE [Le Bonitas] shall not have any rights against OWNER [PHE] for damages or other remedies by reason of OWNER'S [PHE's] failure or refusal to grant any approval referred to in this Section 5.*" (Exh. A, Sec. 5.1(8), p. 11) (emphasis added).  Thus, Le Bonitas expressly covenanted that it would not sue PHE for its delay or failure to approve designs.  PHE negotiated for this language for the precise reason that it did not want to engage Le Bonitas in any dispute as to what is and is not a reasonable exercise of an approval right and/or what is and is not a reasonable time to consider and respond to designs. (Herzfeld Decl. ¶ 5).

(b)   **The "Deemed Disapproval" Clause.**

The License Agreement further states that "Owner [PHE] shall have ten (10) business days from Owner's actual receipt to *review and respond* in writing to each of LICENSEE's [Le Bonitas'] submissions," but that if "*Owner does not respond to such submission within such ten (10) business day period, such submission shall be deemed disapproved.*"  (Exh. A, Sec. 5.1(2), p. 11) (emphasis added).  Thus, the parties expressly contemplated that PHE might not respond to a design submission in ten business days and, in such event, the result would be a *disapproval* of the designs-- *not a breach of contract*.

In his deposition, Mr. Busanna confirmed his understanding that "Paris Hilton Entertainment might not respond to every design submission in ten days," and that he

"understood that if within ten days after having sent the designs, that there was no response, that they were considered disapproved." (Exh. C, Busanna Depo pp. 14-15). Mr. Busanna specifically discussed this clause with the owners. (*Id.* at p. 14).

Mr. Busanna further testified that, during negotiations, Le Bonitas specifically asked that the words "deemed disapproved" in Section 5.1(2) be replaced with the word "approved," but that was rejected by Beanstalk. (*Id.* at pp. 25-26.) Thus, Le Bonitas knowingly accepted the risk that PHE might not respond to a particular submission within ten days, and that its designs could be disapproved in this manner.

In fact, Mr. Busanna confirmed in his testimony that he fully "understood that one way Paris [Hilton] could disapprove your [Le Bonitas'] designs is by not responding at all." (*Id.* at p. 15.)  In such circumstances, he agreed "it was up to Le Bonitas to resubmit designs." (*Id.* at pp. 19-20).  Mr. Busanna specifically testified that it would not have been a breach for PHE to respond in twelve or fifteen business days. (*Id.* at pp. 33-35).  Mr. Busanna further confirmed Le Bonitas' expectation that PHE was not required to actually approve or disapprove a design submission within ten business days, *and* that he would have considered it perfectly reasonable for PHE to *respond* to a submission with questions about the designs. (*Id.* at pp. 27-29).

2.    **Le Bonitas Agrees To Pay PHE Bi-Annual Minimum Guaranteed Royalties (Exh. A, Section 3.3 and Exh. 6 Thereto).**

In exchange for the rights granted by PHE, Le Bonitas agreed to pay PHE a minimum guaranteed royalty of €1,225,000, payable in bi-annual installments with the first payment being made upon signature. (Exh. A, Sec. 3.3 & exh. 6 thereto, pp. 5 & 32).  These payments were deemed "fully earned by [PHE] upon execution of this

Agreement." (*Id.*)  Le Bonitas made the first installment payment of €97,500, but as explained below, no other payments were ever made.  (Herzfeld Decl. ¶ 6).

### 3.  Le Bonitas' Distribution Requirements (Exh. A, Sec. 14).

Section 14.1 of the License Agreement required that Le Bonitas use its "*best efforts* to sell, distribute and supply" the licensed articles and to "begin the bona fide manufacture, distribution and sale of the LICENSED ARTICLES *in each country* in the LICENSED TERRITORY on or before the Distribution Start Date" of January 1, 2010. (Exh. A, Sec. 14.1 and exh. 9 therein, pp. 25 & 33) (emphasis added).

Mr. Busanna confirmed that, at the time he negotiated the contract, he "understood that Le Bonitas would start the manufacture, distribution, and sale of the products in all of the countries as per the contract," and that this was to occur by January 1, 2010.  (Exh. C, Busanna Depo p. 377).  Thus, Le Bonitas was not only bound to use best efforts to sell in every country in which it was licensed, it was *required* to have *actually* achieved sales in every licensed territory by January 1, 2010.

### 4.  PHE's Right of Termination and Acceleration of Payments Due, and Right to Attorneys Fees (Exh. A, Sec's 13.1 & 9.2).

If Le Bonitas failed to "to make any payment" and failed to cure such default within five days of notice, PHE had the right to terminate the contract.  (Exh. A, Sec. 13.1(i), p. 22).  Upon termination, the "balances owing on all MINIMUM ROYALTIES for the TERM shall be immediately due and payable."  (Exh. A, Sec. 13.1, p. 23).

Section 13.1 also provides PHE with the right of termination, and acceleration of the minimum guarantees, in the event Le Bonitas "does not fulfill its obligation to distribute, promote and advertise the LICENSED ARTICLES as set forth under Section

14." (Exh. A, Sec. 13.1(xiii), p. 23).

PHE may also recover "reasonable attorneys fees, costs and expenses which may be . . . incurred by [PHE], including costs of collection of all amounts owed to [PHE] by LICENSEE and costs of all actions by [PHE] against LICENSEE to enforce LICENSEE'S compliance with this Agreement." (Exh. A, Sec. 9.2, p. 17).

     **5.**    **The Integration Clause.**

The License Agreement is a fully integrated agreement and no provision may "be waived or modified except in writing signed by both parties." (Exh. A, Sec. 17, p. 29).

**B.**    *Through No Fault of PHE,* Le Bonitas Fails in the Manufacture and Distribution of the First Season of Product (the Spring/Summer Line).

Shortly after the contract was signed on or about March 5, 2009, Le Bonitas began working on its 2010 Spring/Summer collection of the Paris Hilton line. By April 6, 2009, PHE approved the "mood boards" for this line which was the first step in the design process. (Sibbald Decl. ¶ 2). Although a meeting was initially planned for April 14, 2009 to go over the detailed designs (the next step), delays caused by Le Bonitas' suppliers forced the meeting to be pushed to May 27, 2009 (*a 43 day delay*). (Exh. C, Busanna Depo pp. 124-125 and 129-131). Despite the delay, Le Bonitas was able to complete the sales samples in time for market which began at the end of June/ beginning of July 2009. (Exh. C, Busanna Depo p. 132).[2]

Unfortunately, for reasons that have nothing to do with PHE or Ms. Hilton, sales for the Spring/Summer line were extremely disappointing. According to Mr. Busanna,

Le Bonitas' actual sales were no more than 12% of what they had previously projected, and Le Bonitas failed to make *any* sales in such major territories as England, France and the Far East where Ms. Hilton enjoys wide popularity. (*Id.* at p. 154).[3] This raised serious concerns for Le Bonitas, including the negative impact on future sales seasons. (*Id.* at p. 316). At his deposition, Mr. Busanna gave the following testimony with respect to the difficulty Le Bonitas would face if sales on the Spring/Summer line were poor.

> Q:  Is it a truthful statement that if sales of the spring/summer line were compromised, Le Bonitas would not be able to pay the guaranteed minimum [due PHE]?
>
> A:  It would have been difficult, very difficult.  (*Id.* at p. 122).

According to Le Bonitas' English distributor, the reasons for poor sales had nothing to do with Ms. Hilton, but rather included such things as Le Bonitas' overpricing of the items and Le Bonitas' failure to provide a wider range of sizes. (*Id.* at 225-227; Weinsten Decl. ¶ 3, Exh. F). In contrast, this same distributor noted that there had been a "good reaction to the Paris Hilton clothing line" designed and manufactured by a different Italian clothing company called Diciotto. (Exh. F).

The poor results on the Spring/Summer line prompted Mr. Busanna to write Beanstalk on September 9, 2009 stating "sales are going very badly so we are very disappointed and worried." (Sibbald Decl. ¶ 4; Exh. J). On October 9, 2009, one month later, Mr. Busanna wrote Beanstalk in desperation: "as already told many times, sales

---

[2] The sales market for a particular season begins as many as eight or more months before the items would actually appear in stores. (Sibbald Decl. ¶ 3).

[3] Despite its contractual requirement to begin bona fide manufacture and sales in every licensed country by January 1, 2010, Le Bonitas did not hire any distributors for Asia, Australia or Africa- focusing instead on Europe and the Middle East. (*Id.* at p. 277). In fact, Busanna confirmed that no effort at all had been made to sell in Africa or any Asian country other than minimal efforts with Korea and Japan. (*Id.* at pp. 346-347).

are going very badly so we really need to meet because we have very big problems."
(Sibbald Decl. ¶ 5; Exh. K).  When asked by Beanstalk in October 2009 about efforts by
Le Bonitas to market the line, Mr. Busanna responded "We have no money to spend."
(Sibbald Decl. ¶ 6; Exh. L).

       In response to Mr. Busanna's desperate plea, a meeting was set for November 4
in London (discussed further in Section I below).  (Sibbald Decl. ¶ 7).


**C.     Le Bonitas Submits The Mood Boards for the 2010 Fall/Winter Season on
         October 8, 2009- *Without the Required Approval Form.***

       According to Le Bonitas' contract with its designer for the Paris Hilton line,
Romina Christodero, Ms. Christodero was contractually required to have completed the
mood boards *and* detailed designs for the 2010 Fall/Winter season on or before
September 20, 2009.  (Exh. C, Busanna Depo p. 81; Marchino Decl. ¶ 2, Exh. S).  In
fact, Mr. Busanna testified that the 2010 Fall/Winter mood boards, according to his
schedule, should have been done by July 2009.  (*Id.* at p. 191).  However, the mood
boards were not sent to Beanstalk for consideration until October 7, 2009 and were not
received until October 8.  (*Id.* at pp. 155-156; Sibbald Decl. ¶ 8).

       Although Beanstalk repeatedly reminded Le Bonitas of the need to submit PHE's
standard approval form with every submission, Le Bonitas failed to do so with respect to
the Fall/Winter mood boards.  (Sibbald Decl. ¶ 8; Exh. C, Busanna Depo p. 49).

       ***To ensure that every licensee's needs are met***, and to facilitate the orderly
management and documentation of approvals for PHE's numerous licensees, PHE
requires that its licensees include with every design submission a standard form which

indicates, among other things, *by when the approval is required.* (Sibbald Decl. ¶ 9; Exh. M, p. 20). This form was sent to Le Bonitas as early as March 11, 2009. (Sibbald Decl. ¶ 9, Exh. N; Exh C, Busanna Depo p. 50). It was also included in a "Licensee Welcome Pack" given to Le Bonitas with the instructions that design "submissions will not be accepted without a completed form." (Sibbald Decl. ¶ 9; Exh. M, pp. 16 & 20).

On June 24, 2009, Beanstalk again reminded Le Bonitas by email of the necessity that the approval form be sent with the design concepts. (Sibbald Decl. ¶ 10; Exh. R). Le Bonitas, however, ignored these requests. (*Id.*) Le Bonitas did not provide advanced notice that it was sending the mood boards, and did not indicate any date by which the boards had to be approved to meet Le Bonitas' needs. (Sibbald Decl. ¶ 10; Exh. C, Busanna Depo pp. 46 & 48, 67-68).

**D.**     **Consistent with PHE's Contractual Approval Rights, Beanstalk *Responds* with Questions to the Submission of the Fall/Winter Mood Boards as Early as October 13, 2009.**

As the licensing agent for PHE, Beanstalk's typical practice with new licensees such as Le Bonitas was to go over design concepts with the licensee before forwarding designs to the licensor for approval. (Sibbald Decl. ¶ 11). In Beanstalk's view, the Fall/Winter mood boards were confusing and came in without sufficient explanation. (*Id.*) Beanstalk had questions regarding what the different products were and the themes associated with the line. (*Id.*) According to Serena Sibbald, the Beanstalk executive responsible for overseeing the Le Bonitas contract, she did not believe Ms. Hilton would understand the presentation without further explanation that had to be

obtained from Le Bonitas. (*Id.*)  Also, Beanstalk wanted to be sure the product and positioning was in line with PHE's existing apparel line manufactured by Diciotto. (*Id.*).

On October 13, 2009, just three business days after the boards were received, Beanstalk's Johanna Brambring ***responded*** to Le Bonitas' mood board submission stating that Beanstalk wanted to review the boards with Le Bonitas prior to sending them to PHE. (Sibbald Decl. ¶ 12; Exh. O).  Beanstalk proposed that this review take place at the November 4 meeting in London. (*Id.*)  Le Bonitas agreed, but asked that the boards be sent to PHE right away. (*Id.*)  Again, Le Bonitas did not provide a date by which it required the boards to be approved. (*Id.*)

Over the next few days, and before sending the boards on to PHE for consideration, Ms. Brambring attempted to follow up with Mr. Busanna about the Fall/Winter presentation.  (Sibbald Decl. ¶ 13).  On October 20, she emailed Mr. Busanna asking for a CD explaining the "thoughts of the presentation." (Exh. C, Busanna Depo pp. 68-69).  This was consistent with the Spring/Summer line for which Le Bonitas provided an explanation of its vision separate and apart from the mood boards themselves. (Sibbald Decl. ¶ 13).

In response to this email, Mr. Busanna told his Le Bonitas colleagues that Ms. Brambring can "go fuck herself." (Exh. C, Busanna Depo p. 69).  Busanna claimed he was "letting off steam" because "they kept asking us questions about things that [in his view] were already in the CD." (*Id.*)

On October 21, 2009, Ms. Brambring wrote Mr. Busanna stating "I thought of some additional information.  I will explain this to you on the phone this week." (Sibbald Decl. ¶ 14; Exh. P).  That same day, Beanstalk sent the CD with the Fall/Winter mood

boards to PHE by overnight carrier. (Sibbald Decl. ¶ 15).  Mr. Busanna testified the

email was followed with a call about the boards.  (Exh. C, Busanna Depo pp. 66-67).

    At the meeting in London on November 4, Beanstalk executives reviewed the

boards with Mr. Busanna.  (Sibbald Decl. ¶ 16; Exh. C, Busanna Depo pp. 59-60). One

of the issues discussed was coordination of Le Bonitas' designs with PHE's Diciotto

apparel line.  (*Id.* at pp. 59-60 & 66*)*.


E.  <u>**Unbeknownst To PHE**, in October 2009, Le Bonitas Decides Not To Proceed</u>
    <u>with a Fall/Winter Line, Terminates Its Distributors and Puts All</u>
    <u>Manufacturing on Hold.</u>

    On August 26, 2009, Le Bonitas' English distributor notified Le Bonitas that it

would no longer present the line. (Exh. C, Busanna Depo pp. 227-228;  Exh. F).   Two

days later, Le Bonitas sent letters to ten other distributors of the Paris Hilton line

terminating their contracts.  (*Id.,* pp. 231-232, 234-238).[4]  Mr. Busanna testified that the

reason was poor sales.  (*Id.* at p. 232).  Le Bonitas did not replace these distributors

(other than the agent for the small Italian territory of Trivento) and, in fact, chose not to

renew the contract for its sales consultant (Paula Abiti) who was hired specifically to

assist in finding distributors for the Paris Hilton line.  (*Id.* at pp. 239, 247-248).

---

[4] This mass termination of distributors effectively ended distribution in the majority of
territories where Le Bonitas had secured distributors, including Greece, Turkey, France,
Spain, Benelux, Scandinavia, Portugal, the Middle East, and various Italian provinces.
(*Id.*).  Although the German distributor (with whom Le Bonitas had a previous
longstanding relationship) did not receive such notice, according to Mr. Busanna, sales
in Germany were poor and "it was evident they were not going to continue selling the
Paris Hilton line." (*Id.* at pp. 250-251).  Le Bonitas' only other major distributor, for
Eastern Europe, terminated their agreement when Le Bonitas failed to deliver the
Spring/Summer line in a timely manner. (*Id.* at pp. 254-255).

On or about this same time, Le Bonitas put all of its manufacturers of the Paris Hilton line on hold as well. (*Id.* at p. 310). On October 28, 2009, Le Bonitas employee Sergio Leoncini (from Purchasing) wrote to another Le Bonitas employee stating "there is a chance that the Paris Hilton line may not be produced after all." (*Id.* at p. 309). Mr. Leoncini further opined that "this could be good news." (*Id.* at p. 311).

As of October 28, only fourteen business days had passed from the time Beanstalk received the mood boards for the Fall/Winter line. (Sibbald Decl. ¶ 17). No-one ever informed PHE or Beanstalk that Le Bonitas was terminating its distributors or putting manufacturing on hold. (Sibbald Decl. ¶ 17).

A few days later, on November 3, 2009, Mr. Busanna sent an email to the owners of the company attaching Section 13.1 of the License Agreement, i.e., *the section that specifies the circumstances under which PHE alone may terminate the contract.* (Weinsten Decl. ¶ 4, Exh. D, Muratori Depo p. 45 and exh. At end of exhibit). The covering email states "In summary, attached are the contractual provisions pertaining to the possible causes of breach. The important parts are underlined. The consequences of a breach are in bold." (*Id.*).

In this critical email, Mr. Busanna specifically underlined the provisions of the agreement that *permit PHE to terminate* in the event Le Bonitas fails to meet its distribution requirements, and highlighted in bold the section that provides that all minimum guaranteed royalties become immediately due in the event of a termination. (*Id.* at pp. 47-48 and Exh. 80 therein).[5]  Mr. Busanna confirmed in his testimony that, *in*

---

[5] The Court may recall that Le Bonitas initially refused to produce this critical document, claiming falsely that it was covered by attorney-client privilege. The Court disagreed and ordered that it be produced.

*October of 2009*, he "was concerned that Le Bonitas would not meet its distribution requirements under the Paris Hilton contract." (Exh. C, Busanna Depo at p. 266).

When Le Bonitas owner, Mr. Muratori, was asked whether he was concerned on November 3, 2009 "that Ms Hilton might terminate this contract," he replied "Yes. That Hilton could cancel this contract, yes." (Exh. D, Muratori Depo p. 47). When later asked whether he discussed the November 3 email with Mr. Busanna, Mr. Muratori testified:

> ". . . the discussion, I believe, hinged on the fear we had that Paris Hilton might cancel the contract because we weren't coming out with the winter collection."

(*Id.* at pp. 58-59).[6]

Of course, no-one disclosed to PHE that Le Bonitas had decided to abandon the Paris Hilton line, or even that it was considering such a move. (Sibbald Decl. ¶ 17).

F.    ***Also Unbeknownst to PHE*, Le Bonitas Completed the Detailed Designs for the Fall/Winter Line by Mid-October 2009, But Did Not Send Them to PHE for Approval.**

Mr. Busanna confirmed that Le Bonitas did not wait for approval of the mood boards before proceeding with the next phase, i.e., the detailed designs. Rather, it requested that its designer, Romina Christodero, prepare them together and that everything be completed by September 20, 2009 as set forth in her contract. (Exh. C, Busanna Depo pp. 81-82; Marchino Decl. ¶ 2, Exh. S). Busanna confirmed that the detailed designs were in fact completed before October 12, 2009. (*Id.* at p. 87). However, when Ms. Christodero requested a meeting to discuss the detailed designs,

Le Bonitas product manager Patrizia Borselli responded that "following poor sales on the summer line, the company is evaluating how to proceed." (*Id.* at pp. 87-88).

Le Bonitas never disclosed this fact to PHE or Beanstalk; nor did they send these designs to PHE for approval, despite later claims that they were pressed for time. (Sibbald Decl. ¶ 18; Exh C., Busanna Depo p. 98). Indeed, with respect to the Spring/Summer line, Le Bonitas had Ms. Hilton approve samples simultaneous with the detailed designs to save time. (Sibbald Decl. ¶ 18; Exh C, Busanna Depo p. 94).

## G.  **Ms. Hilton Considers the Mood Boards on or About November 4 and Declines Approval.**

The mood boards sent by Beanstalk were received by Ms. Hilton's assistant Megan D'Amico at PHE's Los Angeles office on or about October 22, 2009. (D'Amico Decl. ¶ 2). Ms. Hilton was fully booked with work engagements that day, and then left the country between October 23 and 27. (D'Amico Decl. ¶ 2).

When the mood boards arrived, Ms. D'Amico was unaware that they were an official approval item, since the presentation did not include the required approval form filled out by Le Bonitas. (D'Amico Decl. ¶ 3). Through emails with Beanstalk exchanged between November 3 and November 4, Ms. D'Amico ultimately learned that Ms. Hilton's approval was required. (D'Amico Decl. ¶ 3). On November 4, Ms. D'Amico handed Ms. Hilton the mood boards just prior to her getting on a plane for a work appearance in Las Vegas. (D'Amico Decl ¶ 3).

Ms. Hilton specifically recalls that she was not happy with the designs and (as

---

[6] In obvious recognition of the damage done by this testimony, Mr. Muratori, or his lawyers, changed the testimony ***after the deposition was completed.*** They have

permitted by contract) wanted to think about them further. (Hilton Decl. ¶ 2). Thus, the designs were effectively disapproved unless and until Ms. Hilton changed her mind.

**H.   Although Dissatisfied, Ms. Hilton Ultimately Approves the Mood Boards as a Favor to Its Licensee.**

On November 18, Ms. Hilton met with Ms. D'Amico and again went through the mood boards. Ms. Hilton recalls at this meeting that she did not want to approve the designs, because she was still not happy with them. (Hilton Decl. ¶ 3). Ultimately, however, she decided to approve them with minimal comments, because Ms. D'Amico said this needed to get done right away and Ms. Hilton wanted to be a good partner. (Hilton Decl. ¶ 3). Indeed, Ms. Hilton had many other notes but decided not to force Le Bonitas to simply redo everything. (*Id.*) Ms. D'Amico also recalls Ms. Hilton saying she did not particularly care for the boards, but decided to sign off "as a favor" to Le Bonitas. (D'Amico Decl. ¶ 4). The comments were transmitted to Beanstalk that same day, and then forwarded to Le Bonitas on November 20. (Sibbald Decl. ¶ 19).

**I.   Le Bonitas Fails To Pay; PHE Terminates The Contract.**

On November 4, 2009, Mr. Busanna met in London with Ms. Brambring and Ms. Sibbald of Beanstalk to discuss the Paris Hilton line. Mr. Busanna confirmed that sales of the Spring/Summer line were a dismal €185,000 (compared with previous projections of €1,567,621). (Compare Exh. C, Busanna Depo p. 333 w/ Weinsten Decl. ¶ 5, Exh. G p. 4). He also told them that "due to the world financial crisis, we [Le Bonitas] had felt

added the following words at the end "if it became impossible." (Exh. D, change page).

its effects on all of our lines in sales." (Exh. C, Busanna Depo p. 330).  During this meeting, Mr. Busanna asked that PHE consider lowering the contractual minimum guaranteed royalties "due to the crisis that was hitting the entire market." (*Id.* at 333-334; *see also* Sibbald Decl. ¶ 7).  Mr. Busanna explained "we wanted to make it less difficult for us to move ahead so that we could bring this line out in that there were those very difficult sales previously." (*Id.* pp. 320-321).

On November 25, 2009, Ms. Sibbald wrote to Mr. Busanna stating that PHE was not willing to renegotiate the minimum guarantees at this early stage.  (Sibbald Decl. ¶ 20, Exh. Q).  Among other things, Ms. Sibbald explained that it was too early to conclude that the program would not be a success, that Le Bonitas had done very little marketing of the line, and that Le Bonitas could benefit from meeting with and coordinating with other licensees to leverage retail outreach.  (*Id.*)  That same day Le Bonitas wrote Beanstalk falsely claiming breach by PHE, and confirming that it would not be producing a Fall/Winter season.[7]  (Weinsten Decl. ¶ 9, Exh. I(a)).  Le Bonitas did, however, continue with production and delivery of the Spring/Summer line through February/March 2010 and was paid for those deliveries.  (Exh. C, Busanna Depo pp. 264-265, 378-379, 383-384).

On June 15, 2010, Le Bonitas was contractually required to pay the next installment of the minimum guarantees, i.e., €97,500.  (Exh. A, p. 32).  Le Bonitas,

---

[7] Although not material to this Motion, Le Bonitas could easily have produced samples in time for the Fall/Winter market which did not even begin until February 5, 2010. Indeed, with respect to the Spring/Summer line, the detailed designs were approved **just one month** prior to commencement of the market.  (Exh. C, Busanna Depo p. 108 & 129).  Since the Fall/Winter line includes no swimwear, it is only half as many pieces as the Spring/Summer line (Weinsten Decl. ¶ 6, Exh. E, Balli Depo pp. 80-81) requiring even less time to produce samples. (Exh. C, Busanna Depo p. 108).

however, failed to pay, causing Beanstalk to send a breach letter on July 16, 2010. (Herzfeld Decl. ¶ 6; Exh. B). Having failed to pay and/or cure its various other breaches (including breach of its distribution obligations), PHE formally terminated the License Agreement on January 11, 2011. (Weinsten Decl. ¶ 7; Exh. H).

J.     **The Allegations of Le Bonitas' Complaint.**

Despite an unambiguous covenant not to sue regarding approvals, and undisputed facts contradicting its claim, Le Bonitas has made the tactical choice to file a frivolous lawsuit alleging that PHE breached the License Agreement by not responding to its design submission within ten business days. The Complaint alleges:

(a)     "the parties [ ] agreed that Le Bonitas would submit to PHE all items [ ] bearing or incorporating the Property and that PHE had the right, in its sole discretion, to give advance written approval of such items at the concept stage, the final art stage, and the final physical stage . . ." (Cmplt ¶11);

(b)     "Pursuant to Section 5.1(2) of the License Agreement applicable to the approval process, PHE had ten business days within which to 'review and respond in writing to each of [Le Bonitas'] submissions. If [PHE] does not respond to such submission within such ten (10) day business period, such submission shall be deemed disapproved." (Cmplt ¶ 12);

(c)     "by early October 2009, Le Bonitas was able to submit to PHE a CD containing a final stages presentation of, inter alia, prototypes and product samples for the collection in order to receive either final approvals or comments in sufficient time to

incorporate them, manufacture the samples and show the collection at the industry trade fairs as planned and as contemplated by the parties." (Cmplt ¶13)[8];

(d)    "[o]n or about November 20, 2009, PHE, through Beanstalk, finally gave limited comments, but only with respect to the inspiration boards for the collection." (Cmplt ¶ 26); and

(e)    "PHE breached its obligations to engage in the approval process with Le Bonitas, to do so in good faith, and to timely, cooperatively and collaboratively review and respond to submissions" (Cmplt ¶ 39).

In sum, Le Bonitas is seeking rescission and damages for what amounts to an alleged 29-day delay in PHE's response to a CD presentation.

Despite these allegations, and a year of discovery, Le Bonitas has not, and cannot, establish any evidence that either Beanstalk or PHE acted in bad faith. Quite to the contrary, the undisputed facts show that it is Le Bonitas that has acted in bad faith. Regardless, as set forth below, the claims asserted are barred by contract.

**K.    Le Bonitas' Claimed Damages Are Based On Wildly Inaccurate Projections.**

Le Bonitas is asking for €1,446,061 in lost profits from projected sales between 2010 and 2014. (Exh. G, p. 4). According to Mr. Busanna, this claim is based on sales projections he prepared *in 2008* at the outset of the contract. (Exh C, Busanna Depo pp. 348-349 & 352). Of course, *no back up has ever been provided to support those projections* and they turned out to be wildly inaccurate. As Mr. Busanna

---

[8] It is undisputed that this allegation is false, although Le Bonitas has never bothered to fix this part of the pleading. Le Bonitas submitted only inspiration or "mood" boards, not a final stages presentation, prototypes or samples. (Sibbald Decl. ¶ 21).

confirmed, actual sales for the Spring/Summer line were 12% of projections. (*Id.* at p. 357). When asked if he would have to "substantially revise" his projections in view of *actual sales* in the first season, he testified "probably yes, due to the financial crisis. I don't know about the future." (*Id.* at pp. 357-358).

Mr. Busanna also confirmed that sales for swimwear and lingerie are in large part driven by the designs for the product and, in this case, no designs had been created at the time the projections were made. (*Id.* at p. 358). Indeed, no designs were ever created for any season other than Spring/Summer 2010, rendering any attempt to quantify future sales of this yet undesigned product line entirely speculative. This is particularly true in this case, where Le Bonitas had never before designed, manufactured or sold a celebrity line and was new to this business. (*Id.* at p. 326).

## L.   **PHE's Counterclaim**

PHE has filed a counterclaim against Le Bonitas for breach of various requirements in the License Agreement, including among others: (a) Le Bonitas' failure to pay PHE €1,127,500 in minimum guaranteed royalties owed under the contract; and (b) Le Bonitas' failure to meet the distribution requirements of Section 14.1 of the License Agreement, including without limitation, the requirement to "use its best efforts to sell, distribute and supply the LICENSED ARTICLES within the LICENSED TERRITORY hereof," and the requirement to "begin the bona fide manufacture, distribution and sale of the LICENSED ARTICLES in each country in the LICENSED TERRITORY on or before the Distribution Start Date" of January 1, 2010. (Exh. A, Sec. 14.1 & exh. 9 therein, pp. 25 & 33).

As demonstrated by the testimony of its own executives (set forth above), it is

clear that after receiving dismal reports of poor sales on its Spring/Summer line of swimwear and lingerie (which was just the first season in a five-year contract), Le Bonitas simply decided to abandon the contract, and launched this frivolous lawsuit as a tactical measure to avoid paying the full amount of minimum royalties now due.

In its counterclaim, PHE is seeking to recover the €1,127,500 due under its contract (in U.S. dollars valued as of the breach in November 2009), plus interest at the legal rate and attorney fees and costs. As set forth below, based on the undisputed facts of this case, this Court can and should dismiss the entirety of Le Bonitas' complaint with prejudice, and enter judgment in PHE's favor on its counterclaim.

### ARGUMENT

Summary judgment is appropriate when "there is no genuine issue as to any material fact," and "the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden under Rule 56(c), the burden of production shifts, and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Specifically, the nonmoving party must come forward with "'specific facts showing that there is *a* genuine *issue for trial.'*" *Id.* at 587 (citations omitted).

"Mere conclusory statements, conjecture or speculation" by the plaintiff will not defeat a summary judgment motion. *Gross v. National Broad. Co., Inc.,* 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002). Moreover, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," as "there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- 'whether there is [evidence] upon which a jury can properly

K:\4955-2\PLE\motionfor summary judgment 102011.doc
PHE's Motion for Summary Judgment and/or Partial Summary Adjudication

21

proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'" *Id.* (citation omitted).

**A.      Le Bonitas' Complaint Should be Summarily Dismissed As Barred By An Unambiguous Covenant Not To Sue.**

A covenant not to sue is fully enforceable under New York law.  *See Kamfar v. New World Restaurant Group, Inc.*, 347 F. Supp. 2d 38, 51 (S.D.N.Y. 2004) (Judge Kaplan held covenant not to sue barred defamation claims brought by former chairman against corporation he worked for); *Joao v. Cenuco, Inc.*, 376 F. Supp. 2d 380, 382 (S.D.N.Y. 2005) ("if two parties sign a covenant not to sue each other, then a dispute arising out of the conduct covered by that agreement cannot provide a basis for a justiciable controversy under New York law, and the case must be dismissed."); *Chieco v. Paramarketing, Inc.*, 228 A.D.2d 462, 643 N.Y.S.2d 668 (2d Dept. 1996) (negligence claims brought by buyer of paragliding unit against seller were dismissed on summary judgment, where plaintiff signed an agreement releasing defendant from all liability for personal injuries caused by seller's negligence); *Tedesco v. Triboro Bridge and Tunnel Authority*, 250 A.D.2d 758, 673 N.Y.S.2d 181 (2d Dept. 1998) (Injury claims brought by bicyclist against bridge and tunnel authority were barred by agreement signed by bicyclist prior to his participation in a cycling tour; summary judgment affirmed).

In this case, Le Bonitas clearly and unambiguously covenanted that it "shall not have *any* rights against [PHE] for damages or other remedies by reason of *[PHE's] failure or refusal to grant any approval referred to in this Section 5."* (Exh. A, Sec. 5.1(8)) (emphasis added).  Here, however, Le Bonitas is doing exactly what it promised it would not do- - seeking *damages and other remedies* on the basis that PHE allegedly *failed to approve* its designs within a certain time period.  *See, e.g.,* Complaint ¶ 12 ("Pursuant to Section 5.1(2) of the License Agreement applicable to the approval process, PHE had ten business days within which to 'review and respond in

writing to each of [Le Bonitas'] submissions . . ."); Complaint ¶ 13 ("by early October 2009, Le Bonitas was able to submit to PHE a CD containing a final stages presentation . . ."); Complaint ¶ 26 ([o]n or about November 20, 2009, PHE, through Beanstalk, finally gave limited comments . . ."). In short, Le Bonitas' complaint is based on the *exact* conduct covered by its covenant not to sue. There is no ambiguity here whatsoever. Le Bonitas' claims must be dismissed as a matter of law.

B.   **Le Bonitas' Claims Should Be Dismissed For The Additional Reason That It Cannot, As A Matter Of Law, Establish A Breach.**

In order to establish a claim for breach of contract, a plaintiff must plead and prove: "(a) a contract; (b) performance of the contract by one party; (c) breach by the other party; and (4) damages." *First Investors Corp., et al. v. Liberty Mutual Insurance Co.*, 152 F.3d 162, 168 (2d Cir 1998). Here, Le Bonitas cannot as a matter of law establish *any* breach by PHE.

The premise of Le Bonitas' Complaint is that PHE breached by failing to approve its designs within a ten business day period. The contract, however, on its face, does not actually require PHE to "approve" or "disapprove" submissions within ten business days, or any time period for that matter. Rather, the contract states that PHE "shall have" up to ten business days to "review and respond" to submissions, but that if PHE "does not respond to such submission within such ten (10) business day period, such submission shall be deemed disapproved." (Exh. A, Sec. 5.1(2), p. 11). In other words, the parties expressly contemplated that PHE might not *respond* to a submission within ten days and, in such event, the submission is disapproved. Thus, even assuming PHE did not respond in ten business days, and that is not the case, the result is that the designs are considered disapproved- not a claim for breach of contract.

Regardless, it is undisputable that in fact PHE, through its agent, did *respond* to the submission within ten business days. As demonstrated by the testimony of Mr.

Busanna, and emails between Le Bonitas and Beanstalk, Beanstalk responded to the submission immediately by asking for a meeting to go over the designs.  Moreover, it is further undisputed that Beanstalk continued to engage in a dialogue with Le Bonitas, which included a review of the designs at a November 4 meeting in London.

It is equally undisputed that Ms. Hilton too engaged in the process.  As soon as she actually received the designs on November 4, she reviewed them and expressly withheld her approval *as she was permitted to do under her contact.*  The fact that she subsequently decided to permit Le Bonitas to go forward, *as a favor*, is not and cannot be deemed evidence of a breach.

PHE anticipates that Le Bonitas will attempt to claim that PHE is bound by the covenant of good faith a fair dealing, and that whether or not the covenant is breached is a question of fact for a jury.  That argument, however, fails for at least three reasons:

First, *on its* face, the covenant not to sue bars *any* claims related to approvals, whether based on express or implied terms of the contract;

Second, under New York law, *specific* provisions of a contract govern over the *general. Green Harbour Homeowners' Ass'n, Inc. v. G.H. Development & Const., Inc.,* 789 N.Y.S.2d 319, 321 (2005) (Where a contract "employs contradictory language, specific provisions control over general provisions."); *Muzak Corp. v. Hotel Taft Corp.,* 1 N.Y.2d 42, 46 (1956) ("Even if there was an inconsistency between a specific provision and a general provision of a contract (we find none), the specific provision controls."); *Waldman v. New Phone Dimensions, Inc.,* 109 A.D. 702, 704 (1985) ("Where general and special provisions appear, special provisions control.")

Accordingly, as a matter of law, a *general* obligation to act in good faith, whether express or implied, cannot negate the very *specific* provisions that: (a) grant PHE "sole and absolute discretion" over approvals (Section 5.1), (b) permit PHE to disapprove a submission by not responding to it in ten days (Section 5.1(2)), and (c) preclude Plaintiff from suing for "any" failure or refusal to approve designs (Section 5.1(8)).  Indeed, the

whole purpose of these provisions is to avoid litigation over whether or not PHE's exercise of its discretion over approvals was done properly and/or in good faith. Obviously, individual tastes may differ and the point of this contract is that PHE's decisions cannot be challenged *for any reason*.  Again, the results may be harsh for Le Bonitas, but that is exactly what it agreed to; and

Third, there are no facts at all from which a reasonable juror may infer a lack of good faith on the part of PHE or Beanstalk.

Absent any evidence of a breach by PHE, Le Bonitas' claims can and should be dismissed in their entirety.

## C.    Judgment Should Be Entered In Favor Of PHE On Its Counterclaim.

Le Bonitas does not and cannot dispute the following Facts: (1) Le Bonitas did not pay PHE the minimum guaranteed royalties due on June 15, 2010; and (2) on or before November 25, 2009, Le Bonitas abandoned its distribution obligations (including its obligation to use "best efforts" to sell, distribute and supply the licensed articles in each applicable country), and did not meet its obligation to commence "bona fide" manufacture, distribution and sale in every licensed territory by January 1, 2010. Therefore, unless Le Bonitas' performance was excused (which is not the case as demonstrated above), Le Bonitas was in breach as of November 25, 2009.

Damages are also not in dispute, as PHE is only seeking those damages set forth in the contract, i.e., payment of the remaining €1,127,500 in minimum guaranteed royalties ($1,685,530 by the exchange rates in existence on November 25, 2009, Weinsten Decl. ¶ 8, Exh. I), together with interest at the statutory rate, plus contractual attorneys fees (to be submitted at the conclusion of the case).

Absent any triable issues on liability and damages, summary judgment can and should be entered in favor of PHE on its counterclaim.

**D.**   **In the Event the Court Declines to Dismiss Le Bonitas' Complaint, Le Bonitas' Claim for Lost Profits Should be Dismissed as Unduly Speculative.**

Assuming Le Bonitas can proffer evidence of some breach by PHE, it cannot tie that specific breach to any realistic, non-speculative claim for lost profits.

"The law in New York is well settled that '[a] party may not recover damages for lost profits unless they were within the contemplation of the parties at the time the contract was entered into **and are capable of measurement with reasonable certainty.'**" *Zink v. Mark Goodson Prods., Inc.*, 261 A.D.2d 105, 106 (1st Dep't 1999) (emphasis added) (claim for lost profits from a television game show which had not been aired dismissed on summary judgment as too speculative).  *See also Kenford Co. v. Cnty. of Erie*, 67 N.Y.2d 257, 261 (1986)) (plaintiff could not, as a matter of law, recover lost profits from operation of a domed stadium to be constructed by defendant; Although court considered quantity of proof on lost profits to be "massive" and "represent[ing] the industries most advanced and sophisticated method for predicting the probable results  of contemplated projects," the Court held "the ultimate conclusions are still projections, and as employed in the present day commercial world, subject to adjustment and modification."); *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) ("Projections of future profits based upon 'a multitude of assumptions' that require 'speculation and conjecture' and few known factors do not provide the requisite certainty.") (quoting *Kenford*, 67 N.Y.2d at 261); *David v. Glemby Co.*, 717 F. Supp. 162, 170 (S.D.N.Y. 1989) (hair stylist could not recover lost future profits resulting from breach of agreement to establish salons in the U.S.; granting partial summary judgment, Court held "plaintiff's damage calculations [for lost profits] . . . are too speculative by the

PHE's Motion for Summary Judgment and/or Partial Summary Adjudication

standard established in earlier cases."); *Freund v. Wash. Sq. Press, Inc.*, 34 N.Y.2d 379, 382 (1974) (reversing trial court's award of monetary damages in breach of contract suit; damages for loss of royalties held *too speculative*) (citation omitted).

These principles are especially relevant in cases where a party attempts to estimate lost profits from a new business venture. In *Schonfeld*, the Court of Appeal for the Second Circuit noted that "evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate." 218 F.3d at 172. *See also DuPont Flooring Sys., Inc. v. Discovery Zone, Inc.*, No. 98 Civ. 5101 (SHS), 2004 WL 1574629, at *9 (S.D.N.Y. July 14, 2004) (party seeking lost profits failed as a matter of law to prove its losses with reasonable certainty because it had "no ability to provide reliable information based on past earnings.")

For instance, in *Schonfeld*, the plaintiff, a shareholder of a fledgling cable television channel, sued his business partner in the venture, claiming that the partner's breach of a funding obligation caused the newly formed business to fail. 218 F.3d at 175. To support his lost profits claim, the plaintiff proffered projections contained in a business plan created by the defendants themselves. *Id.* at 171. The Court determined that "[a]lthough lost profits need not be proven with 'mathematical precision,' they must be "capable of measurement based upon known reliable factors without undue speculation." *Id.* at 172 (citing *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 403 (1993)). Applying New York law, the Second Circuit affirmed the Court's rejection of the lost profits claim by this start-up business. *Id.* at 175.

In this case, Le Bonitas is claiming damages for lost profits based solely upon wildly unrealistic and inaccurate projections rather than mathematical calculations

based on concrete sales history.  In fact, *no back up data at all* has been provided to

support the 2008 projections.  Specifically, Le Bonitas is asking for €1,446,061 in lost

profits based on *projected sales* between 2010 and 2014 as *estimated* in 2008.  Not

surprisingly, those projections turned out to be totally inaccurate -- actual sales for the

spring/summer line came in at *12%* of the projections.  It is evident that Le Bonitas'

attempt to quantify *future sales* of an undesigned product line was entirely speculative

and unreliable.  This is particularly true in this case, where Le Bonitas had never before

designed, manufactured or sold a celebrity line and was new to this type of business.

Further, Le Bonitas was not even in a position to proceed with the clothing

venture because the company terminated its distributors in October 2009 due to poor

sales.  Mr. Busanna also confirmed that sales for swimwear and lingerie are in large

part driven by the designs for the product and, in this case, *no designs had been*

*created at the time the projections were made*.  Accordingly, there *is no* information

upon which a reasonable profit calculation may be based, and none has been

produced.  The lost profits claim should be summarily dismissed as pure speculation.

E.    **Le Bonitas Has Waived its Claim for Rescission, and Has No Legal Basis**
      **To Seek Return of Its Initial Minimum Guarantee Payment To PHE.**

Finally, in addition to lost profits, Le Bonitas is seeking rescission and return of

the €97,500 paid upon signing the contract.  (Exh. G, p. 3).  Under New York law, Le

Bonitas is not entitled to these monies because it waived its right to rescind the

agreement.  The Second Circuit has pointedly and "categorically stated that '[any] action

for rescission must be initiated without unreasonable delay.'"  *Ballow, Brasted, O'Brien*

*& Rusin, P.C. v. Logan*, 435 F.3d 235, 240 (2d Cir. 2006) (quoting *Allen v. WestPoint-*

PHE's Motion for Summary Judgment and/or Partial Summary Adjudication

*Pepperell, Inc.*, 945 F.2d 40, 47 (2d Cir. 1991)).  By continuing to operate through February/March 2010 as if the License Agreement were in effect and continuing to reap the financial benefits of that Agreement despite its belief that PHE was in breach of the contract, Le Bonitas abandoned its claim for rescission.  *See V.S. International S.A., et al. v. Lopez,* 862 F. Supp. 1188, 1196 (S.D.N.Y. 1994) (Licensee deemed to have waived rescission claim by continuing to use Licensor's name and receive benefits of the contract after alleged breach by Licensor); *Lazard Freres & Co. v. Crown Sterling Management, Inc.,* 901 F.Supp. 133, 136 (S.D.N.Y. 1995) (under doctrine of election of remedies, when a party materially breaches a contract, the non-breaching party may choose to continue to perform the contract or it may refuse to continue and terminate the agreement, but not both); *see also Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.,* 103 F. Supp. 2d 711, 736 (S.D.N.Y. 2000), *aff'd,* 294 F.3d 383 (2d Cir. 2002) (accord).

As succinctly set forth in *Net2Globe International, Inc. v. Time Warner Telecom of New York*, 273 F. Supp. 2d 436, 457 n.13 (S.D.N.Y. 2003), courts of New York and of this District and Circuit have long held that "the power to terminate a continuing contract because of a particular breach of that contract is a power of election . . . .  Where a contract is broken in the course of performance, the injured party has a choice presented to him of continuing the contract or of refusing to go on. If the injured party chooses to go on, he loses his right to terminate the contract because of the default." *Apex Pool Equip. Co. v. Lee*, 419 F.2d 556, 562 (2d Cir. 1969) (citations omitted; internal quotations omitted); *see ESPN, Inc. v. Office of the Comm'r of Baseball,* 76 F. Supp. 2d 383, 387-88 (S.D.N.Y. 1999) (same, adding: "Once a party elects to continue

the contract, [it] can never thereafter elect to terminate the contract based on that breach, although [it] retains the option of terminating the contract based on other, subsequent breaches.") (citations omitted; internal quotations omitted) (*quoting Bigda v. Fischbach Corp.*, 898 F. Supp. 1004, 1011-12 (S.D.N.Y.1995)); *Emigrant Indus. Sav. Bank v. Willow Builders, Inc.*, 290 N.Y. 133, 48 N.E.2d 293, 299 (1943) ("Where a contact is broken in the course of performance, the injured party has a choice presented to him of continuing the contract or of refusing to go on . . . . If the injured party chooses to go on, he loses his right to terminate the contract because of the default.") (citations omitted; internal quotations omitted).

Le Bonitas cannot have it both ways. When Le Bonitas decided to continue exercising its rights under the contract to manufacture and deliver product in 2010, *after it had declared breach in November 2009,* Le Bonitas acted in a manner inconsistent with its claim for rescission, obtained the benefits of the License Agreement (and was paid for delivery of the Spring/Summer line), and forfeited its right to seek rescission. *See CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 415-16 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 56 (2d Cir. 2009) (quoting *Net2Globe,* 273 F. Supp. 2d at 457 n.13); *Cont'l Ins. Co. v. Helmsley Enters., Inc.*, 211 A.D.2d 589, 589 (1st Dep't 1995) (holding that an insurer waives the right to rescission by accepting premiums after learning of an event allowing for cancellation of the policy).

Absent a claim for rescission, there is simply no legal theory under which Le Bonitas could possibly recover the first installment of the minimum guaranteed royalties. Le Bonitas should, therefore, be precluded from any claim for return of the €97,500 paid as the initial installment of PHE's minimum guarantees royalties.

## CONCLUSION

For all the reasons stated above, PHE respectfully requests that this Court grant this its motion for summary judgment, that Le Bonitas' claims be dismissed in their entirety with prejudice, and that judgment be entered in favor of PHE on its counterclaims in the amount of $1,685,530, plus interest at the statutory rate commencing from November 25, 2009, plus attorneys fees and costs.  In the alternative, if the Court determines that triable issues of fact exist, then PHE respectfully requests that the Court grant partial summary adjudication dismissing Le Bonitas' claims for lost profits and rescission.

Dated:   January 17, 2012

LAVELY & SINGER PC

By: _____
Michael E. Weinsten

2049 Century Park East, Suite 2400
Los Angeles, CA, 90067
(310) 556-3501
mweinsten@lavelysinger.com

*Attorneys for Defendant*
*Admitted Pro Hac Vice*

FRANKFURT KURNIT KLEIN & SELZ PC

By: _____
Maura J. Wogan

488 Madison Avenue
New York, NY, 10022
(212) 980-0120
mwogan@fkks.com

*Attorneys for Defendant*