UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LE BONITAS S.P.A., | |
| Plaintiff, | Case No. 10 Civ. 9350 (AKH) |
| - against - | ECF Case |
| PARIS HILTON ENTERTAINMENT INC., | |
| Defendant. | |

## MEMORANDUM OF LAW OF PLAINTIFF LE BONITAS S.P.A. IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY ADJUDICATION

Martin Garbus, Esq.
Joseph T. Johnson, Esq.

EATON & VAN WINKLE LLP
Attorneys for Plaintiff Le Bonitas S.p.A.

3 Park Avenue
New York, New York 10016
(212) 779-9910

# **TABLE OF CONTENTS**

*Page*

Table of Authorities...................................................................................iii

Table of Exhibits.......................................................................................v

Preliminary Statement................................................................................1

Statement of Facts.....................................................................................5

      PHE's delay and lack of any legitimate excuse are undisputed.......................5

        I.     It is uncontradicted that PHE had a contractual obligation to engage in the approval process and to review and respond regarding approvals as set forth in the licensing agreement...........................................................................5

        II.    It is uncontradicted Beanstalk was PHE's disclosed licensing agent: PHE's approval obligation started when Beanstalk received submissions from Le Bonitas.......................................7

        III.   It is uncontradicted that the Spring/Summer Collection was manufactured, sold and distributed.........................................9

        IV.   PHE's failure to engage in the approval process, as evidenced by its extended delay in approving the inspiration boards for the Fall/Winter Collection, was a breach of contract...........................................................10

             A.  Communications between Le Bonitas and Beanstalk show that Beanstalk contributed to PHE's inexcusable breach of contract............................................................10

             B.  Communications between Beanstalk and PHE further show the inexcusable breach of contract............................14

             C.  Testimony of Paris Hilton and Megan D'Amico further shows the lack of any legitimate excuse and an indifference and total disregard for PHE's contractual obligations...........................................................20

        V.    PHE's breach of contract was material....................................23

Argument..................................................................................................24

    I.     Point I – Summary Judgment Should Be Granted Because
          PHE Materially Breached Its Obligation To Review And
          Respond To Le Bonitas's Submission....................................24

          A.  The License Agreement Is Unambiguous: Summary
              Judgment May Be Granted When The Terms Are
              Applied To The Undisputed Facts.....................................25

          B.  Any Ambiguity Must Be Construed Strongly Against
               PHE And In Favor Of A Finding Of Breach..........................29

          C.  The Extrinsic Evidence Is One-Sided In Favor Of
              Le Bonitas And A Finding of Breach..................................30

          D.  Le Bonitas Has Performed Its Obligations Under
               The License Agreement................................................34

          E.  The License Agreement Does Not Expressly Bar
              Recovery Of Damages In These Circumstances..................38

    II.    Point II – Summary Judgment Should Be Granted
          Dismissing That Portion Of PHE's Counterclaim
          Seeking Legal Fees......................................................42

Conclusion.............................................................................................49

## Table of Authorities

_Cases_                                                                    _Page_

239 E. 79th Owners Corp. v. Lamb 79 & 2 Corp.,
30 A.D.3d 167 (1st Dep't 2006)…………………………………………………………..25

Burgos v. Metro-North Commuter R.R.,
40 A.D.3d 377 (1st Dep't 2007)…………………………………………………………..31

Compagnie Financiere De Cic Et De L'-Union Europeenne v.
Merrill Lynch, Pierce, Fenner & Smith Inc.,
232 F.3d 153 (2nd Cir. 2000)………………………………………………………..25, 30

Cone v. Stranahan,
44 A.D.3d 1145 (3rd Dep't 2007)………………………………………………………..29

D.C. USA Operating Co. v. Indian Harbor Ins. Co.,
2007 WL 945016 (S.D.N.Y. 2007)………………………………………………………..41

EMI Entm't World v. Karen Records,
603 F.Supp.2d 759 (S.D.N.Y. 2009)………………………………………………………..8

Fuller-Mosley v. Union Theological Seminary,
47 A.D.3d 487 (N.Y. 1st Dep't 2008)……………………………………………………47

Graphic Scanning Corp. v. Citibank,
116 A.D.2d 22 (N.Y. 1st Dep't 1986)………………………………………………..38, 40

Hooper Assocs., Ltd. v. AGS Computers, Inc.,
74 N.Y.2d 487 (N.Y. 1989)…………………………………………………..42, 44, 45, 47

IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.,
26 F.3d 370 (2nd Cir. 1994)……………………………………………………………..31

Jacobson v. Sassower,
66 N.Y.2d 991 (N.Y. 1985)…………………………………………………..29, 36, 41, 48

Kass v. Kass,
91 N.Y.2d 554 (N.Y. 1998)………………………………………………………………..25

Matter of Big Tree Energy Partners v. Bradford,
219 A.D.2d 27 (3rd Dep't 1996)………………………………………………………….31

Nathan v. Cooper,
2007 WL 4352705 (S.D.N.Y. 2007)………………………………………………………48

Oppenheimer & Co. v. Metal Mgmt.,
2011 WL 2462588 (S.D.N.Y. 2011)……………………………………………………47

Oscar Gruss & Son, Inc. v. Hollander,
337 F.3d 186 (2nd Cir. 2003)……………………………………………………………47

Pro Net, LLC v. ACC Telecom Corp.,
294 A.D.2d 857 (N.Y. 4th Dep't 2002)………………………………………………38, 41

Sero v. New York Cent. Lines,
2010 WL 2294440 (W.D.N.Y. 2010)……………………………………………………44, 46

Terminal Central, Inc. v. Henry Modell & Co.,
212 A.D.2d 213 (N.Y. 1st Dep't 1995)…………………………………………………38

Travelers Prop. Cas. Corp. v. Winterthur Int'l.,
2002 WL 1391920 (S.D.N.Y. 2002)……………………………………………………46

U.S. Bank Nat'l Ass'n v. Southwest Airlines Co.,
2009 WL 2163594 (S.D.N.Y. 2009)……………………………...............25, 26, 27, 34

U.S. Fid. and Guar. Co. v. Delmar Dev. Partners,
14 A.D.3d 836 (3rd Dept. 2005)…………………………………………………...31

## Other Authorities

Restatement (Third) of Agency, § 5.02 (2006)……………………………………………8

Rule 56 of the Federal Rules of Civil Procedure………………………………………1, 49

## TABLE OF EXHIBITS

<table>
<tr><td><b><i>EXHIBIT #</i></b></td><td><b><i>DESCRIPTION</i></b></td></tr>
<tr><td>1</td><td>License Agreement, made as of February 1, 2009, between Paris Hilton Entertainment Inc. and Le Bonitas S.p.A.</td></tr>
<tr><td>2</td><td>The Beanstalk Group Licensee Welcome Pack</td></tr>
<tr><td>3</td><td>Inspiration boards for Fall/Winter Collection 2010-2011</td></tr>
<tr><td>4</td><td>E-mail Exchange between Johanna Brambring and Patrizia Borselli, dated October 8, 2009</td></tr>
<tr><td>5</td><td>E-mail Exchange between Johanna Brambring and Gianni Busanna, dated October 13, 2009</td></tr>
<tr><td>6</td><td>E-mail Exchange between Johanna Brambring and Gianni Busanna , dated October 20-21, 2009</td></tr>
<tr><td>7</td><td>E-mail Exchange between Johanna Brambring and Patrizia Borselli, dated October 26-26, 2009</td></tr>
<tr><td>8</td><td>E-mail Exchange between Johanna Brambring and Gianni Busanna, dated November 2-3, 2009</td></tr>
<tr><td>9</td><td>E-mail from Johanna Brambring to Gianni Busanna, dated November 20, 2009</td></tr>
<tr><td>10</td><td>Registered Letter from Le Bonitas S.p.A to The Beanstalk Group UK Ltd., dated November 25, 2009</td></tr>
<tr><td>11</td><td>E-mail from Johanna Brambring to Gianni Busanna. dated November 30, 2009, attaching Beanstalk "Protocol"</td></tr>
<tr><td>12</td><td>Endorsed Letter-Order, filed October 6, 2011</td></tr>
<tr><td>13</td><td>Le Bonitas's Complaint, filed December 15, 2010</td></tr>
<tr><td>14</td><td>PHE's Answer To Complaint, filed March 23, 2011</td></tr>
<tr><td>15</td><td>PHE's Counterclaim, filed January 27, 2012</td></tr>
<tr><td>16</td><td>Le Bonitas's Answer To Counterclaim, filed March 4, 2011</td></tr>
<tr><td>17</td><td>Excerpts from the deposition of Paris Hilton, taken on October 27, 2011</td></tr>
<tr><td>18</td><td>Paris Hilton Master Schedule for October 21, 2009 to November 18, 2009</td></tr>
<tr><td>19</td><td>Excerpts from the deposition of Megan D'Amico, taken on October 26, 2011</td></tr>
<tr><td>20</td><td>Excerpts from the deposition of Oliver Herzfeld, taken on December 19, 2011</td></tr>
<tr><td>21</td><td>E-mail Exchange between Johanna Brambring and Megan D'Amico, dated October 27, 2009</td></tr>
<tr><td>22</td><td>E-mail Exchange (a continuation of the preceding exchange) between Megan D'Amico and Johanna Brambring as produced by PHE, starting October 27, 2009 and ending November 3, 2009</td></tr>
<tr><td>23</td><td>E-mail Exchange (another continuation of the preceding exchange) between Megan D'Amico and Johanna Brambring starting October 27, 2009 and ending November 4, 2009</td></tr>
<tr><td>24</td><td>E-mail Exchange (and annexed meeting notes) from Johanna Brambring to Serena Sibbald, dated November 5, 2009</td></tr>
<tr><td>25</td><td>E-mail Exchange between Paris Hilton and Megan D'Amico starting November 5, 2009 and ending November 9, 2009</td></tr>
<tr><td>26</td><td>E-mail Exchange between Johanna Brambring and Megan D'Amico (another continuation of a preceding exchange) (with attachment) starting October 27, 2009 and ending November 11, 2009</td></tr>
<tr><td>27</td><td>E-mail Exchange between Megan D'Amico and Johanna Brambring, dated November 11, 2009</td></tr>
<tr><td>28</td><td>E-mail from Johanna Brambring to Serena Sibbald, dated November 16, 2009</td></tr>
<tr><td>29</td><td>E-mail Exchange (another continuation of a preceding exchange) starting October 27, 2009 and ending November 17, 2009 and a forward of same from Megan D'Amico to Paris Hilton, dated November 17, 2009</td></tr>
<tr><td>30</td><td>E-mail Exchange between Johanna Brambring and Megan D'Amico starting November 17, 2009 and ending November 18, 2009</td></tr>
<tr><td>31</td><td>Letter, dated April 21, 2010, from Miri Frankel of The Beanstalk Group to Martin Garbus</td></tr>
<tr><td>32</td><td>Calendar of October and November 2009</td></tr>
</table>

This memorandum of law is submitted by Plaintiff and Counter-Claim Defendant Le Bonitas S.p.A. ("Le Bonitas") in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP") seeking (i) judgment as to liability on its breach of contract claim, or, in the alternative (ii) dismissal of that portion of Defendant and Counter-Claimant Paris Hilton Entertainment Inc.'s ("PHE") counterclaim seeking legal fees.

## PRELIMINARY STATEMENT

The issues in the case were distilled and framed by the Court in its October 6, 2011 Endorsed Letter-Order, in which it held that "[i]t shall be defendant's burden to prove why failure to respond within 10 days, License Agreement, ¶ 5.1(2), was excusable...." (Exh. 12 to Declaration of Martin Garbus ["Garbus Decl."].)

The proof shows that PHE did not do what it agreed to do, depriving Le Bonitas of the benefit of the bargain.  There is no excuse.  It is rare that the "uncontradicted facts" are as uncontradicted as they are here.

The parties entered into a license agreement.  Le Bonitas obtained a license to use the *Paris Hilton* brand and name to sell women's lingerie and swimwear, and PHE had a right to written approval over all items at the concept stage, final art stage and final sample stage.

PHE failed to engage in the required approval process -- it failed to respond for an extended period of time during the fall of 2009 to Le Bonitas's submission seeking approval over "inspiration" a/k/a "mood" boards (at the concept stage). This approval was necessary to develop and finalize the second

seasonal (Fall/Winter) collection using the *Hilton* name.

It is uncontradicted that the operative provision of the license agreement concerning approvals provided that:

> OWNER shall have ten (10) business days from OWNER's actual receipt to review and respond in writing to each of LICENSEE's submissions.   If OWNER does not respond to such submission within such ten (10) business day period, such submission shall be deemed disapproved.

(Exh. 1 to Declaration of Gianni Busanna ["Busanna Decl."] at Section 5.1(2).)

It is uncontradicted that PHE's licensing agent ("Beanstalk") sends each of PHE's licensees (including Le Bonitas) a "Welcome Pack", which is consistent with the license agreement.   It states "[w]hen submitting materials for approval, please allow for the contractual turnaround time of 10 business days for a response" but that "most clients respond before this time frame."   (Exh. 2 to Busanna Decl. at pg. 16.)   Elsewhere, it says "[a]s stated in your contract please allow for the contractual turnaround time for a response when submitting material for approval.   Submissions will be reviewed and returned in a timely manner." (Exh. 2 at pg. 5.)

It is uncontradicted that Beanstalk also sent Le Bonitas a "Protocol", which is also consistent with the license agreement.   It states that "[a]s a reminder, no licensed product may be distributed unless it has been reviewed and final written approval granted.   If a response is not received within ten business days, please contact The Beanstalk Group."   (Exh. 11 to Busanna Decl. at pg. 2.)

The same ten business day approval clause is contained in PHE's other license agreements.   Ms. Hilton was familiar with the clauses. (Exh. 17 to Garbus

2

Decl. at 6-8.)

It is uncontradicted that PHE cannot meet the burden set forth in the Court's 10-6-11 Letter-Order, since there is no "excuse" for its extended failure to respond.  PHE breached the contact.

It is uncontradicted that Beanstalk did nothing with the inspiration boards for nine business days of the ten business day turnaround time, before finally sending them to PHE for review (from October 8-21, 2009).  It is uncontradicted that a week later (on Oct. 28th), Beanstalk admitted that Paris Hilton had not yet even commented on the boards but would "as soon as she can."  It is uncontradicted that a week after that (on Nov. 3rd), Beanstalk advised that Ms. Hilton had approved the boards, only to advise later that same day that this was false.  It is uncontradicted that Ms. Hilton was not even given the boards (on Nov. 4th) until thirteen days after they were received in her home-office, and then she lost them.  Two more weeks passed before PHE finally approved the boards (on Nov.20th).[1]  Throughout this time, Beanstalk assured Le Bonitas that approval was imminent.

Ms. Hilton's "master schedule" during this time shows that while she was vacationing, filming cameos and promoting herself, she had plenty of time to spend the ten minutes necessary to review and approve the boards for her licensee.  (Exh. 18 to Garbus Decl.)  They were only twenty-one pages long. (Exh. 3 to Busanna Decl.)

---

[1]  For ease of reference, Le Bonitas has submitted a calendar for October and November 2009, which is the relevant time period.  (Exh. 32 to Garbus Decl.)

It is uncontradicted that by the time the approval finally came, PHE had the boards for 43 days. Faced with the uncontradicted facts of the breach, PHE (in its purely tactical motion for summary judgment) makes sideways arguments about what it thinks Le Bonitas could or should have done differently. Nonsense. On the question of liability, PHE's breach is clear. The other issues, if relevant at all, go to damages.

Given the facts, Le Bonitas could not, as both a practical matter and as a matter of contract, proceed with further development of the collection during this period. Le Bonitas no longer had enough time to get through the other required stages in time for the industry trade fair for salesmen and buyers. Without having clothing samples ready to show at the beginning of the sales campaign season, the Fall/Winter collection had no chance to be brought to market.

It cannot be that PHE could not respond to Le Bonitas's submission for approval of the inspiration boards, all the while promising to do so. This was a material breach on the part of PHE -- and PHE and Beanstalk knew it -- since Le Bonitas had contracted so they could bring a collection to market during each successive sales season over the approximate five and one-half year term. That's why they agreed to pay PHE over €1,000,000 over the term – and had already paid €97,500 at signing. This was the only way the license agreement made any economic sense.

For these reasons, summary judgment in favor of Le Bonitas on liability is appropriate, and there should be a trial on damages.

4

If, however, the Court finds material issues of fact, Le Bonitas alternatively seeks dismissal of PHE's counter-claim to the extent it seeks legal fees.  It is clear from the license agreement that the indemnification provision on which the fee claim is based concerns liability for third-party claims only, not fees for the breach of contract claims asserted here between the parties themselves.

## STATEMENT OF FACTS

### PHE's delay and the lack of any legitimate excuse are undisputed

I.    **It is uncontradicted that PHE had a contractual obligation to engage in the approval process and to review and respond regarding approvals as set forth in the licensing agreement**

The parties entered into a license agreement, as of February 1, 2009 (the "License Agreement").  (Exh. 1 to Busanna Decl.)  It was for an approximate five and one-half year term.  (Exh. 1 at pg. 32.)  PHE received an initial €97,500 payment at signing.  (Busanna Decl. at 10.)  PHE also obtained the right to nine minimum guaranteed payments over the term totaling another €1,127,000 (and eight percent of net sales to the extent any such sales amounts exceeded the minimum payment amounts).  (Exh. 1 to Busanna Decl. at Sections 3.1, 3.3 and pg. 32.)

Le Bonitas obtained the right to use the *Paris Hilton* name and brand in order to sell items of women's lingerie, sleepwear and beachwear in certain territories.  (Exh. 1 at Sections 1.3, 21. pg. 31; Busanna Decl. at 8.)  Significantly, there was no restriction on Le Bonitas's right to take a seasonal collection to market in each successive sales season over the term.  (Exh. 1 to Busanna Decl.; Busanna Decl. at 23.)

The License Agreement granted PHE written approval rights, in stages, over the items to be sold.  (Exh. 1 to Busanna Decl. at Section 5.)  The stages were the concept stage, final art stage and final physical salesmen sample stage. (Exh. 1 at Section 5.1.)

The operative provision concerning approvals was Section 5.1(2), which provided that:

> OWNER shall have ten (10) business days from OWNER's actual receipt to review and respond in writing to each of LICENSEE's submissions.  If OWNER does not respond to such submission within such ten (10) business day period, such submission shall be deemed disapproved.

(Exh. 1 at Section 5.1(2).)

Thus, the License Agreement required PHE to engage in the approval process so that Le Bonitas could bring the collections it developed to the apparel marketplace and obtain the fruits of the contract: (1) PHE had an express obligation to "review and respond" to each of Le Bonitas's submissions; and (2) to do so within ten business days.

In the generic "Licensee Welcome Pack" given to all of PHE's licensees, Beanstalk stated that "[w]hen submitting materials for approval, please allow for the **contractual turnaround time of 10 business days for a response**" but that "most clients respond before this time frame."  (Exh. 2 to Busanna Decl. at pg. 16 [emphasis added].)  It also says "[a]s stated in your contract please allow for the contractual turnaround time for a response when submitting material for approval.  **Submissions will be reviewed and returned in a timely manner**. (Exh. 2 at pg. 5 [emphasis added].)

6

Consistent with the Welcome Pack is the "Protocol" Beanstalk sent Le Bonitas which states that "[a]s a reminder, no licensed product may be distributed unless it has been reviewed and final written approval granted. If a response is not received within ten business days, please contact The Beanstalk Group." (Exh. 11 to Busanna Decl. at pg. 2.)

## II. It is uncontradicted Beanstalk was PHE's disclosed licensing agent: PHE's approval obligation started when Beanstalk received submissions from Le Bonitas

One of the issues alluded to by PHE during this litigation is that the ten business day contractual turnaround time set forth in Section 5.1(2) starts from PHE's actual receipt, not Beanstalk's receipt. This position cannot be seriously maintained, and merits little discussion.

Beanstalk is specifically identified in the License Agreement in numerous provisions (Exh. 1 to Busanna Decl., Sections 1.10, 3.1, 3.2, 3.3, 3.7, 3.8). Beanstalk's "Licensee Welcome Pack" -- plainly written for all of PHE's licensees -- expressly directs licensees to make submissions for "Beanstalk approval at each stage of development" (Exh. 2 to Busanna Decl. at pg. 5.) Beanstalk expressly directed Le Bonitas to send its submissions for approval to Beanstalk, not PHE. (Busanna Decl. at 19, 28.) Furthermore, Beanstalk had at all times held itself out to Le Bonitas as PHE's licensing agent. (Busanna Decl. at 6.)

The "Protocol" also expressly states that "[a]s per your contract with Paris Hilton, you must submit all products...to Beanstalk for client approval at each stage of development." (Exh. 11 to Busanna Decl. at pg. 1.)

In addition to the foregoing evidence, Beanstalk's Chief Legal Officer, Oliver Herzfeld, put the issue to rest during his deposition.   When asked if Beanstalk was agent for PHE with regard to approvals -- that Beanstalk was to and did receive submissions on PHE's behalf and they sent them out on PHE's behalf -- Mr. Herzfeld confirmed Beanstalk was PHE's "licensing representative." (Exh. 20 to Garbus Decl. at 69-70, 121.)  Mr. Herzfeld said that Le Bonitas could send submissions to Beanstalk on PHE's behalf, and it would be the same as making submissions directly to PHE under Section 5.1(2).  (Exh. 20 at 122-29.) In the words of Mr. Herzfeld:

> They can focus in on the words owner's actual [receipt] and try to read that to mean that owner itself and not its agent must actually receive it.   That's not how I'm reading it.  I'm reading it the way I answered in the prior question.   When it says owner's actual receipt, my reading, it includes owner's representative.

(Exh. 20 at 128-29.)

It is clear that Beanstalk was PHE's disclosed licensing agent acting within its authority in respect of submissions for approval.   It is basic agency law that when an agent has actual authority with respect to a subject, notice given to him with regard to that subject is imputed to his principal.  See, Restatement (Third) of Agency, § 5.02 (2006); EMI Entm't World v. Karen Records, 603 F.Supp.2d 759, 767 (S.D.N.Y. 2009)(a party's notice to an authorized licensing agent was effective as notice to the principal).  As such, the ten business day contractual turnaround time set forth in Section 5.1(2) started from Beanstalk's receipt.

**III.    It is uncontradicted that the Spring/Summer Collection
was manufactured, sold and distributed**

Because PHE has gone extensively into the history (in its motion for
summary judgment), we shall reply in brief.  But none of this history or the other
factual narratives should draw us away from the fundamental narrative
established by the Court -- did PHE breach that clause and, if so, did it have a
justification for the 43 day delay.

The Spring/Summer collection was the first collection undertaken by Le
Bonitas under the License Agreement.  (Busanna Decl. at 17.)  The first stage
which required PHE approval was the concept stage, comprised of "mood" or
"inspiration" boards, which show images, colors, textures, and design themes
which are contemplated for the collection, and oftentimes written words by the
designer to further convey theme ideas.  (Busanna Decl. at 17.)  It is the
necessary starting point in the industry.  (Busanna Decl. at 17.)

Le Bonitas sent the Spring/Summer inspiration boards to Beanstalk in
London, not directly to PHE in Los Angeles, because Beanstalk directed it to do
so.  (Busanna Decl. at 19.)  It took PHE slightly more than the contractual
turnaround time of ten business days from Beanstalk's receipt of the inspiration
boards before PHE approved them, but it approved them after thereafter
nonetheless.  (Busanna Decl. at 20.)

Le Bonitas was able to finalize the collection and showed it at an
international industry trade fair.  (Busanna Decl. at 22.)  Le Bonitas engaged
more than twenty different sales agents and distributors to sell the
Spring/Summer collection around the world to retail stores, and received orders

from such agents and distributors.  Le Bonitas manufactured the items for the Spring/Summer collection and filled the orders for that collection.  (Busanna Decl. at 22, 48.)

IV.   **PHE's failure to engage in the approval process, as evidenced by its extended delay in approving the inspiration boards for the Fall/Winter Collection, was a breach of contract**

The second/successive season was the Fall/Winter collection.  (Busanna Decl. at 23.)  As with the Spring/Summer collection, Le Bonitas needed PHE's written approval of the inspiration boards.  (Exh. 1 to Busanna Decl at Section 5.1.)  The Fall/Winter inspiration boards were sent on a CD to Beanstalk in London -- at its direction -- and were received on October 8, 2009.  (Busanna Decl. at 28; Exh. 4 thereto.)  They were comprised of only twenty-one pages of color images.  (Exh. 3 to Busanna Decl.)

A.   **Communications between Le Bonitas and Beanstalk show that Beanstalk contributed to PHE's inexcusable breach of contract**

The week after Beanstalk received the Fall/Winter inspiration boards, Johanna Brambring of Beanstalk (the principal liaise for this license) asked Gianni Busanna of Le Bonitas (the sales and marketing manager) on October 13th whether they could go through boards together during a face-to-meeting they were arranging for November 4th **before she sent the CD to PHE**.  Mr. Busanna immediately replied, stating "we can go through the presentation together **but it has to be sent to Paris immediately, or it will be too late when we get the response**."  (Busanna Decl. at 29; Exh. 5 thereto.)  Mr. Busanna's email could not have been plainer on this point.

Ms. Brambring did not comply. More to the point, **she did nothing with the boards** (i.e., committed complete nonfeasance). The CD did not leave Beanstalk's office bound for PHE until October 21st, more than a week later.[2] (The tenth business day contractual turnaround time fell on Oct. 22nd.)

Ms. Hilton testified that she had taken a personal vacation out of town from about October 23rd-27th. (Exh. 17 to Garbus Decl. at 52; Exh. 18.) Megan D'Amico, PHE's assistant manager who ran the day-to-day office matters in Los Angeles, testified that her recollection was that Ms. Hilton was only out of town for that vacation and trips to Las Vegas and New York City on November 4th and 5th, respectively. (Exh. 19 to Garbus Decl. at 12, 49-50, 57-58.)

Had Beanstalk sent the inspiration boards to PHE in Los Angeles immediately -- as Le Bonitas expressly asked it to do given that approval was time-sensitive -- Ms. Hilton could have reviewed and approved them long before she left for her vacation. But that did not happen because of Ms. Brambring's nonfeasance.

When Mr. Busanna followed up with Ms. Brambring via email on October 19th about the status of the approval, Ms. Brambring reply-emailed on Oct. 20th that the CD had gone to PHE for its review. (Exh. 6 to Busanna Decl.) This was not true. As noted above, Beanstalk did not even send the CD for another day.

The indifference or incompetence of Beanstalk did not end there. Ms. Brambring's reply-email also asked Mr. Busanna whether she could send the

---

[2] In support of PHE's motion for summary judgment, Serena Sibbald of Beanstalk submitted a declaration in which she admits that her office did not send the CD until October 21, 2009. (Sibbald Declaration, executed January 17, 20212, at 15.) PHE's office manager testified that she received the CD in PHE's Los Angeles office on Oct. 22nd. (Exh. 19 to Garbus Decl. at 42.)

"additional copy as well, which explains the thoughts of the presentation." (Exh. 6 to Busanna Decl.) Apparently Ms. Brambring had never bothered to look at the CD. There was no additional copy explaining the thoughts of the presentation (just as there was no additional copy explaining the thoughts of the Spring/Summer inspiration boards). (Busanna Decl. at 30.) If Ms. Brambring had looked at the boards, she would have seen that practically every page had written thoughts of the presentation from the designer on them.[3] (Exh. 3 to Busanna Decl.)

The next week -- by then the tenth business day contractual turnaround time had passed -- Le Bonitas followed up again with Beanstalk. On October 26th, Patrizia Borselli (the brand manager for the PHE line) emailed Ms. Brambring and asked when they could get PHE's approval over the inspiration boards as "[t]ime is going fast and we need to finalize this quickly." (Busanna Decl. at 32; Exh. 7 thereto.) Ms. Brambring took two days to reply, and for the first time mentioned that Paris Hilton had been travelling and had not yet commented on the inspiration boards. (Exh. 7.) Ms. Brambring did not say that since ten business days had passed, they should be deemed disapproved. Rather, she assured Le Bonitas that Ms. Hilton would "go through as soon as she can." (Exh. 7.)

Nonetheless, this continued delay was critically problematic for Le Bonitas

---

[3] Perhaps Ms. Brambring was trying to add some sort of value to Beanstalk's involvement in the approval process. Otherwise, Beanstalk could be viewed by PHE as nothing more than a mail-drop, merely causing delay (as happened here) in the ten business day contractual turnaround time. Indeed, Ms. Brambring replied that she had thought of some non-descript "additional information" which she would explain later. (Exh. 6 to Busanna Decl.)

(as discussed more fully below). Le Bonitas had already made clear to Beanstalk that approval over the boards was urgent. Le Bonitas emailed Beanstalk on November 2nd and pointed out, among other things, that Ms. Hilton had not disapproved the boards, but just postponed approval because of her other engagements, resulting in an "unjustified suspension of the approval process." (Busanna Decl. at 33; Exh. 8 thereto.) Le Bonitas reserved all of its rights. (Exh. 8.) In reply, Ms. Brambring did not disagree. She just asked Mr. Busanna to call her. (Exh. 8.)

The incompetence and malfeasance of Beanstalk continued. Ms. Brambring and Mr. Busanna spoke on November 3rd, at which time she told him that PHE had approved the boards.[4] (Busanna Decl. at 33.) When Mr. Busanna then emailed and asked her to confirm it in writing (as per the License Agreement), she replied only that she had not, in fact, received "final approval." (Exh. 8 to Busanna Decl.) Perhaps she had lied to him on the phone in the hope that he would not ask for approval in writing.

Mr. Busanna met with Ms. Brambring and Serena Sibbald (her supervisor) of Beanstalk, in London, on November 4th. (Busanna Decl. at 34.) Mr. Busanna reiterated that time was of the essence; and that Le Bonitas could only wait another day or so, or it would be impossible to finalize the collection for the industry trade fair on February 5th.[5] (Busanna Decl. at 34.) They assured him that PHE knew of the urgency and would approve the inspiration boards shortly.

---

[4] PHE could not possibly have approved the boards on November 3rd because Ms. Hilton was not even given them by her assistant until Nov. 4th. (Exh. 17 to Garbus Decl. at 52.)

[5] The Nov. 4th meeting minute notes taken by Ms. Brambring and sent to Ms. Sibbald corroborate that this was expressly discussed. (Exh. 24 to Garbus Decl. at PHE 939.)

(Busanna Decl. at 34.)

Internally, Beanstalk appears to have appreciated the significance of the problem caused by its acts of nonfeasance and malfeasance and PHE's delay. By November 16th, Ms. Brambring had emailed Ms. Sibbald and listed all the emails she had "sent so far to PHE to **chase approval** for the Le Bonitas inspirational boards." (Exh. 28 to Garbus Decl. [emphasis added])  She listed seven separate such emails.  (Exh. 28.)

Incredibly, however, when PHE finally gave Beanstalk its written approval of the Fall/Winter inspiration boards on November 18th (Exh. 30 to Garbus Decl.) -- a full two weeks after the Nov. 4th meeting -- Beanstalk still waited another two days before advising Le Bonitas (on Nov. 20th).  (Exh. 9 to Busanna Decl.)

**B.   Communications between Beanstalk and PHE further show the inexcusable breach of the contract**

The correspondence shows that once PHE received the inspiration boards from Beanstalk on October 22[st] -- a full ten business days Beanstalk received them -- Beanstalk repeatedly advised PHE of the need for an immediate approval, but to no avail.  Moreover, the same correspondence shows that PHE repeatedly advised Beanstalk that approval was imminent.

Ms. D'Amico testified that the inspiration boards were received in the PHE office on Oct. 22nd.[6]  (Exh. 19 to Garbus Decl. at 42.)  However, Ms. Brambring waited until Oct. 27th before following up about the needed approval.  (Exh. 21 to Garbus Decl.)  Ms. D'Amico acknowledged having received the CD containing the inspiration boards, stating "I have not had any time with Paris, we are hoping

---

[6] The PHE office is not really an office -- it is in the house of one of the more celebrated party girls in America.  (Exh. 17 to Garbus Decl. at 41.)

to get it this week."  (Exh. 21 to Garbus Decl.)

Ms. Brambring waited yet another week before emailing Ms. D'Amico again (on November 2nd) and advising:

> Please note **we need urgent approval today** on the Fall / Winter 2010-11 designs for Le Bonitas as **time is off [sic] essence**.  Delaying further the approval process is already impacting delivery of the goods in stores, and the Licensee is seriously concerned that they will miss the peak selling period with their retailers and will incur penalties by the retailers. Therefore, please could you assist on this matter as I need to revert back to the licensee with the approval today. **I** wish to thank you in advance for your kind assistance in making **this matter as a high priority**."

(Exh. 22 to Garbus Decl. [emphasis added].)

Incredibly, that was the first time Ms. D'Amico had even looked at the boards (apparently only in response to Ms. Brambring's inquiry).  (Exh. 19 to Garbus Decl. at 43-44, 72-74.)  In other words, they sat in the PHE office from Oct. 22nd until Nov. 2nd, when Ms. Brambring asked about the status of approval.

Even then (after two emails from Ms. Brambring seeking approval), Ms. D'Amico still did not comprehend that PHE had an obligation to approve them. She replied that "it just looks like an inspiration board. She really can't approve anything unless it's an official submission of a piece from her line."  (Exh. 22 to Garbus Decl.).  Ms. Brambring had to explain to her the next day (on November 3rd) that:

> Paris needs to approve the inspirational board designs in order for Le Bonitas to move to the next stage, which is the concept designs stage for each garment.  They would like to know if Paris is happy with the overall mood of the submitted story (i.e., theme, colour, details, etc)."

(Exh. 22.)

During her testimony, Ms. D'Amico acknowledged that she had been copied on an earlier email from Beanstalk seeking Ms. Hilton's approval over the Spring/Summer inspiration boards. (Exh. 19 to Garbus Decl. at pgs. 76-77.) She claimed that, nevertheless, as of November 2nd **she had never before seen an inspiration board** and **did not know whether Ms. Hilton had an obligation to review** or approve it.[7]  (Exh. 19 at pgs. 78-79.) She admitted that her confusion caused delay in getting the boards to Ms. Hilton for approval. (Exh. 19 at pg. 84.) In fact, her total incompetence (and/or indifference) caused almost two full week's delay.

On Nov. 4th, Ms. Brambring again emailed Ms. D'Amico, advised that Le Bonitas was in London that day and asked "[i]s it possible to get Paris's feedback/approval on the inspiration boards for today's meeting? **I don't understand, as Paris was approving inspirational boards for the first collection for Le Bonitas**."  (Exh.23 to Garbus Decl. [emphasis added].)

At that point (on November 4th), Ms. D'Amico finally gave Ms. Hilton the inspiration boards for the first time, advised that approval was urgent, and asked for her approval as soon as possible. (Exh. 19 to Garbus Decl. at pg. 46, 82, 84.) She also began assuring Ms. Brambring that approval was imminent, stating "she will be able to give approval on the inspiration boards. She is travelling today, but she has them with her and I've let her know you need approval on them today."(Exh. 23 to Garbus Decl.)   Nevertheless, that promised approval never arrived until Nov. 18th.

---

[7] Ms. D'Amico had one job after college, for about eight months, before working for PHE. (Exh. 19 to Garbus Decl. at pg. 52-53.)

On November 5th, Ms. D'Amico emailed Paris Hilton: "did you get a chance to review the inspiration boards for Le Bonitas? If not, can you please look them over while you're in the airport or on the plane? It would be great if you could give me your feedback tonight." (Exh. 25 to Garbus Decl.)  There was no response from Ms. Hilton.

Four more days of nonfeasance passed.  On November 9th, Beanstalk tried to get PHE's approval again.  By Nov. 9th, Ms. Hilton had been back from her trip to Las Vegas and New York City for days.  Ms. Brambring emailed Megan D'Amico and asked "[c]ould you please let me know **urgently**, when we can receive approval on the Le Bonitas inspirational boards?"  (Exh. 26 to Garbus Decl. [emphasis added].)

This prompted another email from Ms. D'Amico to Paris Hilton.  (Exh. 19 to Garbus Decl. at 90-91.)  She wrote "can you please look at these today? do you still have the print out/cd? Please let me know your feedback on this range asap."  (Exh. 25 to Garbus Decl.)  Ms. Hilton replied via email "[y]es, need print out."  (Exh. 25.)  Ms. Hilton no longer even had the twenty-one page print-out of inspiration boards that Ms. D'Amico had handed her on her way out the door to Las Vegas on November 4th.  (Exh. 19 to Garbus Decl. at 92-93.)

The overall indifference and incompetence also continued.  Ms. D'Amico had the CD containing the boards in her office.  Despite this, she emailed Ms. Brambring and asked "[a]ny way you can send me an attachment with the powerpoint for approval?"  (Exh. 26 to Garbus Decl.)

On November 10th, Ms. Brambring made the same point.  She asked whether PHE still had the disc she sent and advised that the powerpoint document was too large to send via email.  (Exh. 26 to Garbus Decl.)  She also, for the first time, noted the ten business day contractual turnaround time.  She advised "**this is super urgent; we have to make sure the licensee get approval within 10 days. They are loosing [sic] already a lot of time of [sic] the development for the collection and this is critical for them**."  (Exh. 26 [emphasis added].)

Ms. D'Amico testified that she had not reviewed the License Agreement (until shortly before her deposition) and did not believe she had been advised of a ten-day approval period.  (Exh. 19 to Garbus Decl. at 71-72.)  Perhaps Ms. Brambring's email on November 10th was the first time she learned that PHE had a contractual turnaround time obligation of ten business days.

On November 11th, Ms. D'Amico finally admitted to Beanstalk that "Paris took it with her while traveling and we have not been able to locate it. We will continue to look, but look into sending it to us again somehow."  (Exh. 26 to Garbus Decl.)  Ms. D'Amico never explained why she could not simply print another set from the CD she had received and hand it to Ms. Hilton (yet again).

Ms. Brambring replied via email and attached the inspiration boards, advising "**[a]s I mentioned, this is very important for Le Bonitas to receive the feedback from Paris.  They can't proceed to the next step (sketches for each garment) without your approval.  Could you come back to us today?**"  (Exh. 26 to Garbus Decl. [emphasis added].)  There was no response.  Ms.

18

Brambring then emailed Ms. D'Amico again and asked whether she had received her email and attachment.  (Exh. 27 to Garbus Decl.)  Ms. D'Amico finally replied and advised that she had received it, and again assured Ms. Brambring that "we will try to get this approval to you by **today**."  (Exh. 27 to Garbus Decl. [emphasis added].)  As to that email exchange, Ms. D'Amico testified that she was sure she tried to get the approval, but that "Paris probably wasn't free."  (Exh. 19 to Garbus Decl. at 104-05.)

Five more days of nonfeasance passed, with no approval.  On November 16th, Ms. Brambring emailed Ms. D'Amico yet again, stating "[p]lease could you give me an approval on the Inspirational boards for Le Bonitas, they are so desperate to hear back from PHE."  (Exh. 29 to Garbus Decl.)  Ms. D'Amico testified that Ms. Hilton was "unavailable" during this time with other commitments.  (Exh. 19 to Garbus Decl. at 105-06.)[8]  On Nov. 17th, Megan forwarded Ms. Brambring's most recent email to Ms. Hilton and asked "[h]ave you approved the inspiration boards for Le Bonitas?  Need this today please." (Exh. 29 to Garbus Decl.)

Another day of nonfeasance passed.  Still yet another email from Ms. Brambring was necessitated, on Nov. 18th, stating "[p]lease get back to me on the Le Bonitas underwear inspirational boards approval.  Sorry, but **this has been with PHE for nearly a month and if we don't get approval the Licensee will not be able to design the range for next year.  Please this is a very urgent matter**."  (Exh. 30 to Garbus Decl. [emphasis added].)

---

[8] We have submitted to the Court the "master schedule" given to us by Ms. Hilton's lawyer showing her schedule for these days.  (Exh. 18 to Garbus Decl.)  To argue that she was not "available" to take ten minutes to look at the boards is preposterous.

Finally, Ms. D'Amico reply emailed Ms. Brambring on Nov. 18th with approval of and minimal comments on the Fall/Winter inspiration boards. (Exh. 30 to Garbus Decl.) The final act of nonfeasance -- Beanstalk then took another two full days to copy and paste those comments into an email to Le Bonitas advising of the approval. (Exh. 9 to Busanna Decl.)

### C. Testimony of Paris Hilton and Megan D'Amico further shows the lack of any legitimate excuse and an indifference and total disregard for PHE's contractual obligations

As for Ms. Hilton's schedule, as noted above, she had a personal vacation from Oct. 23-27, was in Las Vegas on Nov. 4th, and in New York City on Nov. 5th. (Exh. 19 to Garbus Decl. at 49-50, 55-57.) Beyond that, she was in Los Angeles, where she resided, during the entire time until she gave her approval over the boards on Nov.18[th]. (Exh. 19 to Garbus Decl. at 49-50, 57-58.)

Ms. D'Amico testified about Ms. Hilton's other engagements, in Los Angeles, during that time period. She was able to recall a charity event comprised of shopping and spending time with the winner of an auction. (Exh. 19 to Garbus Decl. at 59.) She also recalled that Ms. Hilton had pitched her reality show "The World According to Paris" to producers. (Exh. 19 at 61.) Lastly, Ms. D'Amico testified that Ms. Hilton attended a party at a Hotel in Los Angeles on Nov. 17th to launch her own hair line product. (Exh. 19 at 107-10.)

Ms. D'Amico testified that she knows when Ms. Hilton is available for approvals, and that Nov. 18th was the **first time** Ms. Hilton was available to meet for the approval over the Fall/Winter inspiration boards. (Exh. 19 at 112.) Ms. D'Amico met with Ms. Hilton on Nov. 18th, and estimated that **it could have**

**taken more than ten minutes for Ms. Hilton to review and approve the boards**. (Exh. 19 at 59-60.) Ms. D'Amico also claimed that Ms. Hilton did not care for the boards, but approved them as a "favor" because she knew Le Bonitas had been waiting and it was urgent. (Exh. 19 at 62.) Some favor.

During her deposition, Ms. Hilton confirmed that she was the only person at PHE who gave approvals, and she always did approvals with Megan D'Amico. (Exh. 17 at 25, 114-15.) She also testified that she met with Ms. D'Amico every single day. (Exh. 17 at 66-67.) However, she also admitted that she had no calendar or list as to when approvals were required for her various licensees, nor did anyone even suggest that she have such a list. (Exh. 17 at 34-35.)

Ms. Hilton described her schedule as "insane", involving appearances, premieres and meetings having nothing to do with her obligations to her licensees. (Exh. 17 to Garbus Decl. at 47-48.) This is borne out by Ms. Hilton's "Master Schedule" for Oct. 21-Nov. 18, 2009 (which was produced by her lawyer for the first time at her deposition). (Exh. 18 to Garbus Decl.) The Master Schedule corroborates the time she committed to promoting herself -- not her licensees -- during this period. (Exh. 18 to Garbus Decl.) It also completely belies Ms. D'Amico's bald, risible assertion that Ms. Hilton was completely unavailability until Nov. 18th to take the ten minutes or so necessary to review the boards. She had ample time, each and every day.

Of course, the issue is not whether Ms. Hilton or Ms. D'Amico deemed her unavailable to review and respond to the inspiration boards. She had a contractual obligation to do so within ten business days. The facts show that in

Case 1:10-cv-09350-AKH   Document 54   Filed 02/24/12   Page 28 of 55

addition to the serial nonfeasance, malfeasance and general incompetence of Beanstalk and Ms. D'Amico -- painstakingly detailed above and fully chargeable to PHE -- Ms. Hilton chose not to make the time needed (i.e., ten minutes or so) and chose other business ventures and self-promotional events over her contractual obligations to Le Bonitas.

Ms. Hilton recalled first receiving the inspiration boards from Ms. D'Amico on November 4th, as she was leaving for Las Vegas. (Exh. 17 to Garbus Decl. at 52.) However, she also admitted that she was not sure what happened to them, but that she eventually needed another set. (Exh. 17 at 55-56.) Ms. Hilton also testified that she was not happy with the boards and "wanted sit it and think about it." (Exh. 17 at 58.) Assuming, arguendo, that this uncorroborated testimony is even truthful, Ms. Hilton did not have the contractual right to "sit and think" for weeks on end. And she told no one her alleged concerns until she finally met with Megan D'Amico and (nonetheless) approved the boards (on Nov. 18th). (Exh. 17 at 58.) Remarkably, Ms. Hilton claimed that she had never been advised that Le Bonitas's collection could not be completed in time if she did not review the inspiration boards. (Exh. 17 at 121.)

The approval Ms. D'Amico sent to Ms. Brambring on November 18th reflects how minimal the concerns were that she gave -- the sum total of Ms. Hilton's deep thoughts on the boards was asking for removal of eggs, handcuffs and the phase "Hottie- the perfect mix" and for certain images to be drawn neater. (Exh. 30 to Garbus Decl.) These are the few things she identified as not being not happy with. (Exh. 17 to Garbus Decl. at 59-61.)

## V.    PHE's breach of contract was material

Gianni Busanna explained the materiality of Le Bonitas's contractual right to enforce Section 5.1 in order to bring a collection to market in each successive sales season over the term of the License Agreement. (Busanna Decl. at 24.) It is a basic tenet of the industry (and common sense) that a collection must be present in each successive season in order to be successful.  Such presence enables the distributor to build on customer interest and loyalty and thus maximize sales.  Moreover, Le Bonitas had to pay PHE guaranteed minimum payments twice a year over the term of the License Agreement.  (Ex. 1 to Busanna Decl. at pg. 32.)  Without the right and ability to bring a collection to market each successive season, the License Agreement made no economic sense for Le Bonitas and it would not have entered into it. (Busanna Decl. at 24.)

Moreover, Le Bonitas must have sets of a full collection of physical salesmen samples ready to show at industry trade fairs, which mark the beginning of each seasonal sales campaign, and to show to potential sales agents and distributors who come to Le Bonitas's showroom at around the same time.  (Busanna Decl. at 21.)  Because PHE failed to engage in the approval process, effectively suspending the process altogether at the concept stage for 43 days (Busanna Decl. at 28-35), it prevented Le Bonitas from bringing the collection to the Immagine Italia & Co. trade fair in Florence starting on February 5, 2010.  (Busanna Decl. at 25, 27, 35-39, 43.)  The Fall/Winter collection could not be brought to market.  PHE's breach deprived Le Bonitas of the benefit of the

bargain.

In view of the foregoing uncontested facts and for the reasons set forth below, it is respectfully submitted that (i) summary judgment should be granted to Le Bonitas on liability as to its breach of contract claim or, in the alternative (ii) so much of PHE's counterclaim seeking legal fees should be dismissed.

## ARGUMENT

### POINT I

#### SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE PHE MATERIALLY BREACHED ITS OBLIGATION TO REVIEW AND RESPOND TO LE BONITAS'S SUBMISSION

The License Agreement, when read as a whole, is unambiguous. The only commercially reasonable interpretation yields that PHE had an obligation to review and respond to submissions in ten business days and to otherwise engage in the approval process, which would have enabled Le Bonitas to bring its collections to the marketplace and obtain the fruits of the contract. Moreover, any potential ambiguity arising from an isolated, purely textual reading (there should be none) is resolved when the terms are applied to the undisputed set of facts which occurred here. The extrinsic evidence is completely one-sided in favor of Le Bonitas and leads to the very same interpretation. Since the contract terms when applied to the undisputed facts establish PHE's material breach, summary judgment should be granted as to liability on Le Bonitas's breach of contract claim.

24

A.  **THE LICENSE AGREEMENT IS UNAMBIGUOUS:**
    **SUMMARY JUDGMENT MAY BE GRANTED WHEN THE TERMS**
    **ARE APPLIED TO THE UNDISPUTED FACTS**

The law is well-settled that summary judgment may be granted in a contract dispute where the language is unambiguous. Compagnie Financiere De Cic Et De L'-Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 147 (2nd Cir. 2000). Ambiguity is a question of law for the court. U.S. Bank Nat'l Ass'n v. Southwest Airlines Co., 2009 WL 2163594 *8 (S.D.N.Y. 2009); see, e.g., 239 E. 79th Owners Corp. v. Lamb 79 & 2 Corp., 30 A.D.3d 167, 818 N.Y.S. 194 (1st Dep't 2006). The entire contract should be examined, and the relation of the parties, and particular words should not be isolated from context but read in light of the obligations as a whole. Kass v Kass, 91 N.Y.2d 554, 566-67, 673 N.Y.S.2d 350 (N.Y. 1998). Further, while a contract may be ambiguous as applied to one set of facts, it may not be as to another. U.S. Bank Nat'l Ass'n v. Southwest Airlines Co., 2009 WL 2163594 at *8.

PHE had a right to approve all of the licensed articles. (Exh. 1 to Busanna Decl. at Section 5.1). But Le Bonitas plainly did not contract for the mere possibility that Ms. Hilton might choose to review its submissions for such approvals, in exchange for €1,225,000. PHE had to fully engage in the approval process. PHE had corresponding, express obligations (1) to "review and respond" to each of Le Bonitas's submissions, and (2) to do so within ten

business days.[9]  (Exh. 1 at Section 5.1(2).)

PHE had to review and respond in ten business days and in such manner so as to enable Le Bonitas to bring each successive seasonal collection to the marketplace over the term of the License Agreement.   This was a material provision for Le Bonitas.   It enabled Le Bonitas to achieve the fundamental purpose of the License Agreement for Le Bonitas -- maximizing sales for its benefit.

The agreement did contemplate that there might be a circumstance in which PHE might take more than ten business days to respond.   The second sentence of Section 5.1(2) states if PHE fails to respond to any submission within ten business days, the submission shall be "deemed disapproved."  (Exh. 1 at Section 5.1(2).)  But in the circumstances of this case, this second sentence is inapposite.   PHE did not receive the boards until the tenth business day (Oct. 22nd), and Ms. Hilton was not even given the boards until thirteen days after that (on Nov. 4th).   And because PHE repeatedly promised that approval was imminent but would not give formal written approval, Le Bonitas could not proceed.   The status quo had to be maintained from Oct. 8th until PHE finally gave its approval on Nov. 20th.

U.S. Bank Nat'l Ass'n v. Southwest Airlines Co., 2009 WL 2163594, is instructive on this issue of interpretation, as applied to the set of facts before the Court.   The plaintiff obtained summary judgment on its breach of contract claims

---

[9] Moreover, the parties also **expressly agreed** that, in their respective dealings with one another, they would "act in good faith and fair dealing."  (Exh. 1 to Busanna Decl. at Section 21.)

because the terms of the airplane leases between the parties required that if engines were replaced by the lessee during the term of the lease, they had to be of equal "value" and "utility" to the original engines. Id. at *9.

The lessee's first proffered interpretation would have rendered the terms completely meaningless. Id. Its second proffered interpretation was a different meaning of the terms than the lessor proffered. But the undisputed fact was that the lessee returned replaced engines worth millions less than the originally leased engines. Id. It mattered not to the District Court that there was a dispute about the precise meaning of the terms because under any plausible definition, there was still a clear breach of the lease. Id. at *9-10.

In this case, PHE may assert that it could have conceivably disapproved a submission by simply not responding. PHE might alternatively argue that it did, in fact, "respond" in some measure within ten business days. But PHE cannot have it both ways. Moreover, as in U.S. Bank Nat'l Ass'n, 2009 WL 2163594 *8-10, neither of these contentions bars a finding of breach given the undisputed set of facts which actually occurred.

Those facts are fully detailed above. PHE (through Beanstalk) did not disapprove of the inspiration boards through a non-response. And PHE did not engage in the approval process as required by Section 5. What did occur was a series of acts of nonfeasance, malfeasance and general incompetence by Beanstalk, Megan D'Amico and Paris Hilton over the course of 43 days before approval finally arrived -- during which Beanstalk kept promising Le Bonitas that Ms. Hilton would immediately review the boards and that approval was imminent.

27

By then it was too late for Le Bonitas to manufacture sets of the collection for the Florence trade fair starting on February 5, 2010.  Under any plausible interpretation of Section 5.1, PHE breached the License Agreement.[10]

The nonfeasance and malfeasance of Beanstalk (fully chargeable to PHE), Ms. D'Amico and Ms. Hilton and their repeated promises that approval was imminent had the practical effect of suspending the approval process from the perspective of Le Bonitas.  It prevented Le Bonitas from going forward or backward.  (Busanna Decl. at 42-43.)  Under no plausible interpretation did Section 5 give PHE the unilateral right to suspend the approval process in this way.  This is borne out further by Section 5.2, which expressly granted PHE a right to suspend the process, but only after it had given Le Bonitas notice of a breach of the agreement, and only until the breach was cured.  (Exh. 1 at Section 5.2.)  That never occurred.

The License Agreement, interpreted as a whole, did not permit PHE to deprive Le Bonitas of its contractual right to take a collection to market during each successive season through PHE's failure to engage in the approval process by reason of its nonfeasance and malfeasance.  To conclude otherwise would permit PHE to deprive Le Bonitas of the benefit of the bargain.  The parties expressly agreed, in their respective dealings with one another, to "act in good faith and fair dealing".  (Exh. 1 at Section 21.)  PHE's duty of good faith helps to measure its compliance with its other duties.  By any measurement, when the

---

[10] It matters not whether Ms. Hilton completely ignored the boards or (as she alone contends) "sat and thought about them".  Either way, PHE (and Beanstalk, its disclosed agent) had them for 43 days before it approved them.  Given the proven facts, this was a material breach of the License Agreement.

terms are applied to the undisputed facts, it is clear that PHE materially breached these contractual duties to Le Bonitas.  In this circumstance, summary judgment is warranted.

## B.   ANY AMBIGUITY MUST BE CONSTRUED STRONGLY AGAINST PHE AND IN FAVOR OF A FINDING OF BREACH

Le Bonitas maintains that the License Agreement is unambiguous when its terms are applied to the undisputed set of facts here.  But if an ambiguity might be found in Section 5.1, it must be construed strongly against PHE because it is undisputed that Beanstalk drafted the form of contract used by it for PHE's licensees.  (Busanna Decl. at 7; Exh. 20 to Garbus Decl. at 9-12.)

That any ambiguity must be construed against the drafter is well-settled. In Jacobson v. Sassower, 66 N.Y.2d 991, 993, 499 N.Y.S.2d 381 (N.Y. 1985), a lawyer's retainer agreement did not clearly state that a "non-refundable" retainer was meant to be a minimum fee to be forfeited irrespective of whether services were actually rendered.  The New York Court of Appeals deemed it entirely proper for the agreement to be construed against the drafter, lawyer. Id.; accord, Cone v. Stranahan, 44 A.D.3d 1145, 1147 fn. 1, 843 N.Y.S.2d 717 (3rd Dep't 2007).

Assuming, arguendo, that the Court finds Section 5.1 of the License Agreement to be ambiguous, as in Jacobson, 66 N.Y.2d 991, that ambiguity is to be construed to the detriment of PHE, not Le Bonitas.  Under any commercially reasonable interpretation, PHE had to engage in the approval process.  PHE's obligation to review and respond to the boards was express -- and did not extinguish by the mere passage of ten business days (while the inspiration

boards sat at Beanstalk).

Regardless of any ambiguity, it is undisputed that PHE did not even receive the inspiration boards until the tenth business day, that Ms. Hilton did not receive them until well after that and then lost them, and that the approval did not arrive until the 43rd day.  What occurred was not permissible under Section 5.1. PHE materially breached its contractual duties to Le Bonitas regarding the approval process.

## C.   THE EXTRINSIC EVIDENCE IS ONE-SIDED IN FAVOR OF LE BONITAS AND A FINDING OF BREACH

While Le Bonitas contends that the License Agreement is unambiguous when the terms are applied to the undisputed facts in this case, the extrinsic evidence is overwhelmingly in its favor as well.  All such evidence is consistent with the obvious purpose and intent of the License Agreement -- a ten business day contractual turnaround time for approval submissions in order to permit Le Bonitas to bring successive seasonal collections to market and earn both parties money.  This evidence further warrants the granting of summary judgment to Le Bonitas.

The Second Circuit Court of Appeals in Compagnie Financiere De Cic Et De L'-Union Europeenne, 232 F.3d 153, 159, recognized that even where a contract is ambiguous, where there is no evidence to support one party's interpretation or the evidence is one-sided in favor of the other party, summary judgment may still be warranted.  After rejecting one party's "primarily textual" interpretation, the Court of Appeals viewed the "overwhelming weight" of extrinsic

evidence as supporting the undisputed purpose of the parties' agreement. Id. at 160-61. It granted summary judgment in favor of the party with the reasonable interpretation and the weight of evidence behind it.

The Second Circuit Court of Appeals has also recognized the probative value of evidence of parties' practical construction of an agreement. In IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp., 26 F.3d 370, 374 (2nd Cir. 1994), the Court of Appeals expressly noted that "[f]or over a century, courts have looked to the conduct of the parties in resolving ambiguities in contractual language", and then followed suit. Accord, Burgos v. Metro-North Commuter R.R., 40 A.D.3d 377, 836 N.Y.S.2d 76 (1st Dep't 2007)(parties' performance demonstrated they understood their contractual duties whether or not they could be construed as ambiugous); see also, U.S. Fid. and Guar. Co. v. Delmar Dev. Partners, 14 A.D.3d 836, 788 N.Y.S.2d 252 (3rd Dep't 2005)(parties performed consistent with letter agreement, evidencing their intent that it be an amendment to their contract). Relevant extrinsic evidence includes what the parties wrote to each other evidencing the meaning of the contract. See, Matter of Big Tree Energy Partners v. Bradford, 219 A.D.2d 27, 640 N.Y.S.2d 270 (3rd Dep't 1996)(party's writing evidenced what a contract term meant as to price and its performance was consistent).

The Beanstalk Welcome Pack and the Protocol are irrefutable and unequivocal -- even in Beanstalk's view, the License Agreement provided for a ten business day "contractual turnaround time", submissions would be reviewed and returned in a "timely manner" and if timely response was not received,

Beanstalk should be contacted to obtain it.  (Exhibits 2 and 11 to Busanna Decl.)

Here, the parties' course of performance and other writings are also telling.  On the third business day after Beanstalk received the boards, Gianni Busanna told Johanna Brambring "we can go through the presentation together **but it has to be sent to Paris immediately, or it will be too late when we get the response.**"  (Exh. 5 to Busanna Decl.)  Ms. Brambring did not object to this directive, because this is what the License Agreement required.

Mr. Busanna wrote Ms. Brambring on November 2nd and stated "the approvals required by article 5 of our agreement are not given for reasons which don't refer to the approval process but to the absence and engagements of Miss Hilton"; and it would not "accept the unjustified suspension of the approval process" (Exh. .8 to Busanna Decl.).  Tellingly, Ms. Brambring did not contest the point.  Rather, she immediately emailed Ms. D'Amico and said "[p]lease note we need urgent approval **today** on the Fall / Winter 2010-11 designs for Le Bonitas as time is off [sic] essence."  (Exh. 22 to Garbus Decl.)

Ms. Brambring was apparently playing both sides.  She also told Mr. Busanna that PHE had approved the boards, but then recanted, she promising the next day that approval was imminent.  (Busanna Decl. at 33-34; Exh. 8 thereto.)

Ms. Brambring became even more express to PHE in her concern about having run afoul of the approval clause.  She emailed Ms. D'Amico on November 10th, stating "**this is super urgent; we have to make sure the licensee get approval within 10 days. They are loosing [sic] already a lot of time of [sic]**

**the development for the collection and this is critical for them**." (Exh. 26 to Garbus Decl.)  In more of her own words, Ms. Brambring repeatedly "chased" PHE for the promised approval. (Exh. 28 to Garbus Decl.)  Everyone understood that PHE was in breach and that it was jeopardizing Le Bonitas's ability to get the Fall/Winter collection to market.

The fact that Ms. Hilton approved the boards (albeit after 43 days had passed) is also probative of her own "practical construction" of her duties under the License Agreement.  It evidences that Ms. Hilton knew her obligation to review the boards and to respond to the inspiration boards had not been satisfied.

In her deposition, Ms. Hilton claimed that she approved the boards because she was "just being a good partner" to Le Bonitas.  (Exh. 17 to Garbus Decl. at 89.)  This assertion is risible (and self-serving), but also belied by her other testimony.  Ms. Hilton admitted that she had an affirmative obligation to review submissions in connection with her license agreements.  (Exh. 17 at 109-10.)  While she also claimed to have "no idea" whether she still had to review submissions seeking approval after ten business days had passed (Exh. 17 at 110-12), she admitted that no one told her at any point not to review the inspiration boards.  (Exh. 17 at 123.)  Her actions in reviewing and approving the boards, despite the passage of ten business days, are entirely consistent with and corroborate the rest of the extrinsic evidence.  It is all one-sided in favor of Le Bonitas.

The words and (mis)deeds of both Beanstalk and PHE are entirely

consistent with Le Bonitas's interpretation of PHE's duties.  This evidence shows no doubt that PHE materially breached its contractual obligation to review and respond to the inspiration boards or otherwise engage in the approval process. Summary judgment is warranted in these circumstances.

**D.   LE BONITAS HAS PERFORMED ITS OBLIGATIONS UNDER THE LICENSE AGREEMENT**

Le Bonitas has also established the elements for a breach of contract claim for the purpose of granting summary judgment.

A party seeking summary judgment on a breach of contract claim must demonstrate (1) the existence of a contract, (2) adequate performance, (3) breach by the counterparty, and (4) damages.   U.S. Bank Nat'l Ass'n v. Southwest Airlines Co., 2009 WL 2163594 *7.  Le Bonitas has done so.

Neither of the parties contends that the License Agreement does not govern their relationship.  As for adequate performance by Le Bonitas, PHE may try to point to its distribution requirements found in Section 14.1 and Exhibit 9 to their agreement.  But the terms of the License Agreement have been satisfied by Le Bonitas in this regard.

Le Bonitas agreed to (i) use its "best efforts to sell, distribute and supply" the licensed articles within the "Licensed Territory" and (ii) "begin the bona fide manufacture, distribution and sale" of the licensed articles in each country in the Licensed Territory on or before the "Distribution Start Date".  (Exh. 1 to Busanna Decl. at Section 14.1.)  The Distribution Start Date was January 1, 2010, and the Licensed Territory was Worldwide except North and South America.  (Exh. 1 to Busanna Decl. at Exhibits 2 and 9.)

It was also agreed, however, that:

> Notwithstanding the foregoing Distribution Start Date, LICENSEE must launch the LICENSED ARTICLES with at least two (2) retailers in each of Australia, Italy, the United Kingdom, France, Germany, Russia, the United Arab Emirates, Israel, Kuwait, Lebanon, Japan, China and South Korea by June 30, 2011, all of which shall be considered the "Minimum Launch Requirements." If LICENSEE fails to meet the Minimum Launch Requirements in connection with any of such countries in the Licensed Territories, the license rights granted to LICENSEE pursuant to this Agreement in connection with such country in the LICENSE TERRITORY shall revert to OWNER.

(Exh. 1 to Busanna Decl. at Exhibit 9.)

As for termination provisions, PHE had a right to terminate the License Agreement if:

> for any six (6) month period LICENSEE does not make every reasonable effort to commercially distribute and sell all categories of LICENSED ARTICLES...to a minimum of four (4) countries in [each of] Asia...[and] in Europe, and two (2) countries in the Middle East, and does not cure such failure within forty (40) days after written notice from OWNER.

(Exh. 1 to Busanna Decl. at Section 13.1(iv).)

These conflicting distribution requirements must be reconciled to give meaning to all the provisions. The Minimum Launch Requirements set forth the countries in which distribution of the line was material to PHE, and the date by which such distribution had to occur (June 30, 2011). Those countries comprise less than the License Territory. The entire continent of Africa is omitted entirely from the Minimum Launch Requirements. The termination provision would appear to do the same, that is, identify less than what comprises the Licensed Territory. Notably, Africa and Australia are omitted entirely from Section 13.1(iv).

The Distribution Start Date was eighteen months earlier (January 1, 2010), and was for Le Bonitas's benefit.  It was intended to be a start-up period with less stringent obligations in which to meet potential retailers and begin attempts at sell-in.  The staggered dates and lessened obligations for the Distribution Start Date was recognition of the challenges Le Bonitas would face in launching a wholly new line of clothing.  It had only to "begin" the bona fide manufacture, distribution and sale of the licensed articles by January 1, 2010, followed the next year by an actual "launch" with retailers in specifically identified countries, but not the entire Licensed Territory.

This is the same interpretation of these provisions given by Beanstalk's in-house counsel to Le Bonitas's counsel in April 2010, eight months before Le Bonitas commenced this lawsuit.   (Exh. 31 to Garbus Decl.)   The parties understood that meeting the Minimum Launch Requirements would take time and would require a lead-in period during which Le Bonitas would use its "best efforts to sell, distribute and supply" the licensed articles in the Licensed Territory.

Moreover, to the extent that the distribution requirements found in Section 14.1 and Exhibit 9 are conflicting or otherwise  ambiguous, such ambiguities must be construed "most strongly" against PHE, whose agent (Beanstalk) drafted the License Agreement. Jacobson v. Sassower, 66 N.Y.2d at 993.  PHE cannot draft unclear or conflicting provisions and simultaneously seek to rely on the ambiguity it created.

In view of the foregoing, Le Bonitas adequately performed its obligation to begin the bona fide manufacture, distribution and sale of the licensed articles on or before the Distribution Start Date.  Mr. Busanna set forth the countries for whom Le Bonitas had engaged sales agents and distributors.  (Busanna Decl. at 22.)  Le Bonitas's sales and distribution network included everywhere in the Licensed Territory except Asia, Africa and Australia.  Le Bonitas received orders from sales agents and distributors in the network and filled them.  (Busanna Decl. at 22.)  In other words, it manufactured, distributed and sold the licensed articles in those countries for which it received orders.

Lastly, the fact that Le Bonitas sustained damages by reason of PHE's breach is manifest.  It had entered into a License Agreement for a five and one half year term, with the right to bring a collection to market in each successive season.  In this way, Le Bonitas could have built on sales from one season to the next, as is customary in the industry, and obtained the full benefit of the bargain.  (Busanna Decl. at 24.)  It invested time, money and effort in bringing the Spring/Summer collection to market.  But PHE prevented it from bringing the next seasonal collection (Fall/Winter) to market.  The absence of the collection from the Fall/Winter season compromised both the Spring/Summer collection's sales at point of sale, and sales for all future collections over the remainder of the term.  (Busanna Decl. at 47.)

**E.    THE LICENSE AGREEMENT DOES NOT EXPRESSLY BAR
RECOVERY OF DAMAGES IN THESE CIRCUMSTANCES**

PHE may seek to rely on Section 5.1(8) of the License Agreement to claim

that Le Bonitas cannot sue to recover its damages.  But the interpretation of this

section, when reconciled with the other language of the License Agreement, and

as applied to the set of facts before the Court, demonstrates that Le Bonitas can

sue for its damages.

Contractual limitations on one's liability must be clear, explicit and

unambiguous, and shall be strictly construed against the party seeking to avoid

liability.  Terminal Central, Inc. v. Henry Modell & Co., 212 A.D.2d 213, 218, 628

N.Y.S.2d 56 (N.Y. 1st Dep't 1995)(no limitation on liability found).   Where a

provision limiting liability does not unambiguously apply to the alleged breach for

which recovery is sought, the claim should not be dismissed.  See, Pro Net, LLC

v. ACC Telecom Corp., 294 A.D.2d 857, 741 N.Y.S.2d 795 (N.Y. 4th Dep't

2002)(limit on liability for interruption or failure of service did not unambiguously

apply to the failure to deliver in the first instance).  Indeed, summary judgment

may be warranted for the plaintiff when a defendant's claimed limitation on

liability is taken out of context or renders other provisions superfluous.  See,

Graphic Scanning Corp. v. Citibank, 116 A.D.2d 22, 24-25, 499 N.Y.S.2d 712

(N.Y. 1st Dep't 1986)(summary judgment granted in favor of the plaintiff for lost

profits in light of inapposite limit on liability).

Clearly, PHE had a duty to engage in the approval process.  To conclude

otherwise would be to render the review and approval "process" language

entirely superfluous and to grant PHE an unfettered, unilateral power to deprive

Le Bonitas of the fruits of the contract.  To grant PHE an approval right but no corresponding obligation to review and respond to submissions for approval was plainly not what the parties intended.

Further to that duty, the first sentence of Section 5.1(2) establishes that PHE had an obligation to actually "review and respond" to Le Bonitas's submissions.  PHE had discretion to approve or disapprove, but it had to exercise that discretion in good faith after an actual review of Le Bonitas's submissions.  PHE was expressly given ten business days within which to "review and respond" -- the first sentence of Section 5.1(2) places a commercially reasonable but necessary limit on how long PHE could take in its review.

The second sentence of Section 5.1(2) provides that if PHE fails to respond to submissions within the required ten business day period, it should be "deemed disapproved." As we know from the undisputed facts of this case, this sentence is inapposite given the fact that PHE did not even receive the boards until the tenth business day, Ms. Hilton did not receive them until thirteen days after that, and all the while Beanstalk repeatedly promised Le Bonitas that approval was imminent.  Le Bonitas could not go forward or go back, and had to maintain the status quo until PHE formally responded.[11]  (Busanna Decl. at 45-46.)  Until Ms. Hilton reverted with input, comments or feedback -- as a practical matter, some degree of collaboration from PHE was obviously necessary -- Le Bonitas had no information with which to proceed.

---

[11] If Le Bonitas could proceed without an express approval from Ms. Hilton, that would entirely nullify and render meaningless PHE's express right to "advance written approval, in Owner's sole and absolute discretion, at all stages..." (Exh.1 to Busanna Decl., Section 5.1.)

But we also know from the undisputed facts before this Court that there was no valid reason why PHE did not respond for 43 days, despite PHE's duty to engage in the approval process.   The series of acts of nonfeasance, malfeasance and indifference of Beanstalk and PHE explain the delay, but did not satisfy or otherwise discharge PHE's duty.

Section 5.1(8) of the License Agreement provides that PHE's "failure or refusal to grant any approval" does not give rise to a claim for damages or other remedies.  (Exh. 1 to Busanna Decl.)  This provision was intended only to guard against liability for the exercise of PHE's discretion in disapproving a particular item.  (Busanna Decl. at 45-46.)  But that never occurred here -- Ms. Hilton, in fact, gave her approval of the boards (albeit on the 43rd day).

Le Bonitas's claim is not based on a failure or refusal to grant any particular approval over a particular item, that is, the exercise of Ms. Hilton's discretion in disapproving something.  It arises from PHE's failure or refusal to engage in the approval process altogether for 43 days -- a de facto suspension of the approval process, in breach of its contractual obligations.  Le Bonitas's claim is not in conflict with Section 5.1(8) -- the set of facts presented by this suit were never contemplated by this provision and are not addressed by it.  As such, it is inapposite.  Compare, Graphic Scanning Corp. v. Citibank, 116 A.D.2d 22, 24-25, 499 N.Y.S.2d 712.

Section 5.1(8) is, at best, ambiguous in the regard to these facts.  As such, it must be strictly construed against the party seeking to avoid liability, PHE.  Pro Net, LLC v. ACC Telecom Corp., 294 A.D.2d at 858.  The fact that it

must be construed against PHE as the drafter of the contract is yet another reason it cannot bar damages here.  <u>Jacobson v. Sassower</u>, 66 N.Y.2d at 993. Section 5.1(8) does not say that PHE is absolved of liability for failing to engage in the approval process -- as happened here -- or even for its delay in granting its approval.  It certainly could have been drafted to say these things, but it says something more limited.  <u>Compare</u>, <u>D.C. USA Operating Co. v. Indian Harbor Ins. Co.</u>, 2007 WL 945016 *9 (S.D.N.Y. 2007)("If [the defendant] sought to exclude coverage for the remediation of all petroleum hydrocarbons found... [it] was capable of writing a less clumsy provision to accomplish this result").  PHE hired Beanstalk and its team of in-house lawyers to draft a clear form of license agreement.  If it failed to do so, that ambiguity must be construed against it.

Moreover, the License Agreement did contemplate that there might be a suspension of the approval process, but it did not exclude the recovery of damages in such event.  Suspension was expressly governed by a different provision, namely Section 5.2 (RIGHT TO SUSPEND APPROVAL PROCESS), which states that:

> [i]n addition to its other remedies, [PHE] reserves the right to suspend the approval process after [PHE] has given [Le Bonitas] notice of breach of this Agreement, until [Le Bonitas] has cured the breach.

(Exh.1 to Busanna Decl., Section 5.2.)  In the event that Le Bonitas was in breach of the License Agreement, PHE could suspend the approval process altogether (after giving notice).  That never occurred here, so PHE had no such right.  Section 5.2 -- the section which is most applicable to the set of facts which

actually occurred -- does not bar damages or other remedies by Le Bonitas in the event that PHE improperly suspended the approval process.

In view of all the evidence, and the terms of the License Agreement as applied to such evidence, the breach of PHE has been established. Since there is no express, unambiguous bar to the recovery sought by Le Bonitas, it is respectfully submitted that summary judgment should be granted as to liability.

POINT II

SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING THAT
PORTION OF PHE'S COUNTERCLAIM SEEKING LEGAL FEES

In the event the Court does not grant Le Bonitas summary judgment as to liability on its breach of contract claim, it should, in the alternative, dismiss that portion of PHE's counterclaim which seeks legal fees. (Ex. 15 to Garbus Decl., ¶¶ 18, 21.) They are not recoverable under the indemnity provisions of the License Agreement, which plainly pertain only to fees incurred in respect of third-party claims.

This precise issue has been thoroughly examined and decided by the New York Court of Appeals under similar contractual language. In Hooper Assocs., Ltd. v. AGS Computers, Inc., 74 N.Y.2d 487, 549 N.Y.S.2d 365 (N.Y. 1989), the plaintiff ("Hooper") agreed to purchase computer equipment and services from the defendant ("AGS"). Hooper eventually sued for breach of contract, and also sought its attorney's fees based on the provision granting it indemnity under certain circumstances. Id. at 489-90. AGS moved for summary judgment to dismiss the fee claim. Id. at 490. On appeal, the Court of Appeals reversed the lower courts and granted summary judgment to AGS, finding that the indemnity

42

provisions "clearly covered" fees for third party claims only, not fees in an action on the contract itself. Id. at 494.

The Court of Appeals noted that, first and foremost, because the prevailing party is not ordinarily entitled to its fees, any such promise should not be found unless it is "umistakably clear" and can be "clearly implied" from the language and purpose of the entire agreement. Id. at 491-92. Moreover, the indemnity language at issue was typical of those contemplating reimbursement when the indemnitee pays damages on a third-party claim. It set forth a duty to "indemnify and hold harmless" Hooper and identified the specific subject matters out of which the indemnity obligation could arise. Each category was in the nature of a third-party claim, to wit, breach of warranty, performance of service, infringement, and mechanic's liens. Id. at 490.

The other provisions in the indemnity section also "unmistakably" related to third-party claims, such as Hooper's duty to notify AGS of any claim to which indemnity might apply and Hooper's right to assume the defense with its own counsel. Id. at 492. These provisions were superfluous given Hooper's interpretation. The Court of Appeals recognized that given the purpose of the entire agreement -- AGS's provision of computer services to Hooper -- the potential for third-party claims against Hooper existed, and the reference to attorney's fees was intended to reimburse Hooper for such fees in defending such claims. Id. at 494.

Here, the potential for third-party claims was plainly contemplated by the parties, inasmuch as Le Bonitas would be distributing goods into the stream of commerce bearing the *Hilton* name.   Section 9.2 of the License Agreement reflects this.   Le Bonitas had express duties to "defend, indemnify and hold harmless" PHE.   As in <u>Hooper Assocs.</u>, 74 N.Y.2d at 492-93, these duties unmistakably pertain only to third-party claims.  (Exh. 1 to Busanna Decl.)  A duty to defend is unequivocal, that is, to defend PHE in an action brought against it by a third party. <u>See</u>, <u>e.g.</u>, <u>Sero v. New York Cent. Lines</u>, 2010 Westlaw 2294440 *5 (W.D.N.Y. 2010)(noting that a party's interpretation would give no meaning to the duty to "defend", which creates a duty distinct from one to indemnify).

In the first sentence of Section 9.2, the duties are limited to the "**liability**" of the indemnitee (PHE) arising out of a lawsuit, legal proceeding, action claim or demand (defined as a "Claim").  This is language is plainly referable to claims made by others -- the indemnitee cannot be "liable" to itself, as it would have to be to give those words any meaning in an action on the contract.

Further, the indemnified "Claim" in favor of PHE must be "based upon" four specifically identified subject matters. (Exh. 1 at Section 9.2.)  As in <u>Hooper Assocs.</u>, 74 N.Y.2d at 490, each category is unmistakably in the nature of a third-party claim, <u>to</u> <u>wit</u>, (i) alleged defects in the licensed articles, (ii) alleged infringement or unauthorized use or misappropriate of intellectual property of **third parties**, (iii) actual breaches of warranty, representations, terms or conditions by Le Bonitas, **a manufacturer or a distributor**, and (iv) actual breaches of a law or regulation by Le Bonitas, **a manufacturer or a distributor.**

44

The License Agreement also contains provisions concerning rights to undertake and conduct the defense and settlement of "Claims" (Sections 9.2) and the giving of notice of any claim to which indemnity might apply (as well as a duty to cooperate) (Section 9.4). The specific language employed on these two issues is "unmistakably" referable only to third-party claims. Similar provisions in Hooper Assocs., 74 N.Y.2d at 492-93, were determined to pertain to third-party claims only or would otherwise be rendered completely meaningless.

The only sentence in Section 9.2 which contains a reference to the recovery of attorney's fees starts with the words "**This indemnification** shall include..." (Sections 9.2 and 9.3.) It is a direct syntactical connection to the immediately preceding paragraph -- it is referring back to it -- which defines and limits the types of "Claims" for which indemnity may be sought, namely, third-party claims.

The "This indemnification" sentence goes on to list as recoverable:

all damages, interest payments, reasonable attorney's fees, costs and expenses...including costs of collection of all amounts owed to OWNER by LICENSEE and costs of all actions by OWNER against LICENSEE to enforce LICENSEE's compliance with this Agreement.

(Section 9.2.)  The first clause of the sentence -- "all damages, interest payments, reasonable attorney's fees, costs and expenses" -- it is plainly referable to and most certainly consistent with costs incurred in respect of third party claimsonly.

As for the second clause of the sentence -- "including costs of collection of all amounts owed to OWNER by LICENSEE and costs of all actions by OWNER against LICENSEE to enforce LICENSEE's compliance with this Agreement" -- it is also referable to and consistent with third-party claims.  To the extent any ambiguity could exist, it is explained by the distinction between Le Bonitas's duty to defend versus its duty to indemnify, which give rise to different rights and remedies.  See, e.g., Sero v. New York Cent. Lines, 2010 Westlaw 2294440 *5; Travelers Prop. Cas. Corp. v. Winterthur Int'l., 2002 Westlaw 1391920 *5-7 (S.D.N.Y. 2002)(discussing the legal distinction between a contractual duty to defend and to indemnify with respect to third-party claims in the context of a lease).

In contrast, PHE had no duty to defend Le Bonitas, only to indemnify it. (Section 9.3.)  This is recognition of the fact that PHE obtained greater protection from third-party claims, inasmuch as there was a greater likelihood that they would arise from the conduct of Le Bonitas, not PHE.  Le Bonitas was the party to the contract distributing goods into the stream of commerce bearing the *Hilton* name, not PHE.

Thus, PHE arguably had a recovery right which Le Bonitas did not have -- in the context of a third-party claim only -- in the event of a breach of Le Bonitas's defense or indemnification obligations.  PHE could arguably seek to recover its costs incurred in enforcing its right to a defense (i.e., to "enforce compliance") or its right to indemnity upon a judgment (i.e., "costs of collection of all amounts owed").

In <u>Oscar Gruss & Son, Inc. v. Hollander</u>, 337 F.3d 186 (2nd Cir. 2003), the Second Circuit Court of Appeals was confronted with similar language in an indemnity provision in a breach of contract claim between the parties themselves. In discussing the standard of analysis, the Court of Appeals confirmed that the intention to provide counsel's fees in an action on the contract must, as first set forth in <u>Hooper Assocs.</u>, 74 N.Y.2d at 492, "be unmistakably clear." <u>Id.</u> at 199.

As in Section 9.2 here, the indemnity language in <u>Oscar Gruss & Son</u>, 337 F.3d 186, also included "enforcement" language. It stated that reimbursement for legal and other expenses "includ[ed], without limitation, in connection with the enforcement of this Agreement and the indemnification obligations set forth herein." <u>Id.</u> at 199. In reversing the District Court, the Court of Appeals had little trouble determining that this indemnity provision (under which attorney's fees were sought) "indisputably" applied only to third party claims, when viewed in light of the preceding provisions. <u>Id.</u> at 200. As held by the Court of Appeals, it pertained only if the defendant refused to indemnify the plaintiff for a third party claim (not to the direct action on the contract originally sued upon). <u>Id.</u>; <u>accord</u>, <u>Oppenheimer & Co. v. Metal Mgmt.</u>, 2011 Westlaw 2462588 *9-10 (S.D.N.Y. 2011)(court rejected attorney's fees claim in action on the contract in which indemnity provided for recovery of expenses incurred in "pursuing any claim" or in "enforcing" the agreement); <u>compare</u>, <u>Fuller-Mosley v. Union Theological Seminary</u>, 47 A.D.3d 487, 488, 851 N.Y.S.2d 401 (N.Y. 1st Dep't 2008)(contractual indemnity awarded for a third party claim, but the provision did not permit the indemnitee to recover its fees for "its pursuit of claims for

47

indemnification").

In <u>Nathan v. Cooper</u>, 2007 Westlaw 4352705 (S.D.N.Y. 2007), the District Court was confronted with indemnification language -- as Section 9.2 does here -- referencing both "enforcement" and "collection," <u>to wit</u>, providing for recovery of expenses arising from "enforcement or collection of a judgment under this indemnity". <u>Id.</u> at *4.  The Court rejected the claim for attorney's fees in the action on the contract because, inasmuch as the provisions as a whole suggested they applied to third-party claims, the language could not meet the "unmistakably clear" burden. <u>Id.</u> at *5.

Notably, the License Agreement also contains express termination (Section 13.1) and remedies (13.2) provisions.  Logically, these are the sections in which PHE would include an express right to its attorney's fees as the prevailing party in an action between the parties on the contract itself.  PHE was fully capable of being clear and unambiguous in drafting the form of license agreement it used in this matter.  Since it failed to do so, any ambiguity must be construed "most strongly" against it on this additional ground.  <u>Jacobson v. Sassower</u>, 66 N.Y.2d at 993.

As established above, the provisions of Section 9 of the License Agreement are not "unmistakably clear" in favor of an intention for PHE to recover its fees in this action on the contract.  To the contrary, Section 9 is plainly referable to recovery of fees in respect of third-party claims.  PHE cannot recover its attorney's fees in this circumstance.  In view of the foregoing, it is respectfully submitted that summary judgment should be granted, dismissing so much of

PHE's counterclaim as seeks such fees.

## CONCLUSION

For all the reasons set forth above, plaintiff and counter-claim defendant Le Bonitas respectfully request that the Court enter an order granting summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (i) as to liability on it breach of contract claim for relief, or, in the alternative (ii) dismissing that portion of defendant and counter-claimant Paris Hilton Entertainment Inc.'s claim seeking legal fees, together with such other and further relief as the Court may deem proper in the circumstances.

Dated:  New York, New York
        February 24, 2012

                                    COUNSEL TO EATON & VAN WINKLE LLP


                                    By: ___s/Martin Garbus_____
                                         Martin Garbus
                                         Joseph T. Johnson

                                    3 Park Avenue
                                    New York, New York 10016
                                    (212) 779-9910

                                    Attorneys for Plaintiff Le Bonitas S.p.A.