UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LE BONITAS S.P.A.,

                              Plaintiff,

            - against -

PARIS HILTON ENTERTAINMENT INC.,

                              Defendant.

Case No. 10 Civ. 9350 (AKH)

ECF Case

**MEMORANDUM OF LAW OF PLAINTIFF LE BONITAS S.P.A.
IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF
<u>DEFENDANT PARIS HILTON ENTERTAINMENT</u>**

Martin Garbus, Esq.

EATON & VAN WINKLE LLP
Attorneys for Plaintiff Le Bonitas S.p.A.

3 Park Avenue
New York, New York 10016
(212) 779-9910

## TABLE OF CONTENTS

Page No.

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT ..................................................................... 1

COUNTER-STATEMENT OF FACTS ........................................................ 2

I.   The License Agreement Is a Form Contract – There Is No Extrinsic
     Evidence Concerning The Meaning of Section 5.1(8) ...................... 2

II.  The Testimony Regarding The "Deemed Disapproval" Language Of
     Section 5.1(2) Is Falsely Stated and Mischaracterized .................... 3

III. The Conflicting Distribution Requirements ....................................... 5

IV.  The Parties' Indemnification Obligations Involve Third Party Claims Only ....... 6

V.   The Facts of the Spring/Summer Collection Are Distorted Beyond
     Recognition in Paris Hilton's Papers ................................................ 7

VI.  The Designer's Contract, Internal Schedule and Approval Form Are
     Utterly Irrelevant ............................................................................ 10

VII. Paris Hilton's Breach Regarding the Inspiration Boards Is Not Excused By
     Paris Hilton's Gross Negligence and Intentional Acts, Including Losing The
     Boards and Ignoring Them .............................................................. 11

VIII. Paris Hilton's Claim That Le Bonitas's Termination of Sales Agents And
     Distributors Is Irrelevant, Wrong and a Factual Issue; Its Essence Is
     Contradicted By Exactly What Was Going On.  Manufacturing Of The
     Spring/Summer Collection Proceeded .............................................. 15

IX.  Le Bonitas's Preparation of Design Pages Is, At Best, Another Immaterial
     Fact Issue ....................................................................................... 18

X.   Ms. Hilton Never Reviewed the Inspiration Boards Prior to November 18,
     2009 ................................................................................................ 18

ARGUMENT ......................................................................................... 23

   A.   The License Agreement Does Not Bar Recovery Of Legal Fees And Other Damages By Le Bonitas .................................................................... 23

   B.   A Breach Has Occurred; Paris Hilton Failed to Engaged in the Approval Process Or Otherwise Review And Respond Sufficient To Enable Le Bonitas To Receive The Benefit Of The Bargain .............................. 28

   C.   That a Breach Has Occurred Alone, Prevents Summary Judgment In Favor Of Paris Hilton .............................................................................. 31

   D.   Le Bonitas Under the Contract And Seeking Attorneys Fees In Its Relief Clause Has Suffered Damages-Lost Profits And Legal Fees Owed To It. This May Be Proven At Trial.  Further Discovery, If It Has Not Yet Proven It Conclusively, Should Be Permitted On This .................................... 33

   E.   Le Bonitas Has Not Elected A Remedy: It Satisfied A Duty To Mitigate .......... 38

CONCLUSION ....................................................................................... 40

# TABLE OF AUTHORITIES

## CASES

Ash v. New York Univ. Dental Ctr.,
  164 A.D.2d 366, 564 N.Y.S.2d 308 (N.Y. 1st Dep't 1990) .......................................... 23

Banc of America Sec. LLC v. Solow Bldg. Co.,
  47 A.D.3d 239, 847 N.Y.S.2d 49 (N.Y. 1st Dep't 2007) .............................................. 27

Cieco v. Paramarketing, Inc.,
  228 A.D.2d 462, 643 N.Y.S.2d 668 (N.Y. 2nd Dep't 1996) ........................................ 25

Dalton v. Educational Testing Serv.,
  87 N.Y.2d 384, 639 N.Y.S.2d 977 (N.Y. 1995) .......................................................... 30, 31

Enidine Inc. v. Dayton-Phoenix Group,
  2003 WL 22383571 (W.D.N.Y. 2003) ........................................................................ 33, 34

Graphic Scanning Corp. v. Citibank,
  116 A.D.2d 22, 499 N.Y.S.2d 712 (N.Y. 1st Dep't 1986) ........................................... 24, 25

India.com v. Dalal,
  324 Fed. Appx. 59, 2009 WL 1119612 (2d Cir. 2009) ................................................ 31

Joao v. Cenuco, Inc.,
  376 F.Supp.2d 380 (S.D.N.Y. 2005) ........................................................................... 25

Kalisch-Jarcho, Inc. v. City of N.Y.,
  58 N.Y.2d 377, 461 N.Y.S.2d 746 (N.Y. 1983) .......................................................... 26, 27

Kamfar v. New World Rest. Group,
  347 F.Supp.2d 38 (S.D.N.Y. 2004) ............................................................................ 25

Lexington Prods. Ltd. v. B.D. Communications,
  677 F.2d 251 (2d Cir. 1982) ....................................................................................... 37

Pro Net, LLC v. ACC Telecom Corp.,
  294 A.D.2d 857, 741 N.Y.S.2d 795 (N.Y. 4th Dep't 2002) ......................................... 24, 26

Prudential Ins. Co. of Am. v. Dewey Ballantine, Bushby, Palmer & Wood,,
  170 A.D.2d 108, 573 N.Y.S.2d 981 (N.Y. 1st Dep't 1991) ......................................... 39

Tedesco v. Triborough Bridge & Tunnel Auth.,
  250 A.D.2d 758, 673 N.Y.S.2d 181 (N.Y. 2nd Dep't 1998) ....................................... 25

Terminal Central, Inc. v. HenryModell & Co.,
   212 A.D.2d 213, 628 N.Y.S.2d 56 (N.Y. 1st Dep't 1995)...........................................24

V.S. Int'l. v. Boyden World Corp.,
   1993 WL 59399 *1 (S.D.N.Y. 1993).........................................................................34, 35, 36, 37


## STATUTES

Federal Rules of Civil Procedure ("FRCP") Rule 56(d)................................................38

## TABLE OF EXHIBITS

**_EXHIBIT #_**                              **_DESCRIPTION_**

| EXHIBIT # | DESCRIPTION |
|---|---|
| 33 | Excerpts from the deposition of Oliver Herzfeld, taken on December 19, 2011 |
| 34 | Excerpts from the deposition of Gianni Busanna, taken on November 14 and 15, 2011 |
| 35 | Excerpts from the deposition of Elisabetta Maria Argia Balli, taken on November 16, 2011 |
| 36 | Excerpts from the deposition of Guglielmo Muratori, taken on November 17, 2011 |
| 37 | Excerpts from the deposition of Marco Adami, taken on November 17, 2011 |
| 38 | Initial Disclosures by Plaintiff and Counter-Claim Defendant Le Bonitas dated April 29, 2011 |
| 39 | E-mail Exchange between Serena Sibbald of The Beanstalk Group, LLC and Gianni Busanna, starting June 19, 2008 and ending June 26, 2008, with documents concerning Paris Hilton's other brands |
| 40 | (a) E-mail Exchange between Serena Sibbald and Gianni Busanna, starting October 30, 2008 and ending December 3, 2008, attaching a business plan and sales projections [LB 5-6] and proposed deal terms [1-26]; (b) the 2010 annual budget for all of Le Bonitas's collections [LB 27]; and (c) invoices and expense reports reflecting Le Bonitas's out-of-pocket expenses in developing the Fall/Winter collection [LB 28-38] |

This memorandum of law is submitted by Plaintiff and Counter-Claim Defendant Le Bonitas S.p.A. ("Le Bonitas") in opposition to the motion of Defendant and Counter-Claimant Paris Hilton Entertainment Inc. ("Paris Hilton") for summary judgment.

## PRELIMINARY STATEMENT

Paris Hilton received the boards on October 8, 2009.  She was to respond to them by October 22, 2009.  She returned them on the 43rd day instead – November 20, 2009.  The termination letter was sent out on November 25, 2009. Her primary defense is that she got the boards to Le Bonitas on time (she did not) – this relates to the "timing" necessary to get goods to market in Italy – a subject about which she and her colleagues know nothing.

The parties have each moved for summary judgment.  Le Bonitas has already submitted a memorandum of law in support of its motion ("LB's Moving Mem.")  Those arguments are expressly incorporated by reference.

The only issue on this motion is Paris Hilton's failure to respond.  Once it has been determined she has breached the other extraneous issues do not come into play.

Le Bonitas has asserted in its motion that (i) Paris Hilton failed to engage in the approval process as contemplated by the License Agreement, as it failed to respond for an extended period of time during the fall of 2009 to Le Bonitas's submission seeking approval over inspiration boards, and (ii) this was a material breach of the License Agreement because it unarguably prevented Le Bonitas from getting the Fall/Winter collection to the marketplace.

Paris Hilton asserts in her motion that (i) it did respond with questions, (ii) Ms. Hilton reviewed the boards "as soon as she physically received them on November 4, 2009" (this is after her response date) and (iii) and it eventually approved them as a "favor." (Paris Hilton's memorandum of law in support of her motion ["Paris Hilton's Moving Mem."] at 1-2.) Each of these contentions are wrong. Paris Hilton has tried to explain away its 43 day delay in approving the inspiration boards. She cannot. Her statements are shown to be false by her writings, conduct and testimony and that of her agent and colleagues.

When the terms of the License Agreement are applied to the uncontested facts which actually occurred here, summary judgment must be awarded to Le Bonitas. The explanations offered by Paris Hilton merely raise factual issues. As such, they do not entitle Paris Hilton to summary judgment.

## COUNTER-STATEMENT OF FACTS

Paris Hilton's purported fact statement is replete with false statements and wrongfully excerpted deposition answers most of which which have absolutely no bearing on the issues necessary to decide the motions for summary judgment.

Le Bonitas will not purport to controvert each inaccuracy, since most of them are utterly false and irrelevant. Below is but a sampling.

**I.      The License Agreement Is a Form Contract -- There Is No
Extrinsic Evidence Concerning The Meaning of Section 5.1(8)**

Paris Hilton fails as it tries to explain the meaning of Section 5.1(8) of the License Agreement, and the reason it negotiated for the language employed. (Paris Hilton's Moving Mem. at 4.)  It relies exclusively on Paragraph 5 of the declaration of Oliver Herzfeld, Beanstalk's Chief Legal Officer ("Herzfeld Decl.").

Paris Hilton failed to provide the Court with Mr. Herzfeld's deposition testimony.  This was deliberate and not an accident.  That testimony completely contradicts any assertion that he is competent to testify as to how or when this language even ended up in Beanstalk's standard form of license agreement, much less why it was included or what it was intended to mean.

Mr. Herzfeld testified that the License Agreement was based on Beanstalk's "form" document that had "been around for a long time".  (Exh. 33 to the declaration of Martin Garbus in Opposition to Paris Hilton's Motion for Summary Judgment ["Garbus Opp. Decl."], pgs. 9-10, 60.)  He could not recall where or when any changes (if any) to that form document were made prior to its signing as the License Agreement.  (Exh. 33, pg. 9, 11.)  He admitted that he was not even the person who modified or changed the form document into the License Agreement which was signed.  (Exh. 33, pgs. 9-10.)

As for Section 5.1 (including its 11 subparts), Mr. Herzfeld did not even know -- one way or the other -- whether any of it had existed as part of the form document prior to his joining Beanstalk.  (Exh. 33, pgs. 10-11.)  Consistent with that testimony, he could not recall whether he made any modification to any part of Section 5.1.  (Exh. 33, pgs. 11, 59-60.)

Gianni Busanna, sales and marketing manager for Le Bonitas, established in his declaration in support of Le Bonitas's motion for summary judgment ("Busanna Decl.") that none of the language in Section 5.1(8) was changed from the initial form of license agreement submitted to him by Beanstalk prior to signing.  (Busanna Decl. at 7.)

Mr. Herzfeld attempts to re-write Section 5.1(8), and to use different words than those set forth to change its meaning.  But cannot.

## II.     The Testimony Regarding The "Deemed Disapproval" Language Of Section 5.1(2) Is Falsely Stated And Mischaracterized

Paris Hilton also purports to summarize Mr. Busanna's testimony in respect of the "deemed disapproved" language of Section 5.1(2) of the License Agreement.   (Paris Hilton's Moving Mem. at 4-5.)   In doing so, it mischaracterizes, truncates or omits relevant parts of the very same answers on which it seeks to rely.

Mr. Busanna testified that it would not have been a breach for Paris Hilton to respond to the Fall/Winter inspiration boards in twelve or fifteen business days. Paris Hilton deliberately omitted Mr. Busanna's answer as to the <u>reason</u>: because "15 days would have still been acceptable even if very difficult for us", and "[w]e could accept it. It would have been very difficult for us, but in some manner, we could have gotten through it."  (Exh. C to the declaration of Michael Weinsten ["Weinsten Decl."] in support of Paris Hilton's motion for summary judgment, at 33, 35.)   Le Bonitas could have still gotten the collection to the market if that had occurred.   But Paris Hilton waited 43 days to approve the boards (not 12 or 15 days).  The questions concerned a set of facts which did not occur.

Mr. Busanna stated his point plainly when he testified that Le Bonitas breached the contract "because a great deal more time passed [than ten days] and we were not able to bring out the work in time for the collection."  (Exh. C to Weinsten Decl. at 33.)  All agree it was 43 days.

4

Paris Hilton asserts that it was Le Bonitas's "expectation" that Paris Hilton would not approve or disapprove a submission in ten business days. (Paris Hilton's Moving Mem. at 5.) That was not what was asked and answered. Mr. Busanna testified only that Paris Hilton was not required to approve or disapprove within ten business days. (Exh. C to Weinsten Decl. at 27-29.)

## III.   The Conflicting Distribution Requirements

Paris Hilton attempts to reconcile the conflicting provisions of Section 14.1 and Exhibit 9 of the License Agreement -- setting forth a "Distribution Start Date", and a later "Minimum Launch Requirements" date with a lesser distribution obligation -- by ignoring the conflict altogether. (Paris Hilton's Moving Mem. at 6.) Paris Hilton simply does not know this business. This issue is fully discussed in Le Bonitas's motion for summary judgment. (LB's Moving Mem. at 34-37.)

Beanstalk's own in-house counsel stated that the later "Obligation to Launch" date of June 30, 2011 was expressly intended to give Le Bonitas more time to meet the "challenges and possible delays in creating, launching and selling a wholly new line of products…" (Exh. 31 to the declaration of Martin Garbus in Support of Le Bonitas's Motion for Summary Judgment ["Garbus Decl."].) In other words, Le Bonitas had the later date, June 30, 2011, in which to meet the "Obligation to Launch" requirements, which excluded Africa entirely from the "Licensed Territory." This later date and the countries (not continents) identified were those material to Paris Hilton in terms of Le Bonitas's distribution requirements.

### IV.    The Parties' Indemnification Obligations Involve Third Party Claims Only

In its "fact" section, Paris Hilton quotes a snippet of language from Section 9.2 of the License Agreement, namely Le Bonitas's indemnification obligation for third party claims, to distort its meaning.  (Paris Hilton's Moving Mem. at 7.)  She is not entitled to her legal fees in this action on the contract itself.  Her intentional actions and gross negligence require a denial of that claim.  To extract and quote only from a dependent or subordinate clause, standing alone, from a sentence setting forth what "[t]his indemnification" includes is deliberately misleading to the Court.    It is certainly not a "fact."   Moreover, the whole sentence itself is dependent upon and subordinate to the immediately preceding paragraph, which expressly defines the "Claims" for which "[t]his indemnification" may be sought, to wit, third party claims only.

This issue is in Le Bonitas's motion for summary judgment.  (LB's Moving Mem. at 42-48.)   Sections 9.2 and 9.3 of the License Agreement set for the parties' respective indemnification obligations in respect of third-party claims, that is, claims brought by others.  Section 9.4 sets forth the parties' obligations to give notice concerning and cooperate with each other in respect of those third-party claims.  The quoted snippet does not apply to a direct action between the parties, as here.

## V.     The Facts Of The Spring/Summer Collection Are Distorted Beyond Recognition In Paris Hilton's Papers

In discussing the development of the Spring/Summer collection, Paris Hilton recounts some -- but not all -- of the facts (all of which are irrelevant to its motion) and provides only parts of deposition answers.  (Paris Hilton's Moving Mem. at 7.)

It ignores that Paris Hilton's approval of the Spring/Summer inspiration boards took only slightly longer that the ten business day "contractual turnaround time" that was required [1]  (Busanna Decl. at 20.)  Because Paris Hilton promptly gave approval over the boards on April 6, 2009, and because Paris Hilton also agreed to review the design pages and the first sample set of the collection at the same time (the second and third stages requiring approval) -- cutting out one of two more required "contractual turnaround times" -- Le Bonitas was then able to get the salesmen sample sets made and ready in time for the trade fair taking place about 12 weeks later, on July 4-6, 2009.  (Busanna Decl. at 20-22.)  It is uncontradicted that no such offer was made here.

In a mere footnote, Paris Hilton asserts that Le Bonitas could have gotten the Fall/Winter collection to market in time because the detailed designs for the Spring/Summer collection were approved just one month before the Spring/Summer sales campaign began (on July 4-6, 2009).  (Paris Hilton's Moving Mem. at 17, fn. 7.)  Paris Hilton simply does not know what she is talking about.  Paris Hilton's approval came on April 6, 2009.  (Exh. 34 to Garbus Opp. Decl. at 123.)  Paris Hilton's approval of the first physical set of the clothing

---

[1] This term is Beanstalk's, used in its own licensee "Welcome Pack."  (Exh. 2 to Busanna Decl.)

collection took place on May 27, 2009.  (Exh. C to Weisten Decl. at 108.)  This was seven weeks later.  It took Le Bonitas that intervening time to manufacture the first physical set of the collection for Paris Hilton's approval.

After Paris Hilton's approval of that first set on May 27th, the trade fair was five plus weeks after that.   It took Le Bonitas that intervening time to manufacture the several additional physical sets of the collection to show at the fair and give to each of its twenty one different sales agents and distributors. Seven weeks plus five weeks equals twelve weeks – that was how long it took Le Bonitas to manufacture the necessary sets of physical salesmen samples.

As for the real reasons for poor sales – Ms. Hilton's continued ineptness. Paris Hilton fails to mention (Paris Hilton's Moving Mem. at 8) that one of the criticisms of the Spring/Summer collection received from the English distributor was the fact that it "was not in tune with the other Paris Hilton line because there was no style guide." [2]  (Exh. C to Weinsten Decl. at 225.)  And that was because Paris Hilton never provided a style guide to Le Bonitas until well after the events at issue.   The significance of the lack of a style guide cannot be overstated. Another criticism received from sales agents about the inconsistency of style was that Diciotto's *Hilton* apparel collection (already in the market) was more "aggressive" and that LE Bonitas's collection was "romantic."   (Declaration of Gianni Busanna in opposition to PHE's motion for summary judgment ["Busanna Opp. Decl."] at 21.)  There was no consistency, and it hurt sales.  This was Paris Hilton's fault, not Le Bonitas's.

_____

[2] A style guide is intended to establish the look and feel of the brand and for consistency for the brand among different licensees of that brand.

Paris Hilton's ineptness hurt sales in another crucial respect.  As a "celebrity", her name was all that was being sold.  (Busanna Opp. Decl. at 18.) That was what needed to be maximized at the outset.  And the physical salesmen samples of the Spring/Summer collection shown at the trade fairs and given to the sales agents to show to retails stores was the first impression to be made.  Her logo on those samples was a fundamental necessity for sales.

But due to continued indecisiveness and incompetence, Ms. Hilton kept changing her logo.  (Busanna Opp. Decl. at 19.)  When Le Bonitas needed her to authorize its use of one of the logos that had been changed and changed again, that authorization did not come.  (Busanna Opp. Decl. at 20.)  It was yet another a crucial flounder.

The samples had to be made without any *Hilton* logo on the hang tags (they hang from each article and can be seen from afar by customers), and there was no point in using sewn-in labels since they would be blank.  (Busanna Opp. Decl. at 20.)  The samples -- the first impression -- looked unfinished and unprofessional.  (Busanna Opp. Decl. at 20.)  It was a professional embarrassment for Le Bonitas, and its negative impact on sales cannot be overstated.  Again, this was Paris Hilton's fault.

Paris Hilton falsely points to an October 21, 2009 email from Mr. Busanna in regards to what money Le Bonitas had committed to marketing.  (Paris Hilton's Moving Mem. at 8-9.)  Paris Hilton omits Mr. Busanna's deposition testimony about that very same email, in which he explained that his point was that Le Bonitas had already satisfied its marketing expenditure of four percent of actual

sales -- not projected net sales -- pursuant to the License Agreement.  (Exh. 34 to Garbus Opp. Decl. at 323-24; Exh. 1 to Busanna Decl. [License Agreement] at pg.33 [Exh. 10 thereto (promotional commitment)].)   But it does not matter. These distortions upon which Paris Hilton relies are utterly irrelevant to the motions before the Court.

**VI.   The Designer's Contract, Internal Schedule and Approval Form Are Utterly Irrelevant**

Paris Hilton falsely finds some significance in regard to Le Bonitas's contract with its designer and an internal "ideal timing" schedule prepared shortly after the License Agreement was signed in March 2009.  (Paris Hilton's Moving Mem. at 9.)  They are utterly irrelevant.  Paris Hilton's assertions are also false and incomplete.

According to Le Bonitas's contract with its designer for the Paris Hilton line, Romina Christodero, Ms. Christodero was contractually required to have only "design and fabric applications" completed on or before September 20, 2009 for the 2010 Fall/Winter season.  (Declaration of Filippo Marchino in Support of Paris Hilton's Motion for Summary Judgment, ¶ 2, Exh. S thereto.)  When Paris Hilton again falsely attempts to quote from its own translation of that contract, it misquotes -- the Christodero contract does not state that "mood boards" or "detailed" designs were due by that date.  (Paris Hilton's Moving Mem. at 9.)

When Paris Hilton refers to Mr. Busanna's testimony about the internal schedule for the Fall/Winter collection as it relates to the inspiration boards, it rounds up the date and again falsely omits Mr. Busanna's first and more relevant answers.  (Paris Hilton's Moving Mem. at 9.)  Mr. Busanna testified that the "ideal

time" for submitting the 2010 Fall/Winter mood boards was by July 20, 2009 -- not July as contended by Paris Hilton -- but that the designer would also have to consider fabric trends as exhibited at fabric trade fairs in September 2009.  (Exh. 34 to Garbus Opp. Decl., pgs. 135-36, 175-76.)  Elisabetta Balli, the co-owner and product manager for Le Bonitas, testified that the "important part" was the end of the "ideal timing" schedule (which had been prepared back in March 2009).  (Exh. 35 to Garbus Opp. Decl. at pgs. 48-50.)  There is nothing of any value at all to contradict their informed knowledge.

When Paris Hilton asserts that Beanstalk "repeatedly reminded" Le Bonitas of the need to submit Paris Hilton's standard approval form with every design submission (Paris Hilton's Moving Mem. at 9), she presumes there was some obligation on Le Bonitas to use an approval form.   But the <u>License Agreement</u> does not impose any obligation on Le Bonitas to submit any type of approval form in connection with submissions for approval.   It was not a contractual requirement.   (Busanna Decl. at 15; Exh. 1 thereto (License Agreement), Section 5).  Paris Hilton certainly could have chosen to do so -- she expressly incorporated other types of forms into the License Agreement -- but she failed to in this regard.  (Exh. 1 to Busanna Decl., pgs. 37, 45-47.)  The issue is false.

**VII.    Paris Hilton's Breach Regarding The Inspiration Boards
Is Not Excused By Paris Hilton's Gross Negligence and
<u>Intentional Acts, Including Losing The Boards and Ignoring Them.</u>**

Paris Hilton has attempted (after the fact) to concoct a series of false self-serving, made-up explanations for why Paris Hilton-Beanstalk did nothing with the Fall/Winter inspiration boards for nine days of the ten business day

contractual turnaround time.  (Paris Hilton's Moving Mem. at 10-12.)  Serena Sibbald's declaration in support of Paris Hilton's motion ("Sibbald Decl.") on all these issues is self-serving and uncorroborated.[3]  These fact issues are both contrived and completely immaterial.

Paris Hilton now long after the litigation started, many months later claims that in Beanstalk's view, the inspiration boards were confusing, and this was the reason Paris Hilton (Beanstalk) sat on the boards rather than sent them immediately to Paris Hilton.  (Paris Hilton's Moving Mem. at 10.)  This assertion wholly contradicts what the parties did and wrote to each other during this time.  Most importantly, this created assertion is belied by the fact that Beanstalk sent the mood boards to Paris Hilton on October 21, 2009, which was a <u>full two weeks before</u> Ms. Sibbald's face-to-face meeting with Mr. Busanna on November 4, 2009 (at which the boards were discussed).  If Ms. Sibbald had any concern that Ms. Hilton would not understand the boards, it would have absolutely made no sense to send them until that meeting.  The explanation for Paris Hilton's intentional lawlessness and gross negligence is false.

The communications between Le Bonitas and Paris Hilton (Beanstalk) establish that at <u>no time</u> did Paris Hilton(Beanstalk), directly or indirectly assert that the Fall/Winter mood boards were confusing and came in without sufficient explanation.  (Exhs. 4-8 to Busanna Decl.)  Further, those same communications suggest that Paris Hilton (Beanstalk) did not even look at the boards after having

---

[3] Johanna Brambring, on whose behalf Ms. Sibband is trying to testify, has never given any testimony for Paris Hilton in this action.  She is the person who can make admissible Ms. Sibbald's hearsay.  She is not listed as a witness.  She has not submitted an affidavit.

received them.  On October 20, 2009, Beanstalk replied via email to Le Bonitas that "[t]he disc has gone to Paris Hilton for their review.  I would like to send the additional copy as well, which explains the thoughts of the presentation." (Busanna Decl. at 30; Exh. 6 thereto.)  Beanstalk never stated that the boards were confusing or that it needed explanation.

Le Bonitas had never sent Beanstalk any additional CD explaining the "thoughts" of the Fall/Winter inspiration board presentation, just as it had never sent Beanstalk any additional CD explaining the "thoughts" of inspiration boards with respect to the Spring/Summer collection.  If Beanstalk had looked at what had been sent, this would have been apparent.[4]  (Busanna Decl. at 30.)  On October 21, 2009, Johanna Brambring of Beanstalk, the absent witness, emailed Gianni Busanna of Le Bonitas about the boards and stated that she "thought of some additional information."  Again, she did not state that the boards were confusing or that she needed explanation.  (Exh. 6 to Busanna Decl.)[5]

Paris Hilton claims that Le Bonitas never provided a date by which it required the boards to be approved.  (Paris Hilton's Moving Mem. at 11.)  False. Le Bonitas repeatedly indicated that the Fall/Winter mood boards were a time-

---

[4] The Fall/Winter inspiration boards had words from the designer written on the face of most of the twenty-one pages which comprised the boards. (Exh. 3 to Busanna Decl.)

[5] Ms. Sibbald also now claims that Beanstalk had questions regarding what the different products were and the themes associated with the line. (Paris Hilton's Moving Mem. at 10.)  But in none of the written communications between Le Bonitas and Beanstalk did Beanstalk ask questions about different products and the themes associated with the line.  (Exhs. 4-8 to Busanna Decl.)  Moreover, Beanstalk's own meeting minute notes of Ms. Sibbald's face-to-face meeting with Mr. Busanna on November 4, 2009 do not state that they discussed any questions about different products or themes associated with the line.  (Exh. 24 to Garbus Decl.)  Ms. Brambring, a friend of Ms. Sibbald, resides in London where Beanstalk is.

sensitive submission and had to be reviewed and responded to in accordance with the License Agreement.

Le Bonitas advised Paris Hilton, through its agent via email on October 13, 2009 that the inspiration boards had "to be sent to Paris immediately, or it will be too late when we get the response." (Busanna Decl. at 29; Exh. 5 thereto.)  On October 26, Le Bonitas stated "[t]ime is going fast and we need to finalize this quickly." (Busanna Decl. at 32; Exh. 7 thereto.)  On November 2, Le Bonitas emailed Paris Hilton (Beanstalk) and asserted that, inter alia: "the approvals required by article 5 of our agreement are not given for reasons which don't refer to the approval process but to the absence and engagements of Miss Hilton"; it would not "accept the unjustified suspension of the approval process"; and Le Bonitas reserved all of its rights. (Busanna Decl. at 33; Exh. 8 thereto.)

At the face-to-face meeting between Mr. Busanna of Le Bonitas and Ms. Brambring and Ms. Sibbald of Beanstalk on November 4, it was stated that Le Bonitas was still waiting for Paris Hilton's approval over the inspiration boards and that the clothing samples needed to be ready to show at the early February 2010 trade fairs. (Busanna Decl. at 34.)  Paris Hilton's agent's own meeting minute notes corroborate this. (Exh. 24 to Garbus Decl. at pg. 2 of 2.)  Indeed, at the Nov. 4th meeting, Mr. Busanna advised Beanstalk that Le Bonitas could not wait more than another day or so, and was assured by Beanstalk that Paris Hilton had been made aware of the urgency and that approval would be forthcoming shortly. (Busanna Decl. at 34.)

Paris Hilton also claims that Beanstalk attempted to follow up "over the next few days" following October 13, 2009 about the inspiration boards.  (Paris Hilton's Moving Mem. at 11; Sibbald Decl. at 13.)  This is false and created after the fact for this suit.  Johanna Brambring was the direct liase between Beanstalk and Le Bonitas, not Ms. Sibbald.  The evidence that she attempted to follow up on "over the next few days" was a single email six days later (on October 20), when she showed her either lack of knowledge or gross negligence in asking for a disc which did not exist.  (Exh. 6 to Busanna Decl.)

## VIII.   Paris Hilton's Claim That Le Bonitas's Termination Of Sales Agents And Distributors Is Irrelevant, Wrong and a Factual Issue; Its Essence Is Contradicted By Exactly What Was Going On. Manufacturing Of The Spring/Summer Collection Proceeded

Paris Hilton notes that Le Bonitas terminated many of its sales agents and distributors because of the poor sales orders received for the Spring/Summer collection.  (Paris Hilton's Moving Mem. at 12-14.)  It claims that ten terminations occurred on August 28, 2009.  (Paris Hilton's Moving Memo. at 12.)  This is utterly false.  As Mr. Busanna established in his declaration, Le Bonitas sent ten termination letters on October 28, 2009 (not August 28th).[6]  (Busanna Decl. at 22.)   But Le Bonitas had engaged twenty-one different sales agents and distributors.  (Busanna Decl. at 22.)

Mr. Busanna explained the timing of the letters -- under an Italian economic collective/accord which he understood to be applicable to manufacturers (such as Le Bonitas), certain sales agents must be given three months advance notice of termination (despite what the written contract says). (Busanna Decl. at 22.)  So Le Bonitas was compelled to terminate the contracts

---

[6] These letters can be submitted to the Court.  We assume that Paris Hilton does not now dispute that the letters were sent on October 28, 2009.

with the agents and distributors in late October to ensure that these agents and distributors could not maintain any rights with respect to the upcoming sales campaign for the Fall/Winter collection beginning in late January/early February 2010. (Busanna Decl. at 22.) The trade fair for the Fall/Winter collection was not until February 5, 2010, and attracted thousands of buyers. (Busanna Decl. at 22.) Paris Hilton simply does not know the industry or business practices in Italy. Le Bonitas does. There was ample time and opportunity before then to find better agents and distributors for the Fall/Winter collection.

Paris Hilton also claims that Le Bonitas put on hold its manufacturers in respect of filling orders for the Spring/Summer collection. (Paris Hilton's Moving Memo. at 13.) Mr. Busanna explained, and Paris Hilton refuses to listen, that the issue was that costs for production of the Spring/Summer collection increased significantly because of minimum production charges on some articles. (Exh. 34 to Garbus Opp. Decl. at 307.) Because sales orders were not good, manufacturers were able to charge Le Bonitas a "great deal more" and the costs per item increased. (Exh. 34 to Garbus Opp. Decl. at 308; Busanna Opp. Decl. at 16.) But Le Bonitas nevertheless proceeded with production. (Busanna Decl. at 22, 48.)

Paris Hilton also attempts to submit and rely upon a November 3, 2009 email from Mr. Busanna to the owners of Le Bonitas written in Italian, with contract provisions written in Italian, to the Court. (Paris Hilton's Moving Memo. at 13; Exh. D to Weinsten Decl.) It is irrelevant.

Paris Hilton notes that certain contract provisions that permit Paris Hilton to terminate, were underlined, but then Paris Hilton fails to describe all provisions (Paris Hilton's Moving Mem. at 13) – <u>there is a need for a certified translation of the entire email and its attachment</u>. There are eight different underlined sections,

and only two concern Le Bonitas's distribution obligations.

Paris Hilton has also falsely and deliberately omitted the question and answer asked of Mr. Busanna (upon which it seeks to rely) about this very email during his deposition.[7]  When Paris Hilton's counsel asked Mr. Busanna what the purpose was in underling the clauses, he testified that:

> I underlined certain clauses because at that point in time, on 2 November, we hadn't yet received approval by Paris Hilton and we were very, very concerned about our ability to go to market. And because at that time I highlighted certain points in the contract that were critical and that would have brought about certain effects if we weren't able to carry out our part and what Paris Hilton might have been able to do due to the fault of Paris Hilton.

(Exh. 34 to Garbus Opp. Decl. at 268.)

Paris Hilton did not like that answer, so it attempted to extract a different answer from Guglielmo Muratori, one of Le Bonitas's owners.  Mr. Muratori testified that despite termination of some of Le Bonitas's distributors, "distribution would never have been a problem."  (Exh. 36 to Garbus Opp. Decl. at 56.)  When asked what was discussed with Mr. Busanna about the Nov. 3rd email, he stated that "I don't remember.  But the discussion, I believe, hinged on the fear that Paris Hilton might cancel the contract because we weren't coming out with the winter collection."  (Exh. 36 to Garbus Opp. Decl. at 59.)  For tactical reasons, Paris Hilton did not then ask Mr. Muratori the two most obvious questions in order to have a clean record -- when was that discussion and why?  In order to clarify Mr. Muratori's answer, he stated in his errata sheet that "the discussion, I

---

[7] This sharp practice runs afoul of the spirit and letter of the Federal Rules of Civil Procedure ("FRCP).  FRCP 32(a)(6) provides that when using only part of a deposition, other parts that in fairness should be considered should also be submitted.  Rather than require Paris Hilton to meet its obligations, for economy's sake Le Bonitas is providing pages from transcripts that Paris Hilton should have done in the first instance.

believe, hinged on the fear that Paris Hilton might cancel the contract because we weren't coming out with the winter collection if it became impossible." (Exh. 36 to Garbus Opp. Decl. at errata sheet.)

IX.    **Le Bonitas's Preparation Of Design Pages Is, At Best, Another Immaterial Fact Issue**

Paris Hilton notes that Le Bonitas proceeded to have design pages prepared.  What is the significance of that?  Again it shows she does not know the industry.  (Paris Hilton's Moving Memo. at 14.)  Ms. Hilton did not approve the inspiration boards for 43 days.  Le Bonitas could not proceed to the next phase without her approval.   Paris Hilton suggests that Le Bonitas should have breached the contract and just ignored Paris Hilton's approval rights over the first stage by submitting the design pages.  Silly.

X.    **Ms. Hilton Never Reviewed The Inspiration Boards Prior to November 18, 2009**

First, Paris Hilton would have this Court believe that the inspiration boards sat untouched from October 8 to October 21 at her agent and then October 22 until November 2, 2009 (at Paris Hilton) because there was no approval form. This is contradicted by testimony, emails and conduct.  (Paris Hilton's Moving Mem. at 15.)   Ms. Hilton claims she looked at the boards sometime after November 4 and did not like them, doing nothing for weeks while she "sat to think about them" before she then approved them with only minimal comments.  (Paris Hilton's Moving Mem. at 15-16.)  She lost them for a period of time.  She looked after her other interests, she tells us.  This testimony is created for this litigation, uncorroborated, false, and contradicted.

It appears that the boards arrived from Beanstalk at Ms. Hilton's alleged home/office on October 22nd – the tenth business day.  But Ms. Hilton was not "fully booked" that day, as Ms. D'Amico contends in her declaration.  Her declaration is squarely controverted by Ms. Hilton's own "Master Schedule". (Exh. 18 to Garbus Decl.)

Paris Hilton also tries to <u>change</u> the reason the boards were wholly ignored by her for eleven more days from incompetence and indifference to the non-use of an approval form.  But Ms. D'Amico is already bound by her emails and deposition testimony.  Ms. D'Amico was advised several times by Paris Hilton's own agent that approval was needed over the boards.  There was no mention by either side at any time of anything about an approval form.

Paris Hilton (Beanstalk) emailed Ms. D'Amico on October 27, 2009 for the express purpose of asking whether she had received "the new design boards and CD from Le Bonitas from the new underwear design <u>for Paris's approval</u>". (Exh. 22 to Garbus Decl. [emphasis added].)  All Ms. D'Amico had to do was read this email to know that approval was needed.  In point of fact, Ms. D'Amico's reply proves she fully understood that approval over the boards was needed, because she expressly notes that "I have not had any time with Paris…"  (Exh. 22 to Garbus Decl.)  This exchanged cannot be reconciled with what Ms. D'Amico has now put in her declaration.  It further exhibits a recklessness and intentional disregard for the rights of Le Bonitas.

Paris Hilton (Beanstalk) emailed Ms. D'Amico again on November 2, 2009 and advised:

Please note we need urgent approval today on the Fall / Winter 2010-11 designs for Le Bonitas as time is off [sic] essence.  Delaying further the approval process is already impacting delivery of the goods in stores, and the Licensee is seriously concerned that they will miss the peak selling period with their retailers and will incur penalties by the retailers. Therefore, please could you assist on this matter as I need to revert back to the licensee with the approval today. I wish to thank you in advance for your kind assistance in making this matter as a high priority."

(Exh. 22. to Garbus Decl.)  When Ms. D'Amico finally reply-emailed, she did not say anything about a missing approval form.  What she said was that "it just looks like an inspiration board. She really can't approve anything unless it's an official submission of a piece from her line."  (Exh. 22.)  On November 3, 2009, Beanstalk explained to Ms. D'Amico via reply email that:

Paris needs to approve the inspirational board designs in order for Le Bonitas to move to the next stage, which is the concept designs stage for each garment.  They would like to know if Paris is happy with the overall mood of the submitted story (i.e., theme, colour, details, etc)."

(Exh. 22.)

Ms. D'Amico testified during her deposition that as of November 2, 2009, she had never before seen an inspiration board.  (Exh. 19 to Garbus Decl. at 78-79.)  Of course, this is irreconcilable with what she said in her Nov. 2nd email to Beanstalk.  In any event, Ms. D'Amico admitted that she did not know whether Ms. Hilton had an obligation to review or approve the boards.  (Exh. 19 at 78-79.)  It had nothing to do with an approval form.

It may be that Ms. D'Amico gave Ms. Hilton the boards on November 4, 2009.  But Paris Hilton glosses over <u>when</u> she claims to have first looked at them.  She could not recall in her deposition. She testified "I'm not sure exactly when I looked at it.  I know I looked at it in a few days of getting it.  I'm not sure exactly what was the time."  (Exh. 17 to Garbus Decl. at 54.)

But whether Ms. Hilton ever even looked at the boards before November 18 -- much less was unhappy with them -- is totally uncorroborated.   It's a deliberate cover-up.   When Ms. Hilton was asked if she told anybody that she was unhappy with the boards, she said only when she told Ms. D'Amico on November 18 when they were reviewing them together.   (Exh. 17 to Garbus Decl. at 58.)   When Ms. D'Amico asked if she knew why Ms. Hilton did not approve the boards until they reviewed them together on November 18, 2009, she said no.  (Exh. 19 to Garbus Decl. at 46.)

Ms. Hilton never looked at the boards.   She had ample opportunity to tell Ms. D'Amico.   Ms. Hilton testified that she always did approvals with Ms. D'Amico and met with her every single day.   (Exh. 17 to Garbus Decl. at 25, 114-15; 66-67.)   But Ms. Hilton never said anything about it – until she was sued and deposed.

Ms. D'Amico's emails with Ms. Hilton reveal no mention by either of them that Ms. Hilton had reviewed the boards, much less that she did not like them.  (Exhs. 25 and 29 to Garbus Decl.)  Ms. D'Amico's emails with Beanstalk prove that Ms. Hilton's claim she had reviewed the boards, much less that she did not like them, is false.  (Exhs. 21-23, 26-27, 30 to Garbus Decl.)  In Ms. D'Amico's email to Beanstalk giving approval over the boards, there is no mention that Ms. Hilton ever, ever said she did not like the boards.   The opposite.   She states "[s]he loves the lace and bows, cashmere and wool.   Looking good so far." (Exh. 30 to Garbus Decl.)  A flat out contradiction.

Paris Hilton claims that she approved the boards on November 18, 2009 in order to be a good partner to Le Bonitas.   (Paris Hilton's Moving Mem. at 16.) Not true.   Of course, a good partner would have sent them back weeks before. The reason Ms. Hilton finally gave her approval after 43 days had passed is

because she never looked before.   Ms. Hilton must have known she was in breach of her obligations to review the boards and to respond to the boards.

Ms. Hilton admitted that she had an affirmative obligation to review submissions in connection with her license agreements.   (Exh. 17 to Garbus Decl. at 109-10.)  She claimed to have "no idea" whether she still had to review submissions seeking approval after ten business days had passed, but, and very important, she admitted that no one told her at any point and certainly not prior to November 18 not to review these inspiration boards.  (Exh. 17 at 110-12, 123.)

Paris Hilton claims Ms. Hilton had many mental "notes" on the boards, which she withheld.   Nonetheless, it is contradicted by Ms. D'Amico's email with Beanstalk on November 18, 2009.  (Exh. 30 to Garbus Decl.)  Mental notes are not written notes.

In summary, the "facts" raised by Paris Hilton prove -- not controvert -- Le Bonitas's showing that Paris Hilton did not disapprove of the inspiration boards through a non-response.   And that Paris Hilton did not engage in the approval process as required by Section 5.   What did occur was a series of acts of lawlessness, gross negligence and intentional wrongdoing by Megan D'Amico and Paris Hilton over the course of 43 days.   There is no real question of fact.

Before approval finally arrived, Beanstalk kept promising Le Bonitas that Ms. Hilton would immediately review the boards and that approval was imminent.  By the time approval arrived, it was too late for Le Bonitas to manufacture sets of the collection for the Florence trade fair starting on February 5, 2010.  Under any plausible interpretation of Section 5.1, Paris Hilton breached the License Agreement.   In no event is Paris Hilton entitled to summary judgment in view of these facts.

## ARGUMENT

### A.   THE LICENSE AGREEMENT DOES NOT BAR RECOVERY OF LEGAL FEES AND OTHER DAMAGES BY LE BONITAS

Paris Hilton has fatally failed in its answer to plead this purported limitation on liability as an affirmative defense.  (Exh. 14 to Garbus Decl. at ¶¶ 45-54.)[8] That is the proper context in which a covenant not to sue should be raised.  See, e.g., Ash v. New York Univ. Dental Ctr., 164 A.D.2d 366, 564 N.Y.S.2d 308, (N.Y. 1st Dep't 1990).  It has not been pled and is not properly before the Court on this motion.

Paris Hilton makes a legally incorrect assertion that Section 5.1(8) of the License Agreement bars Le Bonitas from recovering its damages even if Le Bonitas claims recklessness, gross negligence, an intent not to comply and lawlessness.  (Paris Hilton's Moving Mem. at 22.)  This issue has already been considered and rejected by the Court, in denying Paris Hilton's motion to dismiss based on the very same provision.  The Court has no new evidence before it bearing on the meaning of the provision.[9]

Paris Hilton also asserts that Section 5.1(8) of the License Agreement bars Le Bonitas's claim for damages because it is unambiguous.  (Paris Hilton's Moving Mem. at 1.)  But Paris Hilton raised this identical issue in its pre-answer motion to dismiss.  Such motion was summarily denied by the Court.  In support

---

[8] The "facts" fully pulled together in this motion, for the first time, compels us to ask for the right to get legal fees.  The Court previously denied Le Bonitas's claim for legal fees on the grounds it was not timely raised.  We again urge that Le Bonitas be permitted to assert that defense.

[9] As demonstrated in Le Bonitas's counter-statement of facts, Oliver Herzfeld is not competent to testify as to the meaning or intent of Section 5.1(8).  Nor does Paris Hilton even seem to contend that he is.

of its new motion on this same issue, Paris Hilton offers absolutely <u>no admissible</u> <u>evidence</u> with which the Court may reconsider concerning the meaning of Section 5.1(8).

Section 5.1(8) was intended to guard against liability for the exercise of Paris Hilton's discretion in disapproving a particular item.   But that never occurred here -- Ms. Hilton, in fact, gave her approval of the boards (albeit on the 43rd day).   Moreover, Le Bonitas's claim is not based on a failure or refusal to grant any particular approval over a particular item.   It arises from Paris Hilton's deliberate and intentional failure and refusal to engage in the approval process altogether for 43 days -- a <u>de facto</u> suspension of the approval process.   Le Bonitas's claim is consistent.

Assuming, <u>arguendo</u>, that the Court considers this fatally defective defense, Le Bonitas has already fully briefed this issue, and set forth controlling caselaw establishing that Le Bonitas can sue for its damages.   (LB's Moving Mem. at 38-42.)   Section 5.1(8) is a limit on Paris Hilton's liability, and must be clear, explicit and unambiguous.   It is far from it.   It is to be strictly construed against Paris Hilton.   <u>See</u>, <u>Terminal Central, Inc. v. Henry Modell & Co.</u>, 212 A.D.2d 213, 218, 628 N.Y.S.2d 56 (N.Y. 1st Dep't 1995)(no limitation on liability found).   <u>See</u>, <u>Pro Net, LLC v. ACC Telecom Corp.</u>, 294 A.D.2d 857, 741 N.Y.S.2d 795 (N.Y. 4th Dep't 2002)(limit on liability for interruption or failure of service did not unambiguously apply to the failure to deliver in the first instance).   <u>Graphic Scanning Corp. v. Citibank</u>, 116 A.D.2d 22, 24-25, 499 N.Y.S.2d 712 (N.Y. 1st Dep't 1986)(summary judgment granted in favor of the plaintiff for lost

profits in light of inapposite limit on liability).

The caselaw upon which Paris Hilton seeks to rely for its statement that the covenant not to sue is not enforceable in this case does not apply. (Paris Hilton's Moving Mem. at 22.)   The decision in Joao v. Cenuco, Inc., 376 F.Supp.2d 380 (S.D.N.Y. 2005), upon which Paris Hilton also seeks to rely, supports Le Bonitas's position.   The District Court recognized that covenants limiting liability are disfavored and subject to "the closest of judicial scrutiny."  Id. at 382-83 (internal citations omitted).   The District Court found that there was no covenant not to sue contained in the parties' agreement, and the defendant's contention to the contrary to be "utter nonsense."  Id. at 384.

In Kamfar v. New World Rest. Group, 347 F.Supp.2d 38, 46-48 (S.D.N.Y. 2004), a former executive's defamation claim was dismissed on the merits for failing to raise a material issue that the company was grossly irresponsible.   In considering only the company's counterclaim for breach of the covenant not to sue, the District Court determined that the dismissed claim was encompassed by it.  Id. at 50-51.  Cieco v. Paramarketing, Inc., 228 A.D.2d 462, 643 N.Y.S.2d 668 (N.Y. 2nd Dep't 1996) and Tedesco v. Triborough Bridge & Tunnel Auth., 250 A.D.2d 758, 673 N.Y.S.2d 181 (2nd Dep't 1998), involved personal injuries cases in which each plaintiff signed a general release prior to engagement in recreational activities.   They have no application whatsoever to the facts before this Court.

Paris Hilton had a duty to engage in the approval process and comply with her contract.   Le Bonitas could not go forward or go back, and had to maintain

the <u>status</u> <u>quo</u> until Paris Hilton formally responded with Ms. Hilton's comments and/or approval.  Section 5.1(8) of the License Agreement was intended only to guard against liability for the exercise of Paris Hilton's discretion in disapproving a particular item.   Paris Hilton concedes as much in its own moving memorandum, where it states "the whole purpose of these provisions is to avoid litigation over whether or not Paris Hilton's exercise of its discretion over approvals was done properly and/or in good faith."  (Paris Hilton's Moving Mem. at 24-25.)  That is not what happened here.

There was no valid reason why Paris Hilton did not respond for 43 days, despite her duty to engage in the approval process.  There was no exercise of discretion.  The series of acts of recklessness, gross negligence and a disregard for the contract and law did not satisfy or otherwise discharge her duty.  Ms. Hilton could have disapproved the boards, but did nothing other than promise to review them.  That is not the exercise of discretion for which Paris Hilton's liability is arguably limited.   Since the facts of this suit are inapplicable to the circumstances contemplated by Section 5.1(8), the claim is not barred. <u>Compare</u>, <u>Pro Net, LLC</u>, 294 A.D.2d 857, 741 N.Y.S.2d 795.

Additionally, assuming <u>arguendo</u> that Section 5.1(8) was written differently and applicable to the set of facts before the Court (it is not), the New York Court of Appeals has recognized, as a matter of public policy, that even clearly applicable exculpatory clauses will not relieve a breaching party where the misconduct, "as in gross negligence, [ ] betokens a reckless indifference to the rights of others, it may be implicit."  <u>Kalisch-Jarcho, Inc. v. City of N.Y.</u>, 58 N.Y.2d

377, 385, 461 N.Y.S.2d 746, 750 (N.Y. 1983).[10]

Le Bonitas alleged in its complaint that Beanstalk <u>admitted</u> that Ms. Hilton had been travelling and, as of October 28, 2009, had not yet even reviewed the presentation.  (Exh. 14 to Garbus Decl., ¶ 24.)  Le Bonitas also alleged (i) Paris Hilton's "refusal to engage in and suspension of the approval process" (Exh. 14, ¶ 24), (ii) Paris Hilton breached its obligations to engage in the approval process with Le Bonitas and to do so in "good faith" (Exh. 14, ¶ 39), and (iii) Paris Hilton "wrongfully" suspended the approval process (Exh. 14, ¶ 40).   Obviously, Le Bonitas was not required to "anticipate and overcome every defense that might be raised in opposition to a cause of action."  <u>Banc of America Sec. LLC v. Solow Bldg. Co.</u>, 47 A.D.3d 239, 245, 847 N.Y.S.2d 49, 53 (N.Y. 1st Dep't 2007)(denying a defendant's motion for summary judgment based on a contractual limitation of liability clause, finding that the complaint and evidence, together, raised fact issues concerning willful breach and bad faith).

We have learned now many facts to support a finding that Paris Hilton was grossly negligent toward Le Bonitas.  The serial acts of lawlessness, intentional and gross negligence committed by Beanstalk (fully chargeable to Paris Hilton),

_____

[10] Paris Hilton lives outside the bounds of paying attention to the laws and codes we live by.  The lawlessness she has brought to other areas of her life she has brought to this one.  Her recklessness in the case is another exhibit of the acts of her life.  She has been arrested numerous times for a variety of crimes, including cocaine use, and disregard of other laws.  She was publicly denied entry to a foreign country, Japan, been relentlessly shown in the media in courts and in handcuffs going in and out of courts, and in sex tapes, showing her in sexual acts, that she herself distributes and sells at enormous profit.  The material she objected to on the boards contained handcuffs and the use of the word "hottie".  Le Bonitas without a style guide was trying to sell a celebrity product by using images and concepts central to her status.

She was the star of a film that was shown in the United States and overseas called The Hottie and The Nottie.  Pictures of her in handcuffs after  umerous arrests were distributed throughout the world.

Megan D'Amico and Paris Hilton -- despite Paris Hilton's unavailing attempts to explain them away -- are proven.  They demonstrate a complete and reckless indifference to the right of Le Bonitas to bring its collection to market.  Paris Hilton's conduct failed to exercise even the slightest care in getting the inspiration boards reviewed and approved.  This amounts to gross negligence, and prevents any potential or arguable exoneration under Section 5.1(8) of Paris Hilton's liability.  Compare, Id.

For all the reasons set forth in Le Bonitas's motion for summary judgment, Section 5.1(8) cannot serve as a bar to Le Bonitas's recovery.  Paris Hilton's motion for summary judgment should be denied.

**B.    A BREACH HAS OCCURRED; PARIS HILTON FAILED TO ENGAGE IN THE APPROVAL PROCESS OR OTHERWISE REVIEW AND RESPOND SUFFICIENT TO ENABLE LE BONITAS TO RECEIVE THE BENEFIT OF THE BARGAIN**

In asserting that no breach has occurred, Paris Hilton misconstrues and mischaracterizes both Le Bonitas's claim and the proof.  (Paris Hilton's Moving Mem. at 23-25.)  Paris Hilton breached its obligation to review and respond to submissions in ten business days and to otherwise engage in the approval process, which would have enabled Le Bonitas to bring its collections to the marketplace and obtain the fruits of the contract.  Le Bonitas contends that Paris Hilton's breach is clear.  At worst, factual issues exist which prevents the granting of summary judgment in favor of Paris Hilton.

Paris Hilton would like to rely on the second sentence of Section 5.1(2) -- the "deemed disapproved" language -- but the proof shows that something else occurred entirely.  Paris Hilton claims she did not even receive the boards until

the tenth business day and by her own admission (if it were to be believed), she did not even look at the boards until at least two more weeks after that (a few days after November 4, 2009).  (Exh. 17 to Garbus Decl. at 54.)

Even Ms. Hilton knew she had an affirmative obligation to review the boards, and all we know for certain is that this review finally occurred on November 18th.  (Exh. 17 to Garbus Decl. at 109-10.)  All the while, Beanstalk kept promising Le Bonitas that Ms. Hilton had either approved the boards (later recanted) or would immediately review the boards and that approval was imminent.  No one ever treated the boards as "deemed disapproved."  And no one treated Paris Hilton's duty to review and respond as discharged until November 18th.  By then it was too late.

Paris Hilton also attempts to write the express -- not implied -- covenant of good faith and fair dealing out of the contract entirely.  (Paris Hilton's Moving Mem. at 24-25.)  But it is not a matter of a general provision versus a specific provision.  Paris Hilton's express duty of good faith helps to measure her compliance with her other duties (not limit or alter them) in enabling Le Bonitas to obtain the fruits of the contract.  By any measurement, when the terms are applied to the undisputed facts, it is clear that Paris Hilton grossly and repeatedly materially breached these contractual duties to Le Bonitas

Oliver Herzfeld, Beanstalk's Chief Legal Officer, says Le Bonitas knew what it was getting into when the contracted with Ms. Hilton.  (Exh. 33 to Garbus Opp. Decl. at 134-35.)  Not true.  Normal contracts, he says, are obligations Ms. Hilton does not have to live up to?

The New York Court of Appeals case of <u>Dalton v. Educational Testing Serv.</u>, 87 N.Y.2d 384, 639 N.Y.S.2d 977 (N.Y. 1995) is instructive on the interplay of the covenant of good faith and fair dealing with an express duty to review a submission.  "Dalton" took the SAT administered by "ETS" and by accepting the form agreement entered into a contract.  <u>Id.</u> at 389.  When Dalton was accused by ETS of having someone else take the test for him, he opted to submit additional information to ETS, pursuant to its regulations, corroborating his presence at the exam.  <u>Id.</u> at 387-89.  The jury found that ETS never considered or evaluated his submissions.  After a nonjury trial, ETS was found to have failed to act in good faith.  <u>Id.</u> at 388-89.

In affirming the verdict, the Court of Appeals noted that ETS had an implied duty to actually review and evaluate Dalton's evidence.  Whether ETS made any effort to consider Dalton's submission was necessarily a factual issue. <u>Id.</u> at 391.  Because ETS was found to have failed to exercise its discretion in the first instance by declining to even consider the material, it failed to comply in good faith, thereby breaching its contract with Dalton.  <u>Id.</u> at 392-93.

Here, there is significant, probative evidence that Paris Hilton failed or refused to even consider the inspiration boards until November 18th -- namely, <u>all</u> the corresponding between Beanstalk and Megan D'Amico, and Ms. D'Amico and Ms. Hilton.  Ms. Hilton now claims she did review the boards before then. Failing or refusing to engage in the approval process required by the License Agreement, the Court of Appeals tells us, is a breach.

Paris Hilton also claims that a lack of good faith cannot be inferred.  (Paris

Hilton's Moving Mem. at 25.)   The contention is a misapprehension of the law. The covenant of good faith and fair dealing does not concern a subjective test as to Ms. Hilton's mood or mindset.   See, e.g., India.com v. Dalal, 324 Fed.Appx. 59, 60-61, 2009 WL 1119612 **2 (2nd Cir. 2009)(clarifying for the District Court that for the covenant of good faith and fair dealing, a finding of intent of bad faith was unnecessary).   It is a contract requirement.   Dalton v. Educational Testing Serv., 87 N.Y.2d at 389.

There is no view of the evidence to support Paris Hilton's request for summary judgment.

## C.   THAT A BREACH HAS OCCURRED ALONE, PREVENTS SUMMARY JUDGMENT IN FAVOR OF PARIS HILTON

Paris Hilton asserts that "unless Le Bonitas's performance was excused", it is entitled to a money judgment now.   (Paris Hilton's Moving Mem. at 25.)   But Paris Hilton's material breach of contract -- depriving Le Bonitas of the benefit of the bargain – did excuse Le Bonitas's further performance.   It is black letter contract law.

But even if Le Bonitas's performance was not somehow excused by Paris Hilton's breach of contract, summary judgment would still not be appropriate in favor of Paris Hilton.   That is because, in addition to all the other proof before the Court, there is an issue concerning whether there was a meeting of the minds or the License Agreement was supported by adequate consideration.

Paris Hilton employees have circled the wagons – even one of the lawyers.  Mr. Herzfeld was designated in Paris Hilton's initial disclosures as the

person knowledgeable about interpretation of the License Agreement.   Mr. Herezfeld's testimony is worth looking at.   It is also false as any reading of the contract shows.   At his deposition, Mr. Herzfeld testified that Paris Hilton had <u>no duty</u> whatsoever to review submissions for approval.   (Exh. 33 to Garbus Opp. Decl. at 129-30, 134-35, 192-93.)   This testimony was surprising, to say the least.

If Mr. Herzfeld is to be believed, the License Agreement should fail for want of consideration and/or no meeting of the minds.   Without any duty to review the very submissions seeking her required approval, Mr. Herzfeld tells us, Ms. Hilton <u>had no duty to do anything</u> to get five years of payments from Le Bonitas.   That was certainly not what Le Bonitas or any sane person would have thought it agreed to.

Paris Hilton also asserts that she is entitled to attorney's fees.   (Paris Hilton's Moving Mem. at 25.)   Le Bonitas has requested that this portion of its counterclaim be dismissed in its motion for summary judgment.   As already fully briefed by Le Bonitas (LB's Moving Mem. at 42-49), they are not recoverable under the indemnity provisions of the License Agreement.   The provisions of Section 9 of the License Agreement are in no way even remotely "unmistakably clear" in favor of an intention for Paris Hilton to recover her fees in this action on the contract.   To the contrary, Section 9 is plainly referable to recovery of fees in respect of third-party claims.   Paris Hilton cannot recover her attorney's fees in this circumstance.

Paris Hilton is not entitled to summary judgment irrespective of whether or not Le Bonitas could be found to have breached the contract.

**D.     LE BONITAS UNDER THE CONTRACT AND SEEKING ATTORNEYS FEES IN ITS RELIEF CLAUSE HAS SUFFERED DAMAGES-LOST PROFITS AND LEGAL FEES OWED TO IT.  THIS MAY BE PROVEN AT TRIAL.  FURTHER DISCOVERY, IF IT HAS NOT YET PROVEN IT CONCLUSIVELY,[11] SHOULD BE PERMITTED ON THIS**

Paris Hilton also seeks to have Le Bonitas's lost profit claims dismissed at this juncture.  (Paris Hilton's Moving Mem. at 26-28.)  That too is wrong.  It ignores the facts.  Where, as here, damages have been incurred, Le Bonitas should be permitted to prove them at trial.  Moreover, here, only fact discovery on liability has been exchanged and conducted.  Paris Hilton herself has indicated she wanted expert testimony, after the disposition of these motions.

Le Bonitas has produced its damages calculation as part of its initial disclosures.  (Exh. 38 to Garbus Opp. Decl.)  The disclosure itemizes and sets forth as categories of damages:

1. Payments made to Paris Hilton of €97,500;

2. Le Bonitas's out of pocket expenditures in developing the Fall/Winter collection of €38,542.45; and

3. Le Bonitas's projected sales and usual and customary operating and overhead expenses, reflecting net lost profits of €1,446,061.

The assertion that lost profits should be dismissed at this juncture is premature.  Le Bonitas need not prove the total amount of its damages with precise and detailed certainty.  It has incurred damages and there cannot be any doubt of that.  It is not just the money paid to Paris Hilton, the large costs of the first season or the prohibitive legal fees.  See, generally, Enidine Inc. v. Dayton-

---

[11] At the conference on January 20, 2012, when experts were raised for the very first time (by Paris Hilton), the Court left open the question until the resolution of this motion.

Phoenix Group, 2003 WL 22383571 *2 (W.D.N.Y. 2003)("Enidine has proffered sufficient evidence to create a genuine issue of material fact as to whether damages exist.  Indeed, Enidine is only required to show the existence of damages – and need not do so with mathematical certainty").

In V.S. Int'l. v. Boyden World Corp., 1993 WL 59399 *1 (S.D.N.Y. 1993), the Southern District of New York was also faced with a breach of contract by a licensor ("Boyden"), which licensed the use of its name to the licensee ("VS Int'l") to use for its executive recruitment business.  Boyden nevertheless moved for summary judgment, claiming there was no proof of damages.  The District Court said the rule that only the existence of damages must be certain, not the amount. Id. at *6.  As shown below, we have proven that here.

The District Court per Judge Leisure in V.S. Int'l. .v. Boyden World Corp. readily found an issue of fact on claimed damages for both expenses and lost revenues.  VS Int'l only itemized its expenses incurred in furtherance of the license agreement.  That was enough for purposes of raising a fact issue.  Id. at *7-8.

Here, Le Bonitas has produced the actual invoices and expenditure reports on which its out-of-pocket expenditures computations were based. (Busanna Opp. Decl. at 12, 28; Exh. 40 thereto at LB 28-38.)  The supporting documents plainly show that Le Bonitas has suffered actual out-of-pocket monetary damages in performing under the License Agreement and attempting to bring the Fall/Winter collection to market.  This damage claim along with the others we have mentioned clearly defeats summary judgment.

The lost profits claim of VS Int'l -- both lost business that would have been generated using the Boyden name and lost potential business caused by confusion as to its rights to the name caused by Boyden's breach -- was also scrutinized by Judge Leisure.  Because VS Int'l's revenues increased after the breach, Boyden contended that it was incapable of proving its lost profits.  Id. at 9.  The District Court rejected that reasoning, astutely observing that the increase could have been the result of factors "completely independent of the breach."  Id. Sufficient evidence was found "to have the opportunity to prove these actual damages to the factfinder."  Id. at *8.

Here, we have a similar situation.  Mr. Busanna has shown that Le Bonitas arrived at projected sales figures in the same manner as is customary in his industry -- based on their decades of experience and expertise in this sector of the apparel market.  (Busanna Opp. Decl. at 13-14.)  So too were each and every one of Le Bonitas's projected expenses developed in the customary manner.  (Busanna Opp. Decl. at 29; Exh. 37 to Garbus Reply Decl. at 39-55.)[12]

The business had a proven track record -- a profitable twenty-one year history in the lingerie and swimwear market, having been a successful licensee to such well-known brands as Versace, Dolce & Gabbana and Paul Smith, and it knows the worldwide marketplace very well.  (Busanna Opp. Decl. at 10, 27.)  Le Bonitas also held three other underwear licenses and also produced its own in-

---

[12] During Marco Adami's deposition (Le Bonitas's financial administrator), Ms. Hilton's lawyer went through Le Bonitas's annual 2010 budget prepared for all its collections in great detail.  (Exh. 37 to Garbus Reply. Decl.)  This document is part of Ex. 40, at LB 27. Mr. Adami confirmed that he used the expenses analysis report [marked as exhibit 110 at his deposition] to forecast  expenses for Le Bonitas's lost profits analysis set forth in its initial disclosures [marked as exhibit 109].  (Exh. 37-55-56.)

house collection.   All have been profitable except the *Hilton* license (and one other).   (Busanna Opp. Decl. at 27.)

Ms. Hilton complains that Le Bonitas's sales were poor and are not a reliable indicator of future sales or profits.   But just as in <u>V.S. Int'l. v. Boyden World Corp.</u>, 1993 WL 59399, the revenues were due to other factors and is not a bar to recovery.   More to the point, Mr. Busanna has demonstrated that Ms. Hilton was in large part responsible for the poor sales for the Spring/Summer collection -- that, and a global economic downturn.   Ms. Hilton cannot blame Le Bonitas for that.   It is the nature of cyclical business that this occurs.   How could Le Bonitas anticipate what Lehman Brothers could not?

Le Bonitas was seeking to exploit the *Hilton* name.   She was not a designer.   She was a celebrity.   Her name was what people were buying.   But her ineptness prevented Le Bonitas from using it sufficiently.   She failed (yet again) to come through, and as a result, her logo could not be used on the clothing samples of the collection itself given to the sales agents and distributors. (Busanna Opp. Decl. at 19-20.)   The hang tags were blank, no sew-in labels could be used, and the samples looked amateurish at best.   It was an embarrassment for Le Bonitas, given its long-standing reputation and history of high-quality and success.   And because Ms. Hilton and Beanstalk never bothered to get a style guide together in time, the style of the collection clashed with the *Hilton* apparel collection being distributed by Diciotto.   (Busanna Opp. Decl. at 21.)   It is no wonder why sales suffered.

Paris Hilton, as the wrongdoer, does not have the right to insist on a

mathematically precise calculation at this time when discovery appears to be incomplete.  As noted by Judge Leisure in <u>V.S. Int'l. v. Boyden World Corp.</u>, 1993 WL 59399 *6:

> When it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be any good reason for refusing, on account of such uncertainty, any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he had caused is uncertain. (quoting from <u>Lexington Products Ltd. v. B.D. Communications</u>, 677 F.2d 251 (2d Cir. 1982).

Since any perceived uncertainty in calculations regarding future sales and profits was caused not by Le Bonitas but by the very person who seeks to rely on it -- Paris Hilton -- the jury should be entitled to decide the matter of these damages.

Moreover, sales for new collections increase over time.  (Busanna Opp. Decl. at 18.)  Le Bonitas had no time.  All the problems with the Spring/Summer collection were also remediable with respect to future collections.  (Busanna Opp. Decl. at 22-27.)  Le Bonitas had already taken steps to replace its poorly performing distribution networks, and knew full well how to sell a profitable collection, having done so for decades.

Further, at a conference held on January 20, 2012, the District Court expressly held in abeyance any decision on whether experts could be retained or would be permitted to testify.  As such, the District Court has not even passed upon the timing and sequence of expert disclosures.  No experts have even been retained to date.  Thus, if the District Court deems expert testimony probative on the issue of lost profits, Le Bonitas should be given the opportunity to give the jury an expert's view based on the information given, including historical

company sales figures, industry profit margins and other apparel industry data to support its claim for lost profits.

If Paris Hilton or Beanstalk -- Paris Hilton's licensing agent -- is in possession of relevant historical sales figures for Paris Hilton other apparel lines which supports the reasonableness of Le Bonitas's projected figures, then that data should be produced by Paris Hilton.   Ms. Hilton's promotional material certainly indicates that she does.  (Exh. 39 to Busanna Opp. Decl.)  Ms. Hilton chose not to inquire into such data because of fear it may supports our claim.[13]  It is unavailable to Le Bonitas and cannot be presented.  (Garbus Opp. Decl. at 3.)  Pursuant to FRCP 56(d), the District Court should defer considering the issue and/or allow permit discovery from Paris Hilton on these very issues, which to now have involved only liability issues.

In view of the foregoing circumstances, the existence of Le Bonitas's damages claims has been established.  It is respectfully submitted that summary judgment should be denied.

**E.     LE BONITAS HAS NOT ELECTED A REMEDY:
         IT SATISFIED A DUTY TO MITIGATE**

Ms. Hilton is being cute with the Court in claiming there was a waiver of rescission damages.  (PHE's Moving Mem. at 28-30.)

Le Bonitas stated to Ms. Hilton on November 25, 2009 that her failure to respond with instructions regarding the inspiration boards had prevented it from

---

[13] In discovery, Paris Hilton disclosed the existence of license agreements with four different apparel licensees – Diciotto, JCS Apparel Group, Inc., BBC Apparel Group, LLC and Antebi Footwear Group.  Discovery should be permitted to obtain evidence of sales figures for these licensees and any other apparel licensees for Paris Hilton which would help measure Paris Hilton's sales performance in the apparel marketplace.

bringing the Fall/Winter collection to market and that "the Licensor has failed and we must claim for damages."  Exh. 10 to Busanna Decl.  As Le Bonitas has proven, Ms. Hilton's material breach deprived Le Bonitas of the benefit of the bargain.  It also gave rise to a duty to mitigate damages.

The law is well-settled that the party injured -- Le Bonitas -- by the wrongful act of another -- Ms. Hilton -- is under a duty to minimize the damages liable to result from such injury, and if it does not, it may be barred from seeking additional resultant damages.  <u>Prudential Ins. Co. of Am. v. Dewey Ballantine, Bushby, Palmer & Wood</u>, 170 A.D.2d 108, 115, 573 N.Y.S.2d 981, 986 (N.Y. 1st Dep't 1991).  Here, that is precisely what Le Bonitas did.  The Spring/Summer collection was a total loss.  Costs exceeded sales.  (Busanna Opp. Decl. at 24.)  But the sales mitigated those losses.

Ms. Hilton claims that Le Bonitas cannot have it both ways (Ms. Hilton's Moving Mem. at 30), but the opposite is true.  Ms. Hilton is the one that has pled both waiver and a failure to mitigate damages as competing affirmative defenses.  (Exh. 14 to Garbus Decl.)  Ms. Hilton has submitted no proof whatsoever that Le Bonitas "elected" the remedy of rescission and then knowingly waived it.  Rather, it did what any party would have reasonably done at the time and under the same circumstances, it limited its losses.  <u>Compare</u>, <u>Id.</u> at 116 (triable fact issue as to whether the plaintiff acted reasonably for purpose of minimizing damages).  Le Bonitas then commenced suit as soon as negotiations failed.

Ms. Hilton has failed to meet her burden (again).  This aspect of her motion should also be denied.

**CONCLUSION**

For all the reasons set forth above, plaintiff and counter-claim defendant Le Bonitas S.p.A. respectfully asks the Court to enter an order denying summary judgment to defendant and counter-claimant Paris Hilton Entertainment Inc., together with such other and further relief as the Court may deem proper in the circumstances.

Dated: New York, New York
         March 16, 2012

                        COUNSEL TO EATON & VAN WINKLE LLP


                        By: ____s/Martin Garbus_____
                               Martin Garbus


                        3 Park Avenue
                        New York, New York 10016
                        (212) 779-9910

                        Attorneys for Plaintiff Le Bonitas S.p.A.