UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LE BONITAS S.P.A.,

                              Plaintiff,

        - against -

PARIS HILTON ENTERTAINMENT INC.,

                              Defendant.

PARIS HILTON ENTERTAINMENT INC.,

                              Counter-Claimant,

        - against -

LE BONITAS S.P.A.,

                              Counter-Defendant.

Case No. 10 Civ 9350 (AKH)
ECF Case

**Oral Argument Requested**

**MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION TO PLAINTIFF/COUNTER-DEFENDANT LE BONITAS S.P.A.'S MOTION FOR SUMMARY JUDGMENT**

        This Memorandum of Law is submitted by Defendant/Counter-Claimant Paris Hilton Entertainment, Inc. ("PHE") in opposition to Plaintiff/Counter-Defendant Le Bonitas S.P.A.'s Motion for Summary Judgment.

## TABLE OF CONTENTS

INTRODUCTION............................................................................1

FACTUAL BACKGROUND..............................................................3

    A.    The License Agreement..........................................................3

          1.    The Approval Terms (Exh. A, Section 5.1)........................................3

              (a)    Le Bonitas Covenants Not To Sue Regarding Approvals.....4

              (b)    The "Deemed Disapproval" Clause................................4

          2.    Le Bonitas Agrees To Pay PHE Bi-Annual Minimum Guaranteed Royalties (Exh. A, Section 3.3 and Exh. 6 Thereto)........................5

          3.    Le Bonitas' Distribution Requirements (Exh. A, Sec. 14)..............6

          4.    PHE's Right of Termination and Acceleration of Payments Due, and Right to Attorneys Fees (Exh. A, Sec's 13.1 & 9.2)..................6

          5.    The Integration Clause and Interpretation Clause.......................7

    B.    Through No Fault of PHE, Le Bonitas Fails in the Manufacture and Distribution of the First Season of Product (the Spring/Summer Line)......7

    C.    Le Bonitas Submits The Mood Boards for the 2010 Fall/Winter Season on October 8, 2009- Without the Required Approval Form....................9

    D.    Consistent with PHE's Contractual Approval Rights, Beanstalk Responds with Questions to the Submission of the Fall/Winter Mood Boards as Early as October 13, 2009........................................................11

    E.    Unbeknownst To PHE, in October 2009, Le Bonitas Decides Not To Proceed with a Fall/Winter Line, Terminates Its Distributors and Puts All Manufacturing on Hold.......................................................13

    F.    Also Unbeknownst to PHE, Le Bonitas Completed the Detailed Designs for the Fall/Winter Line by Mid-October 2009, But Did Not Send Them to PHE for Approval..........................................................15

    G.    Ms. Hilton Considers the Mood Boards on or About November 4 and Declines Approval..............................................................16

H.  Although Dissatisfied, Ms. Hilton Ultimately Approves the Mood Boards as a Favor to Its Licensee...............................................17

I.  The Evidence Is Clear That Le Bonitas Could Easily Have Completed Samples In Time For The February 5, 2010 Fair, If It Chose To Do So ..............................................................................17

J.  Even If Le Bonitas Missed A *Single* Trade Fair, There Is No Evidence To Suggest This Would Preclude The Presentation Of A Fall/Winter Collection; Particularly Whereas, Here, The Sales Season Is Several Months Long..............................................................................19

K.  Le Bonitas Fails to Pay; PHE Terminates the Contract.........................19

L.  The Allegations of Le Bonitas' Complaint.................................21

ARGUMENT...............................................................................22

A.  Le Bonitas' Motion Should Be Denied Because Its Claims Are Barred By An Unambiguous Covenant Not To Sue..................................22

   1.  Covenants Not to Sue Are Fully Enforceable In New York..........22

   2.  The Cases Cited By Le Bonitas Are Wildly Inapposite...............23

   3.  The Covenant Here *Unmistakably* Bars Any Claim Based On The *Actual* Conduct Alleged In Le Bonitas' Complaint; The Court Can And Should Disregard Le Bonitas' Semantic Games..........24

      (a)  The Covenant Not To Sue, On Its Face, Bars Claims For An Alleged "Delay" In Approvals..........24

      (b)  Le Bonitas' Claim That PHE Failed To "Engage In The Approval Process" Is Directly Contradicted By Its Own Motion, And In Any Event Is Contractually Barred.......................................25

      (c)  There Was No "Suspension Of The Approval Process," But That Claim Too Is Unmistakably Barred...............................................26

   4.  The Rule Of *Contra Proferentem* Does Not Apply, Whereas Here, The Contract Expressly States That It does Not...............27

B.  This Court Has Not Ruled Upon the Substantive Issues Herein............27

C.     Le Bonitas' Motion Should Be Denied for the Additional Reason That It Cannot, As a Matter of Law, Establish a Breach........................28

1.     A Failure to Respond in Ten Days Is Not a Breach of Contract – It's A Deemed Disapproval......................................28

(a)     Le Bonitas' Interpretation Renders the "Deemed Disapproval Clause" Superfluous....................................29

(b)     Le Bonitas' Reliance on Beanstalk's Protocol and Welcome Pack, Which are Not Contractual Documents, Is Misplaced......................................................29

2.     In Any Event, PHE Did Respond in Ten Days, Through Beanstalk....................................................................30

3.     Le Bonitas Cannot As a Matter of Law Establish a Breach of the Implied Covenant................................................30

(a)     The Implied Covenant Is Trumped by Specific Contract Terms..................................................................31

(b)     Le Bonitas Fails To Proffer Sufficient Admissible Evidence From Which A Reasonable Juror May Infer A Lack Of Good Faith on The Part Of PHE Or Beanstalk; The Mere Passage Of Time Is Not Evidence Of Bad Faith................32

i.     The Period of October 8 (Boards Received by Beanstalk) to October 22 (Received by PHE).........32

ii.     October 22 through November 3.........................33

iii.     November 4 (Paris Disapproves Designs) to November 20 (Paris Approves as a Favor)............34

D.     Whether or Not the Alleged Delay Prevented Le Bonitas from Bringing the Collection to Market Is a Material Issue of Fact...................37

E.     Le Bonitas' Motion May be Denied for the Additional Reason that Le Bonitas Failed to Perform..............................................................37

F.     PHE's Right to Attorneys Fees and Costs Is Unmistakably Clear...........40

CONCLUSION........................................................................................45

## DECLARATIONS

DECLARATION OF OLIVER HERZFELD IN SUPPORT OF PHE'S OPPOSITION TO PLAINTIFF LE BONITAS' MOTION FOR SUMMARY JUDGMENT

Exhibit A – License Agreement dated February 1, 2009 between Paris Hilton Entertainment Inc. and Le Bonitas S.p.A.

Exhibit B – Letter dated July 16, 2010 from Miri Frankel, Associate General Counsel of Beanstalk Group to Gianni Busanna of Le Bonitas S.p.A.

DECLARATION OF MICHAEL E. WEINSTEN IN SUPPORT OF DEFENDANT PARIS HILTON ENTERTAINMENT INC.'S PHE'S OPPOSITION TO PLAINTIFF LE BONITAS' MOTION FOR SUMMARY JUDGMENT

Exhibit C – Excerpts of Videotaped Deposition of Gianni Busanna, Vol. I, taken on November 14 and 15, 2011

Exhibit D – Excerpts of Videotaped Deposition of Gugliemo Muratori, Vol. I, taken on November 17, 2011

Exhibit E – Excerpts of Videotaped Deposition of Elisabetta Maria Argia Balli taken on November 16, 2011

Exhibit F – Email dated August 26, 2009 from Wendy Abbott to Francesco Borchi

Exhibit G – Initial Disclosures by Plaintiff

Exhibit H – Letter dated January 11, 2011 from Michael E. Weinsten to Martin Garbus and Le Bonitas S.p.A.

Exhibit I – Merriam-Webster's Definition of "Failure."

Exhibit I (a) – Letter dated November 25, 2009 from Le Bonitas S.p.A. to The Beanstalk Group UK Ltd.

Exhibit I (b)- Excerpts From the Deposition of Serena Sibbald

Exhibit I (c)- Excerpts From the Deposition of Oliver Herzfeld

DECLARATION OF SERENA SIBBALD IN SUPPORT OF PHE'S OPPOSITION TO PLAINTIFF LE BONITAS'

MOTION FOR SUMMARY JUDGMENT

Exhibit J -- Email dated September 8, 2009 from Johanna Brambring to Serena Sibbald

Exhibit K -- Email dated October 9, 2009 from Gianni Busanna to Johanna Brambring (with a copy to Serena Sibbald)

Exhibit L -- Email dated October 21, 2009 from Gianni Busanna to Johanna Brambring (with a copy to Serena Sibbald)

Exhibit M – The Beanstalk Group's Licensee Welcome Pack

Exhibit N -- Email dated March 12, 2009 from Johanna Brambring to Gianni Busanna  (with a copy to Serena Sibbald)

Exhibit O -- Email dated October 19, 2009 from Johanna Brambring to Gianni Busanna (with a copy to Serena Sibbald)

Exhibit P -- Email dated October 21, 2009 from Johanna Brambring to Gianni Busanna (with a copy to Serena Sibbald)

Exhibit Q -- Email dated November 25, 2009 from Serena Sibbald to Gianni Busanna (with a copy to Johanna Brambring)

Exhibit R -- Email dated June 24, 2009 from Johanna Brambring to Gianni Busanna

DECLARATION OF MEGAN D'AMICO IN SUPPORT OF PHE'S
OPPOSITION TO PLAINTIFF LE BONITAS'
MOTION FOR SUMMARY JUDGMENT

DECLARATION OF PARIS HILTON IN SUPPORT OF PHE'S
OPPOSITION TO PLAINTIFF LE BONITAS'
MOTION FOR SUMMARY JUDGMENT

## TABLE OF AUTHORITIES

### FEDERAL CASES

Care Envtl. Corp. v. M2 Technologies Inc., CV-05,
   1600 (CPS), 2006 WL 2265036 (E.D.N.Y. Aug. 8, 2006)...........................................38

Ferguson v. Lion Holding, Inc.,
   478 F. Supp. 2d 455(S.D.N.Y. 2007) .....................................................................37

First Investors Corp. v. Liberty Mut. Ins. Co.,
   152 F.3d 162 (2d Cir. 1998) ...................................................................................28

Int'l Klafter Co., Inc. v. Cont'l Cas. Co., Inc.,
   869 F.2d 96 (2d Cir. 1989)......................................................................................41

JA Apparel Corp. v. Abboud,
   591 F. Supp. 2d 306 (S.D.N.Y. 2008) .....................................................................29

Joao v. Cenuco, Inc.,
   376 F. Supp. 2d 380 (S.D.N.Y. 2005) .....................................................................22

Kamfar v. New World Restaurant Group, Inc.,
   347 F. Supp. 2d 38, 51 (S.D.N.Y. 2004) .................................................................22

Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,
   418 F.3d 168 (2d Cir. 2005) ..............................................................................42, 43

Rexnord Holdings, Inc. v. Bidermann,
   21 F.3d 522 (2d Cir. 1994) .....................................................................................38

Rockland Exposition, Inc. v. Alliance Of Auto. Serv. Providers Of N.J.,
   08-CV-7069 (KMK), 2009 WL 1154094 (S.D.N.Y. Mar. 19, 2009)............................27

Scott-Macon Securities, Inc. v. Zoltek Companies,
   2005 WL 1138476, at *14 (S.D.N.Y. 2005)........................................................37, 38

Wechsler v. Hunt Health Sys., Ltd.,
   330 F. Supp. 2d 383 (S.D.N.Y. 2004) .....................................................................38

### STATE CASES

Chieco v. Paramarketing, Inc.,
   228 A.D.2d 462, 643 N.Y.S.2d 668 (1996).........................................................22, 23

Graphic Scanning Corp. v. Citibank, N.A.,
    116 A.D.2d 22, 499 N.Y.S.2d 712 (1986)............................................................23, 29

Green Harbour Homeowners' Ass'n, Inc. v. G.H. Dev. & Const., Inc.,
    14 A.D.3d 963, 789 N.Y.S.2d 319 (2005)....................................................................31

Hooper Associates, Ltd. v. AGS Computers, Inc.,
    74 N.Y.2d 487, 548 N.E.2d 903 (1989).......................................................................43

Lopez v. Fernandito's Antique, Ltd.,
    305 A.D.2d 218 , 760 N.Y.S.2d 140 (2003)................................................................41

Muzak Corp. v. Hotel Taft Corp.,
    1 N.Y.2d 42 , 133 N.E.2d 688 (1956)...........................................................................31

Sagittarius Broad. Corp. v. Evergreen Media Corp.,
    243 A.D.2d 325, 663 N.Y.S.2d 160 (1997)..................................................................42

Tedesco v. Triborough Bridge & Tunnel Auth.,
    250 A.D.2d 758, 673 N.Y.S.2d 181 (1998)..................................................................23

Waldman v. New Phone Dimensions, Inc.,
    109 A.D. 702, 704 (1985)............................................................................................31

## INTRODUCTION

On January 18, PHE filed its Motion for Summary Judgment asking the Court to enforce an unambiguous covenant not to sue which expressly bars the claims and defenses asserted by Le Bonitas in this action.  PHE's motion also asks the Court to interpret the "deemed disapproval" clause of PHE's License Agreement (Section 5.1(2)) in accordance with its plain meaning, and to dismiss Le Bonitas' breach claims as inconsistent with that provision.  If the Court agrees with PHE's interpretation of the contract, then Le Bonitas' Motion for Summary Judgment fails and is moot.  If not, then there are factual issues to resolve at trial.

In contrast with PHE's motion, **which is based entirely on issues of contract interpretation,** Le Bonitas devotes **fifty pages** to hotly disputed factual issues.  Indeed, on the very first page of its motion, Le Bonitas frames the issues as (1) whether or not PHE's alleged delay in approving its "mood board" submission was "excusable," and (2) whether or not Le Bonitas received "the benefit of its bargain," i.e., did the alleged delay prevent Le Bonitas from presenting a Fall/Winter collection?  Over the next forty nine pages, through smoke and mirrors, Le Bonitas presents an implausible tale based on gross misrepresentations of evidence and glaring omissions of material facts.

As just one example, Le Bonitas falsely claims, **without citation to evidence**, that Beanstalk "did nothing with the boards (i.e. committed complete nonfeasance)" from the time they received them until October 21.  Motion p. 11.  In fact, however, the undisputed testimony (including from Le Bonitas' principal witness) is that Beanstalk **immediately** reviewed the boards on behalf of PHE and, thereafter, engaged Le Bonitas in a dialogue seeking clarification of the presentation.

Another example involves the false claim that PHE caused Le Bonitas to miss the **single** trade fair planned for February 5, 2010 in Italy, thereby preventing Le Bonitas from presenting the Fall/Winter collection.  Le Bonitas omits to inform the Court that the selling season for the Fall/Winter collection was months long, and most sales are not

done at such fairs.  In fact, the February fair was primarily aimed at the Italian market, and this was a global license.  Thus, even if Le Bonitas would have missed the February fair (and the evidence is to the contrary), there was plenty of time to market and sell the collection had Le Bonitas chose to do so.

Le Bonitas' motion fails for the additional reason that it cannot establish its own performance, a fundamental element of any breach claim.  By October 2009, Le Bonitas was already in breach of its distribution obligations and would not meet its requirement to commence sales in all licensed territories by the distribution start date.  On this issue, Le Bonitas does not (and cannot) dispute the facts.  Instead, it attempts to confuse the issue by discussing other distribution requirements which have nothing to do with the breach at issue.

Finally, this Court should simply disregard Le Bonitas' request to strike PHE's claim for attorneys fees.  The contract unmistakably provides that PHE may recover "the costs of collection of *all* amounts owed" by Le Bonitas as well as fees and costs "of *all* actions by [PHE] against [Le Bonitas] to enforce [Le Bonitas's] compliance with this Agreement."  This language is plain on its face, applies directly to *all* actions to enforce the contract, and is not in any way limited to claims asserted by third parties.  Le Bonitas cites no case to the contrary, because there is none.

In framing the issues as it has, Le Bonitas could not in good faith believe that no triable issue of fact exists to defeat its motion.  The motion appears purely tactical- a defensive move to overwhelm the court in paper and divert attention from the very discrete and dispositive contract interpretation issues raised in PHE's motion.  PHE respectfully submits that the Court should not be distracted by the noise.  Le Bonitas' motion should be summarily denied, and judgment should be entered in favor of PHE.

# FACTUAL BACKGROUND[1]

## A.    The License Agreement.

In early 2009, PHE and Le Bonitas entered into a five-year License Agreement (dated as of February 1, 2009) pursuant to which PHE agreed to license the *Paris Hilton* name and brand to Italian clothing manufacturer Le Bonitas in connection with a line of lingerie, sleepwear and beachwear.  (Cmplt ¶¶ 7-8; Herzfeld Dec. ¶ 2, Exh. A).  The licensed territory included every country worldwide outside of North America and South America.  (Exh. A, Sec. 1.3 & exh. 2 therein at pp. 1 & 31).

Le Bonitas' manager of marketing and sales, Gianni Busanna, negotiated the License Agreement on behalf of Le Bonitas, with input from Le Bonitas' owner Guglielmo Muratori, outside American lawyers and an outside consultant who specializes in licensing.  (Weinsten Decl. ¶ 2, Exh. C, Busanna Depo pp. 8, 10 & 11).  PHE's licensing agent, Beanstalk, negotiated for PHE.  (Herzfeld Decl. ¶ 2).

### 1.    The Approval Terms (Exh. A, Section 5.1).

To protect Ms. Hilton's image and brand, and to ensure the quality of products sold under her name, the License Agreement provided PHE with strict and unfettered approval rights at every stage of the design process, including: (a) the "Concept" stage, i.e., mood boards (also called inspiration boards); (b) the "Final Art" stage, i.e., detailed designs; and (c) "Final Physical," e.g., physical samples of the product.  (Herzfeld Decl. ¶ 3; Exh. A, Sec. 5.1, p. 10.)  In the lingerie/swimwear business, there are typically two design seasons, one for Spring/Summer and one for Fall/Winter.  (Herzfeld Decl. ¶ 4).

---

[1] Although there is obvious overlap between this Opposition and PHE's own Motion for Summary, it is important to note that this brief contains substantial additional facts, evidence and legal arguments not previously presented to the Court.

### (a)   Le Bonitas Covenants Not To Sue Regarding Approvals.

PHE's approval rights were to be exercised in accordance with PHE's "Sole and absolute discretion." (Exh. A, Sec. 5.1, p. 10). Indeed, Section 5.1(8) of the License Agreement expressly states that "***LICENSEE [Le Bonitas] shall not have any rights against OWNER [PHE] for damages or other remedies by reason of OWNER'S [PHE's] failure or refusal to grant any approval referred to in this Section 5.***" (Exh. A, Sec. 5.1(8), p. 11) (emphasis added). Thus, Le Bonitas expressly covenanted that it would ***not*** sue PHE for its delay or failure to approve designs.[2] PHE negotiated for this language for the precise reason that it did not want to engage in any dispute as to what is and is not a reasonable exercise of an approval right and/or what is and is not a reasonable time to consider and respond to designs. (Herzfeld Decl. ¶ 5).

### (b)   The "Deemed Disapproval" Clause.

The License Agreement further states that "Owner [PHE] shall have ten (10) business days from Owner's actual receipt to ***review and respond*** in writing to each of LICENSEE's [Le Bonitas'] submissions," but that if "***Owner does not respond to such submission within such ten (10) business day period, such submission shall be deemed disapproved.***" (Exh. A, Sec. 5.1(2), p. 11) (emphasis added). Thus, the parties expressly contemplated that PHE might not respond to a design submission in ten business days and, in such event, the result would be a ***disapproval*** of the designs-- ***not a breach of contract***.

In his deposition, Mr. Busanna confirmed his understanding that "Paris Hilton Entertainment might not respond to every design submission in ten days," and that he

---

[2] The term "failure" is synonymous with "delay," "delinquency," "deficiency" and "dereliction." Weinsten Decl. ¶ 8, Exh. I (dictionary definition of "failure").

4

"understood that if within ten days after having sent the designs, that there was no response, that they were considered disapproved." (Exh. C, Busanna Depo pp. 14-15). Mr. Busanna specifically discussed this clause with the owners. (*Id.* at p. 14).

Mr. Busanna further testified that, during negotiations, Le Bonitas specifically asked that the words "deemed disapproved" in Section 5.1(2) be replaced with the word "approved," but that was rejected by Beanstalk. (*Id.* at pp. 25-26.) Thus, Le Bonitas knowingly accepted the risk that PHE might not respond to a particular submission within ten days, and that its designs could be disapproved in this manner.

In fact, Mr. Busanna confirmed in his testimony that he fully "understood that one way Paris [Hilton] could disapprove your [Le Bonitas'] designs is by not responding at all." (*Id.* at p. 15.)  In such circumstances, he agreed "it was up to Le Bonitas to resubmit designs." (*Id.* at pp. 19-20).  Mr. Busanna specifically testified that it would not have been a breach for PHE to respond in 12 or 15 business days. (*Id.* at pp. 33-35). Mr. Busanna further confirmed Le Bonitas' expectation that PHE was not required to actually approve or disapprove a design submission within ten business days, *and* that he would have considered it perfectly reasonable for PHE to *respond* to a submission with questions about the designs. (*Id.* at pp. 27-29).

Contrary to Mr. Busanna's testimony, Le Bonitas *now* argues that *any* failure to respond within ten days is a breach.  Obviously, if failure to respond in ten days were a breach, Le Bonitas would not have felt it necessary to ask that it be deemed an approval- since PHE would have to respond in ten days.

### 2.   Le Bonitas Agrees To Pay PHE Bi-Annual Minimum Guaranteed Royalties (Exh. A, Section 3.3 and Exh. 6 Thereto).

In exchange for the rights granted by PHE, Le Bonitas agreed to pay PHE a

5

minimum guaranteed royalty of €1,225,000, payable in bi-annual installments with the first payment being made upon signature. (Exh. A, Sec. 3.3 & exh. 6 thereto, pp. 5 & 32). These payments were deemed "fully earned by [PHE] upon execution of this Agreement." (*Id.*) Le Bonitas made the first installment payment of €97,500, but as explained below, no other payments were ever made. (Herzfeld Decl. ¶ 6).

### 3. Le Bonitas' Distribution Requirements (Exh. A, Sec. 14).

Section 14.1 of the License Agreement required that Le Bonitas use its "***best efforts*** to sell, distribute and supply" the licensed articles and to "begin the bona fide manufacture, distribution and sale of the LICENSED ARTICLES ***in each country*** in the LICENSED TERRITORY on or before the Distribution Start Date" of January 1, 2010. (Exh. A, Sec. 14.1 and exh. 9 therein, pp. 25 & 33) (emphasis added).

Mr. Busanna confirmed that, at the time he negotiated the contract, he fully "understood that Le Bonitas would start the manufacture, distribution, and sale of the products in all of the countries as per the contract," and that this was to occur by January 1, 2010. (Exh. C, Busanna Depo p. 377). Thus, Le Bonitas was not only bound to use best efforts to sell in every country in which it was licensed, it was ***required*** to have ***actually*** achieved sales in every licensed territory by January 1, 2010.

### 4. PHE's Right of Termination and Acceleration of Payments Due, and Right to Attorneys Fees (Exh. A, Sec's 13.1 & 9.2).

If Le Bonitas failed to "to make any payment" and failed to cure such default within five days of notice, PHE had the right to terminate the contract. (Exh. A, Sec. 13.1(i), p. 22). Upon termination, the "balances owing on all MINIMUM ROYALTIES for the TERM shall be immediately due and payable." (Exh. A, Sec. 13.1, p. 23).

Section 13.1 also provides PHE with the right of termination, and acceleration of

6

the minimum guarantees, in the event Le Bonitas "does not fulfill its obligation to distribute, promote and advertise the LICENSED ARTICLES as set forth under Section 14." (Exh. A, Sec. 13.1(xiii), p. 23).

PHE may also recover "reasonable attorneys fees, costs and expenses which may be  . . . incurred by [PHE], including costs of collection of all amounts owed to [PHE] by LICENSEE and costs of all actions by [PHE] against LICENSEE to enforce LICENSEE'S compliance with this Agreement."  (Exh. A, Sec. 9.2, p. 17).

     **5.**     **The Integration Clause And Interpretation Clause.**

The License Agreement is a fully integrated agreement and no provision may "be waived or modified except in writing signed by both parties." (Exh. A, Sec. 17, p. 29).

In Section 21, the agreement provides that "[a]ny rule of law that would require interpretation of any provision against the party responsible for its inclusion herein shall have no effect on the interpretation of this agreement." (Exh. A, Sec. 21.)

**B.**     ***Through No Fault of PHE*, Le Bonitas Fails in the Manufacture and Distribution of the First Season of Product (the Spring/Summer Line).**

Shortly after the contract was signed on or about March 5, 2009, Le Bonitas began working on its 2010 Spring/Summer collection of the Paris Hilton line.  By April 6, 2009, PHE approved the "mood boards" for this line which was the first step in the design process.  (Sibbald Decl. ¶ 2).  Although a meeting was initially planned for April 14, 2009 to go over the detailed designs (the next step), delays caused by Le Bonitas' suppliers forced the meeting to be pushed to May 27, 2009 (*a 43 day delay*).  (Exh. C, Busanna Depo pp. 124-125 and 129-131).  Despite the delay, Le Bonitas was able to complete the sales samples in time for market which began at the end of June/

beginning of July 2009.  (Exh. C, Busanna Depo  p. 132).[3]

Unfortunately, for reasons that have nothing to do with PHE or Ms. Hilton, sales for the Spring/Summer line were extremely disappointing.  According to Mr. Busanna, Le Bonitas' actual sales were no more than 12% of what they had previously projected, and Le Bonitas failed to make *any* sales in such major territories as England, France and the Far East where Ms. Hilton enjoys wide popularity.  (*Id.* at p. 154).[4]  This raised serious concerns for Le Bonitas, including the negative impact on future sales seasons.  (*Id.* at p. 316).  At his deposition, Mr. Busanna gave the following testimony with respect to the difficulty Le Bonitas would face if sales on the Spring/Summer line were poor.

Q:   Is it a truthful statement that if sales of the spring/summer line were compromised, Le Bonitas would not be able to pay the guaranteed minimum [due PHE]?

A:   It would have been difficult, very difficult.  (*Id.* at p. 122).

According to Le Bonitas' English distributor, the reasons for poor sales had nothing to do with Ms. Hilton, but rather included such things as Le Bonitas' overpricing of the items and Le Bonitas' failure to provide a wider range of sizes.  (*Id.* at 225-227; Weinsten Decl. ¶ 3, Exh. F).  In contrast, this same distributor noted that there had been a "good reaction to the Paris Hilton clothing line" designed and manufactured by a different Italian clothing company called Diciotto.  (Exh. F).

The poor results on the Spring/Summer line prompted Mr. Busanna to write

---

[3] The sales market for a particular season begins as many as eight or more months before the items would actually appear in stores.  (Sibbald Decl. ¶ 3).

[4] Despite its contractual requirement to begin bona fide manufacture and sales in every licensed country by January 1, 2010, Le Bonitas did not hire any distributors for Asia, Australia or Africa- focusing instead on Europe and the Middle East.  (*Id.* at p. 277).  In fact, Busanna confirmed that no effort at all had been made to sell in Africa or any Asian country other than minimal efforts with Korea and Japan.  (*Id.* at pp. 346-347).

Beanstalk on September 9, 2009 stating "sales are going badly so we are very disappointed and worried."  (Sibbald Decl. ¶ 4; Exh. J).  On October 9, 2009, one month later, Mr. Busanna wrote Beanstalk in desperation: "as already told many times, sales are going very badly so we really need to meet because we have very big problems." (Sibbald Decl. ¶ 5; Exh. K).  When asked by Beanstalk in October 2009 about efforts by Le Bonitas to market the line, Mr. Busanna responded "We have no money to spend." (Sibbald Decl. ¶ 6; Exh. L).

In response to Mr. Busanna's desperate plea, a meeting was set for November 4 in London (discussed further in Section K below).  (Sibbald Decl. ¶ 7).

**C.**     **Le Bonitas Submits The Mood Boards for the 2010 Fall/Winter Season on October 8, 2009- *Without the Required Approval Form*.**

According to Le Bonitas' contract with its designer for the Paris Hilton line, Romina Christodero, Ms. Christodero was contractually required to have completed the mood boards *and* detailed designs for the 2010 Fall/Winter season on or before September 20, 2009.  (Exh. C, Busanna Depo p. 81; *See also* Electronic Doc. No. 45, Marchino Decl. ¶ 2, Exh. S, submitted with PHE's Motion for Summary Judgment).  In fact, Mr. Busanna testified that the 2010 Fall/Winter mood boards, according to his schedule, should have been done by July 2009.  (*Id.* at p. 191).  However, the mood boards were not sent to Beanstalk for consideration until October 7, 2009 and were not received until October 8.  (*Id.* at pp. 155-156; Sibbald Decl. ¶ 8).[5]

---

[5] Le Bonitas now claims that it required that the boards be approved by around November 5, 2009 in order to get the Fall/Winter line to market.  If this is true (and it is not), then Le Bonitas was grossly negligent in waiting until October to send the boards- they should have been sent in July as originally planned.  By waiting until October, Le Bonitas effectively guaranteed they could not get to market in time if PHE rejected the

Although Beanstalk repeatedly reminded Le Bonitas of the need to submit PHE's standard approval form with every submission, Le Bonitas failed to do so with respect to the Fall/Winter mood boards.  (Sibbald Decl. ¶ 8; Exh. C, Busanna Depo p. 49).

**To ensure that every licensee's needs are met**, and to facilitate the orderly management and documentation of approvals for roughly 17 PHE licensees, PHE requires that its licensees include with every design submission a standard form which indicates, among other things, **by when the approval is required.**  (Sibbald Decl. ¶ 9; Exh. M, p. 20).  This form was sent to Le Bonitas as early as March 11, 2009.  (Sibbald Decl. ¶ 9, Exh. N; Exh C, Busanna Depo p. 50).  It was also included in a "Licensee Welcome Pack" given to Le Bonitas with the instructions that design "submissions will not be accepted without a completed form."  (Sibbald Decl. ¶ 9; Exh. M, pp. 16 & 20). Although the Welcome Pack is not part of the contract (discussed in legal argument below), PHE's unfettered approval rights in section 5.1 clearly permitted PHE to impose reasonable conditions on the exercise of its approvals.

On June 24, 2009, Beanstalk again reminded Le Bonitas by email of the necessity that the approval form be sent with the design concepts.  (Sibbald Decl. ¶ 10; Exh. R).  Le Bonitas, however, ignored these requests.  (*Id.*)  Le Bonitas did not provide advanced notice that it was sending the mood boards, and did not indicate any date by which the boards had to be approved to meet Le Bonitas' needs.  (Sibbald Decl. ¶ 10; Exh. C, Busanna Depo pp. 46 & 48, 67-68).

---

boards on October 22- ten business days after received, since there would not have been time to create new boards and get them to Paris in sufficient time for turn around.

**D.**   **Consistent with PHE's Contractual Approval Rights, Beanstalk *Responds* with Questions to the Submission of the Fall/Winter Mood Boards as Early as October 13, 2009.**

As the licensing agent for PHE, Beanstalk's typical practice with new licensees such as Le Bonitas was to go over design concepts with the licensee before forwarding designs to the licensor for approval. (Sibbald Decl. ¶ 11). In Beanstalk's view, the Fall/Winter mood boards were confusing and came in without sufficient explanation. (*Id.*) Indeed, much of the language made no sense at all. *See, e.g.,* Page 4 of Mood Boards, Le Bonitas Motion Exh. 3 (inexplicably stating, among other things, "3d effects are the key: plisse, combining contrasting and softs home wear pieces.") Obviously, English was not the first language of the designer.

Beanstalk also had questions regarding what the different products were and the themes associated with the line. (*Id.*) According to Serena Sibbald, the Beanstalk executive responsible for overseeing the Le Bonitas contract, she did not believe Ms. Hilton would understand the presentation without further explanation that had to be obtained from Le Bonitas. (*Id.*) Also, Beanstalk wanted to be sure the product and positioning was in line with PHE's existing apparel line manufactured by Diciotto. (*Id.*).

On October 13, 2009, just three business days after the boards were received, Beanstalk's Johanna Brambring ***responded*** to Le Bonitas' mood board submission stating that Beanstalk wanted to review the boards with Le Bonitas prior to sending them to PHE. (Sibbald Decl. ¶ 12; Exh. O). Beanstalk proposed that this review take place at the November 4 meeting in London. (*Id.*) Le Bonitas agreed, but asked that the boards be sent to PHE right away. (*Id.*) Again, Le Bonitas did not provide a date by which it required the boards to be approved. (*Id.*)

Over the next few days, and before sending the boards on to PHE for consideration, Ms. Brambring attempted to follow up with Mr. Busanna about the Fall/Winter presentation.  (Sibbald Decl. ¶ 13).  On October 20, she emailed Mr. Busanna asking for a CD explaining the "thoughts of the presentation."  (Exh. C, Busanna Depo pp. 68-69).  This was consistent with the Spring/Summer line for which Le Bonitas provided an explanation of its vision separate and apart from the mood boards themselves.  (Sibbald Decl. ¶ 13).

In response to this email, Mr. Busanna told his Le Bonitas colleagues that Ms. Brambring can "go fuck herself."  (Exh. C, Busanna Depo p. 69).  Busanna claimed he was "letting off steam" because "they kept asking us questions about things that [in his view] were already in the CD."  (Id.)

On October 21, 2009, Ms. Brambring wrote Mr. Busanna stating "I thought of some additional information.  I will explain this to you on the phone this week."  (Sibbald Decl. ¶ 14; Exh. P).  That same day, Beanstalk sent the CD with the Fall/Winter mood boards to PHE by overnight carrier.  (Sibbald Decl. ¶ 15).  Mr. Busanna testified the email was followed with a call about the boards.  (Exh. C, Busanna Depo pp. 66-67).

At the meeting in London on November 4, Beanstalk executives reviewed the boards with Mr. Busanna.  (Sibbald Decl. ¶ 16; Exh. C, Busanna Depo pp. 59-60).  One of the issues discussed was coordination of Le Bonitas' designs with PHE's Diciotto apparel line.  (Id. at pp. 59-60 & 66).

E.  _**Unbeknownst To PHE**, in October 2009, Le Bonitas Decides Not To Proceed with a Fall/Winter Line, Terminates Its Distributors and Puts All Manufacturing on Hold._

On August 26, 2009, Le Bonitas' English distributor notified Le Bonitas that it would no longer present the line. (Exh. C, Busanna Depo pp. 227-228; Exh. F). Two days later, Le Bonitas sent letters to ten other distributors of the Paris Hilton line terminating their contracts. (_Id.,_ pp. 231-232, 234-238).[6] Mr. Busanna testified that the reason was poor sales. (_Id._ at p. 232). Le Bonitas did not replace these distributors (other than the agent for the small Italian territory of Trivento) and, in fact, chose not to renew the contract for its sales consultant (Paula Abiti) who was hired specifically to assist in finding distributors for the Paris Hilton line. (_Id._ at pp. 239, 247-248).

On or about this same time, Le Bonitas put all of its manufacturers of the Paris Hilton line on hold as well. (_Id._ at p. 310). On October 28, 2009, Le Bonitas employee Sergio Leoncini (from Purchasing) wrote to another Le Bonitas employee stating "there is a chance that the Paris Hilton line may not be produced after all." (_Id._ at p. 309). Mr. Leoncini further opined that "this could be good news." (_Id._ at p. 311).

As of October 28, only fourteen business days had passed from the time Beanstalk received the mood boards for the Fall/Winter line. (Sibbald Decl. ¶ 17). No-one ever informed PHE or Beanstalk that Le Bonitas was terminating its distributors or

---

[6] This mass termination of distributors effectively ended distribution in the majority of territories where Le Bonitas had secured distributors, including Greece, Turkey, France, Spain, Benelux, Scandinavia, Portugal, the Middle East, and various Italian provinces. (_Id._). Although the German distributor (with whom Le Bonitas had a previous longstanding relationship) did not receive such notice, according to Mr. Busanna, sales in Germany were poor and "it was evident they were not going to continue selling the Paris Hilton line." (_Id._ at pp. 250-251). Le Bonitas' only other major distributor, for Eastern Europe, terminated their agreement when Le Bonitas failed to deliver the Spring/Summer line in a timely manner. (_Id._ at pp. 254-255).

putting manufacturing on hold.  (Sibbald Decl. ¶ 17).

A few days later, on November 3, 2009, Mr. Busanna sent an email to the owners of the company attaching Section 13.1 of the License Agreement, i.e., **the section that specifies the circumstances under which PHE alone may terminate the contract.**  (Weinsten Decl. ¶ 4, Exh. D, Muratori Depo p. 45 and exh. 80 at end of Exh. D).  The covering email states "In summary, attached are the contractual provisions pertaining to the possible causes of breach.  The important parts are underlined.  The consequences of a breach are in bold."  (*Id.*)

In this critical email, Mr. Busanna specifically underlined the provisions of the agreement that **permit PHE to terminate** in the event Le Bonitas fails to meet its distribution requirements, and highlighted in bold the section that provides that all minimum guaranteed royalties become immediately due in the event of a termination. (*Id.* at pp. 47-48 and Exh. 80 therein).[7]  Mr. Busanna confirmed in his testimony that, **in October of 2009**, he "was concerned that Le Bonitas would not meet its distribution requirements under the Paris Hilton contract."  (Exh. C, Busanna Depo at p. 266).

When Le Bonitas owner, Mr. Muratori, was asked whether he was concerned on November 3, 2009 "that Ms Hilton might terminate this contract," he replied "Yes.  That Hilton could cancel this contract, yes."  (Exh. D, Muratori Depo p. 47).  When later asked whether he discussed the November 3 email with Mr. Busanna, Mr. Muratori testified:

> ". . . the discussion, I believe, hinged on the fear we had that Paris Hilton might cancel the contract because we weren't coming out with the winter collection."

---

[7] The Court may recall that Le Bonitas initially refused to produce this critical document, claiming falsely that it was covered by attorney-client privilege.  The Court disagreed and ordered that it be produced.

(*Id.* at pp. 58-59).[8]

Of course, no-one disclosed to PHE that Le Bonitas had decided to abandon the Paris Hilton line, or even that it was considering such a move.  (Sibbald Decl. ¶ 17).

**F.**   ***Also Unbeknownst to PHE*, Le Bonitas Completed the Detailed Designs for the Fall/Winter Line by Mid-October 2009, But Did Not Send Them to PHE for Approval.**

Mr. Busanna confirmed that Le Bonitas did not wait for approval of the mood boards before proceeding with the next phase, i.e., the detailed designs.  Rather, it requested that its designer, Romina Christodero, prepare them together and that everything be completed by September 20, 2009 as set forth in her contract.  (Exh. C, Busanna Depo pp. 81-82; Marchino Decl. ¶ 2, Exh. S).  Busanna confirmed that the detailed designs were in fact completed before October 12, 2009.  (*Id.* at p. 87).  However, when Ms. Christodero requested a meeting to discuss the detailed designs, Le Bonitas product manager Patrizia Borselli responded that "following poor sales on the summer line, the company is evaluating how to proceed."  (*Id.* at pp. 87-88).

Le Bonitas never disclosed this fact to PHE or Beanstalk; nor did they send these designs to PHE for approval, despite later claims that they were pressed for time.  (Sibbald Decl. ¶ 18; Exh C., Busanna Depo p. 98).  Indeed, with respect to the Spring/Summer line, Le Bonitas had Ms. Hilton approve samples simultaneous with the detailed designs to save time.  (Sibbald Decl. ¶ 18; Exh C, Busanna Depo p. 94).

In his declaration submitted with Le Bonitas motion, Mr. Busanna testifies that

---

[8] In obvious recognition of the damage done by this testimony, Mr. Muratori, or his lawyers, changed the testimony ***after the deposition was completed.***  They have added the following words at the end "if it became impossible."  (Exh. D, change page).

"despite Beanstalk and PHE's delay, at no time did they offer to permit the design pages and samples to be approved at the same time (as they had permitted for the Spring/Summer collection)."  Busanna Decl. ¶ 34.  This testimony underscores Le Bonitas' deception and bad faith, in view of the fact that Le Bonitas never requested simultaneous approvals of samples and designs on the Fall/Winter line, and never even bothered to tell PHE or Beanstalk that the detailed designs were already done. Obviously, since PHE agreed to this on the Spring/Summer line, it would have done the same for Fall/Winter.

G.   **Ms. Hilton Considers the Mood Boards on or About November 4 and Declines Approval.**

The mood boards sent by Beanstalk were received by Ms. Hilton's assistant Megan D'Amico at PHE's Los Angeles office on or about October 22, 2009.  (D'Amico Decl. ¶ 2).  Ms. Hilton was fully booked with work engagements that day, and then left the country between October 23 and 27.  (D'Amico Decl. ¶ 2).

When the mood boards arrived, Ms. D'Amico was unaware that they were an official approval item, since the presentation did not include the required approval form filled out by Le Bonitas.  (D'Amico Decl. ¶ 3).  Through emails with Beanstalk exchanged between November 3 and November 4, Ms. D'Amico ultimately learned that Ms. Hilton's approval was required.  (D'Amico Decl. ¶ 3).  On November 4, Ms. D'Amico handed Ms. Hilton the mood boards just prior to her getting on a plane for a work appearance in Las Vegas.  (D'Amico Decl ¶ 3).

Ms. Hilton specifically recalls that she was not happy with the designs and (as permitted by contract) wanted to think about them further.  (Hilton Decl. ¶ 2).  Thus, the designs were effectively disapproved unless and until Ms. Hilton changed her mind.

16

**H.**     **Although Dissatisfied, Ms. Hilton Ultimately Approves the Mood Boards as a Favor to Its Licensee.**

On November 18, Ms. Hilton met with Ms. D'Amico and again went through the mood boards.  Ms. Hilton recalls at this meeting that she did not want to approve the designs, because she was still not happy with them.  (Hilton Decl. ¶ 3).  Ultimately, however, she decided to approve them with minimal comments, because Ms. D'Amico said this needed to get done right away and Ms. Hilton wanted to be a good partner. (Hilton Decl. ¶ 3).  Indeed, Ms. Hilton had many other notes but decided not to force Le Bonitas to simply redo everything.  (*Id.*)  Ms. D'Amico also recalls Ms. Hilton saying she did not particularly care for the boards, but decided to sign off "as a favor" to Le Bonitas. (D'Amico Decl. ¶ 4).  The comments were transmitted to Beanstalk that same day, and then forwarded to Le Bonitas on November 20.  (Sibbald Decl. ¶ 19).


**I.**     **The Evidence Is Clear That Le Bonitas Could Easily Have Completed Samples In Time For The February 5, 2010 Fair, *If It Chose To Do So*[9]**

As of November 20, 2009, 77 days (more than 2 ½ months) remained before the February 5, 2010 trade fair which Le Bonitas claims was the start of the market. (Sibbald Decl. ¶ 22).  This was more than enough time to complete the samples.  (*Id.* ¶¶ 22-24).  Indeed, with respect to the Spring/Summer line, the detailed designs were approved *just one month* prior to commencement of the market.  (Exh. C, Busanna Depo p. 108 & 129).  Since the Fall/Winter collection included no swimwear, it was only half as many pieces as the Spring/Summer line. (Weinsten Decl. ¶ 6, Exh. E, Balli

---

[9] In the event the case proceeds to trial, PHE will put forth substantial independent expert testimony corroborating the evidence set forth herein.

Depo, pp. 80-81).  Therefore, according to Mr. Busanna, even less time was needed to manufacture the samples for the Fall/Winter collection.  (Exh. C, Busanna Depo p. 108). In view of the fact that Le Bonitas terminated most of its distributors in October 2009, there would be even fewer samples to produce, since the samples are primarily made for the distributors.  (Sibbald Decl. ¶ 22).

Here, the detailed designs were already completed, and Ms. Hilton's limited comments on the mood boards would have had no appreciable impact on those designs.  (Sibbald Decl. ¶ 23; Exh. C, Busanna depo pp. 146-147).  Accordingly, even if it had taken another ten days to approve the detailed designs (until November 30), and it could have been done sooner, *Le Bonitas would still have more than double the amount of time (66 days) it had on the Spring/Summer line to create far less than half the amount of samples.* (Sibbald Decl. ¶ 23).

In his recent declaration, Mr. Busanna claims that "it *usually* takes around eight weeks" to manufacture the samples after the detailed designs are approved.  Busanna Decl. ¶ 39.  (Emphasis added.)  At his deposition, Mr. Busanna could not say whether or not, in this case, Le Bonitas could have asked its manufacturers to expedite delivery because as he testified "I have information of a general nature . . . I don't do that work, and it doesn't – it's not my job to know about that." (Exh. C., Busanna Depo p. 141).  Of course they could have! And other time saving measures could have been taken. (Sibbald Decl. ¶ 24).  Regardless, even without time saving measures, Le Bonitas could have manufactured the samples in time for the February 5 fair, since as of November 20, *eleven weeks remained*.

**J.      Even If Le Bonitas Missed A *Single* Trade Fair, There Is No Evidence To Suggest This Would Preclude The Presentation Of A Fall/Winter Collection; Particularly Whereas, Here, *The Sales Season Is Several Months Long.***

Even assuming, however, samples could not be completed by the February 5 trade fair in Italy, Le Bonitas does not and cannot claim that there were no other fairs they could attend (there were, Sibbald Decl. ¶ 25) or that absence from this single fair would have any appreciable impact in overall sales for the Fall/Winter season.  As explained by Ms. Sibbald, the February 5 Pitti Imagine fair is primarily aimed at the Italian market with very few overseas buyers.  (*Id.* at ¶ 26)  This was a global license.  If attendance at fairs was Le Bonitas' strategy, they should have been attending fairs globally, since they had a global license. (*Id.*)

Further, as Mr. Busanna admitted in his deposition, **the Fall/Winter sales season is two and one half months long**, and "this is when buyers will come into the offices of the sales agents or distributors and look at the product."  (Exh. C, Busanna Depo p. 138).  In other words, while trade fairs have some relevance, this is not where most sales are done.  (Sibbald Decl. ¶ 27).  In fact, PHE's apparel licensee, Diciotto, was quite successful and never once showed the line at a single trade fair, opting instead to have buyers visit their show rooms or visit the buyers in situ.  (*Id.* at ¶ 28).  Again, Le Bonitas is being intentionally deceptive.

**K.      Le Bonitas Fails To Pay; PHE Terminates The Contract.**

On November 4, 2009, Mr. Busanna met in London with Ms. Brambring and Ms. Sibbald of Beanstalk to discuss the Paris Hilton line.  Mr. Busanna confirmed that sales of the Spring/Summer line were a dismal €185,000 (compared with previous projections

of €1,567,621).  (Compare Exh. C, Busanna Depo p. 333 w/ Weinsten Decl. ¶ 5, Exh. G

p. 4).  He also told them that "due to the world financial crisis, we [Le Bonitas] had felt

its effects on all of our lines in sales."  (Exh. C, Busanna Depo p. 330).  During this

meeting, Mr. Busanna asked that PHE consider lowering the contractual minimum

guaranteed royalties "due to the crisis that was hitting the entire market."  (*Id.* at 333-

334; *see also* Sibbald Decl. ¶ 7).  Mr. Busanna explained "we wanted to make it less

difficult for us to move ahead so that we could bring this line out in that there were those

very difficult sales previously."  (*Id.* pp. 320-321).

On November 25, 2009, Ms. Sibbald wrote to Mr. Busanna stating that PHE was

not willing to renegotiate the minimum guarantees at this early stage.  (Sibbald Decl. ¶

20, Exh. Q).  Among other things, Ms. Sibbald explained that it was too early to

conclude that the program would not be a success, that Le Bonitas had done very little

marketing of the line, and that Le Bonitas could benefit from meeting with and

coordinating with other licensees to leverage retail outreach.  (*Id.*)  That same day, Le

Bonitas wrote Beanstalk falsely claiming breach by PHE, and confirming that it would

not be producing a Fall/Winter season.  (Weinsten Decl. ¶ 9, Exh. I(a)).  Le Bonitas did,

however, continue with production and delivery of the Spring/Summer line through

February/March 2010 and was paid for those deliveries.  (Exh. C, Busanna Depo pp.

264-265, 378-379, 383-384).

On June 15, 2010, Le Bonitas was contractually required to pay the next

installment of the minimum guarantees, i.e., €97,500.  (Exh. A, p. 32).  Le Bonitas,

however, failed to pay, causing Beanstalk to send a breach letter on July 16, 2010.

(Herzfeld Decl. ¶ 6; Exh. B).  Having failed to pay and/or cure its various other breaches

(including breach of its distribution obligations), PHE formally terminated the License

Agreement on January 11, 2011.  (Weinsten Decl. ¶ 7; Exh. H).

**L.**      **The Allegations of Le Bonitas' Complaint.**

Despite an unambiguous covenant not to sue regarding approvals, and undisputed facts contradicting its claim, Le Bonitas has made the tactical choice to file a frivolous lawsuit alleging that PHE breached the License Agreement by not responding to its design submission within ten business days.  The Complaint alleges:

(a)      "the parties [ ] agreed that Le Bonitas would submit to PHE all items [ ] bearing or incorporating the Property and that PHE had the right, in its sole discretion, to give advance written approval of such items at the concept stage, the final art stage, and the final physical stage . . ." (Cmplt ¶11);

(b)      "Pursuant to Section 5.1(2) of the License Agreement applicable to the approval process, PHE had ten business days within which to 'review and respond in writing to each of [Le Bonitas'] submissions.  If [PHE] does not respond to such submission within such ten (10) day business period, such submission shall be deemed disapproved." (Cmplt ¶ 12);

(c)      "by early October 2009, Le Bonitas was able to submit to PHE a CD containing a final stages presentation of, <u>inter alia</u>, prototypes and product samples for the collection in order to receive either final approvals or comments in sufficient time to incorporate them, manufacture the samples and show the collection at the industry trade fairs as planned and as contemplated by the parties."  (Cmplt ¶13)[10];

---

[10] It is undisputed that this allegation is false, although Le Bonitas has never bothered to fix this part of the pleading.  Le Bonitas submitted only inspiration or "mood" boards, not a final stages presentation, prototypes or samples.  (Sibbald Decl. ¶ 21).

21

(d)    "[o]n or about November 20, 2009, PHE, through Beanstalk, finally gave limited comments, but only with respect to the inspiration boards for the collection." (Cmplt ¶ 26); and

(e)    "PHE breached its obligations to engage in the approval process with Le Bonitas, to do so in good faith, and to timely, cooperatively and collaboratively review and respond to submissions"  (Cmplt ¶ 39).

In sum, Le Bonitas is seeking rescission and damages for what amounts to an alleged 29-day delay in PHE's response to a CD presentation.[11]

Despite these allegations, and a year of discovery, Le Bonitas has not, and cannot, establish any evidence that either Beanstalk or PHE acted in bad faith.  Quite to the contrary, the undisputed facts show that it is Le Bonitas that has acted in bad faith. Regardless, as set forth below, the claims asserted are barred by contract.

## ARGUMENT

**A.**    **Le Bonitas' Motion Should Be Denied, Because Its Claims Are Barred By An Unambiguous Covenant Not To Sue.**

**1.**    **Covenants Not To Sue Are Fully Enforceable In New York.**

A covenant not to sue is fully enforceable under New York law.  *See Kamfar v. New World Restaurant Group, Inc.*, 347 F. Supp. 2d 38, 51 (S.D.N.Y. 2004) (Judge Kaplan held covenant not to sue barred defamation claims brought by former chairman against corporation he worked for); *Joao v. Cenuco, Inc.*, 376 F. Supp. 2d 380, 382 (S.D.N.Y. 2005) ("if two parties sign a covenant not to sue each other, then a dispute arising out of the conduct covered by that agreement cannot provide a basis for a justiciable controversy under New York law, and the case must be dismissed."); *Chieco*

---

[11] At page 9, Le Bonitas claims it was a 43 day delay, but in doing so it is including (somewhat disingenuously) the first ten business days following submission of the designs.

*v. Paramarketing, Inc.*, 228 A.D.2d 462, 643 N.Y.S.2d 668 (2d Dept. 1996) (negligence claims brought by buyer of paragliding unit against seller were dismissed on summary judgment, where plaintiff signed an agreement releasing defendant from all liability for personal injuries caused by seller's negligence); *Tedesco v. Triboro Bridge and Tunnel Authority*, 250 A.D.2d 758, 673 N.Y.S.2d 181 (2d Dept. 1998) (Injury claims brought by bicyclist against bridge and tunnel authority were barred by agreement signed by bicyclist prior to his participation in a cycling tour; summary judgment affirmed).

### 2.     The Cases Cited By Le Bonitas Are Wildly Inapposite.

Le Bonitas does not dispute this law.  Instead, it cites inapposite cases for the unremarkable proposition that the covenant must clearly bar the claim at issue for it to be applicable.  For example, in *Graphic Scanning Corp. v. Citibank*, 116 A.D.2d 22, 499 N.Y.S.2d 712 (N.Y. 1st Dept. 1986), the principal case relied upon by Le Bonitas, plaintiff contracted with defendant for defendant to deliver a computerized message processing and delivery system.  Defendant breached by terminating the agreement, and plaintiff sued for damages.  The court ultimately held that a contractual provision barring either party from liability or loss due to a "failure in or breakdown of the communications and data processing facilities . . . or for any interruption of service" was intended to insulate the parties from liability for malfunctions in equipment, and not from the interruption of services due to an unlawful termination of the contract.  To read otherwise would render superfluous a provision allowing defendant to terminate after three years.  As demonstrated below, the facts of *Graphic Scanning Corp.* are so far removed from the facts of this case, that it is completely irrelevant.  Among other things, the covenant not to sue at issue in the present case ***directly*** and ***unequivocally*** addresses the ***exact*** issue at hand- PHE's alleged delay and/or failure to approve designs.[12]

---

[12] The other principal case upon which Le Bonitas relies, *Pro Net v. ACC TeleCom Corp.*, 294 A.D.2d 857, 741 N.Y.S.2d 795 (N.Y. 4th Dept. 2002), appears to be based on similar inapposite facts as *Graphic Scanning*.  However, the decision is a one page decision and does not even cite the language of the clause at issue.  Accordingly, it offers no insight to the present analysis.

3.   **The Covenant Here *Unmistakably* Bars Any Claim Based On The *Actual* Conduct Alleged In Le Bonitas' Complaint; The Court Can And Should Disregard Le Bonitas' Semantic Games.**

In this case, Le Bonitas clearly and unambiguously covenanted that it "shall not have **any** rights against [PHE] for damages or other remedies by reason of *[PHE's] failure or refusal to grant any approval referred to in this Section 5."* (Exh. A, Sec. 5.1(8)) (emphasis added). Here, however, Le Bonitas is doing exactly what it promised it would not do-- seeking **damages and other remedies** on the basis that PHE allegedly **failed to approve** its designs within a certain time period. *See, e.g.,* Complaint ¶ 12 ("Pursuant to Section 5.1(2) of the License Agreement applicable to the approval process, PHE had ten business days within which to 'review and respond in writing to each of [Le Bonitas'] submissions . . ."); Complaint ¶ 13 ("by early October 2009, Le Bonitas was able to submit to PHE a CD containing a final stages presentation . . ."); Complaint ¶ 26 ([o]n or about November 20, 2009, PHE, through Beanstalk, finally gave limited comments . . ."). In short, Le Bonitas' complaint is based on the **exact** conduct covered by its covenant not to sue. There is no ambiguity here whatsoever. Le Bonitas' claims must be dismissed as a matter of law.

(a)   **The Covenant Not To Sue, On Its Face, Bars Claims For An Alleged "Delay" In Approvals.**

Playing games with semantics, Le Bonitas attempts to circumvent the plain meaning of the covenant not to sue claiming that the word "delay" does not appear in this clause and, therefore, it is not barred from suing for an allegedly unreasonable **delay** in approval. Motion p. 41. This argument makes no sense at all. On its face, the covenant includes **any** failure to approve, whether by delay, delinquency or any other means. Indeed, a delay in approval **is** a failure to approve. *See* Weinsten Decl. ¶ 8, Exh. I (**Merriam-Webster's Dictionary equates "failure" as synonymous with**

24

**"delay, delinquency, dereliction . . . neglect, negligence, nonfeasance, oversight.")**  In view of the broader language actually used in the covenant, use of the words "delay in approval" would add nothing.  Certainly, the parties were not required to list every circumstance that might lead to a failure in approval.

It further defies common sense that the parties would covenant to absolve PHE from liability for ***any*** decision to disapprove a submission, regardless of the reason and the impact, yet at the same time exclude from protection claims based on a delay which culminated in an actual approval for Le Bonitas' benefit.

Le Bonitas also ignores the fact that, under Section 5.1(2), any ***delay*** in response or approval beyond ten business days is expressly deemed a "disapproval."  (Exh. A, Sec. 5.1(2)).  Therefore, although Le Bonitas may try and claim that it is suing for an unreasonable ***delay*** and not a failure to approve, the contract says otherwise, since a delay is a disapproval.

Le Bonitas also attempts to circumvent the "deemed disapproval" clause claiming it is "inapposite" because PHE did not actually receive the boards until ten business days had passed.  Motion p. 39.  That argument of course directly conflicts with Le Bonitas' claim that PHE is deemed to have received the boards when its agent, Beanstalk, received the boards.  Motion pp. 7-8.

Because a delay in an approval is a "failure" to approve, Le Bonitas' claims are barred as a matter of law.

**(b)** **Le Bonitas' Claim That PHE Failed To "Engage In The Approval Process" Is Directly Contradicted By Its Own Motion, And In Any Event Is Contractually Barred.**

Similar to its "delay" argument, Le Bonitas claims that PHE failed to "engage in the approval process" and these words also are absent from the covenant not to sue. Motion p. 40.  Considering that Le Bonitas admits PHE did approve the mood boards, albeit in an allegedly untimely manner, this is no different than their claim that PHE

delayed approval.  It, therefore, fails for *all* the reasons stated above.

However, it fails for the additional reason that there is no evidence to infer that Beanstalk and PHE did not *engage* in the approval process.  To the contrary, Le Bonitas admits that: (a) on October 13, 2009 (just three business days after receiving the boards), Beanstalk asked Mr. Busanna for a meeting to discuss the boards (Motion p. 10);[13] (b) that Busanna agreed to the meeting (*Id.*); (c) that Ms. Hilton herself received the boards on November 4 (Motion p. 16); and (d) that Ms. Hilton approved the boards on November 18, ten business days after she got them (Motion p. 20).

Regardless of the rhetoric and personal attacks on PHE and Beanstalk, what Le Bonitas is actually complaining about is an alleged delay of 29 days- conduct which clearly and unambiguously falls within the covenant not to sue.

> ### (c) There Was No "Suspension Of The Approval Process," But That Claim Too Is Unmistakably Barred.

In yet a third attempt to skirt the claim bar by mischaracterizing the facts alleged, Le Bonitas argues that the alleged delay amounts to a "suspension of the approval process," and the clause covering such suspensions (Section 5.2) "does not bar damages or other remedies" for an improper suspension.  Motion pp. 41-42.  Again, the argument makes no sense, because there are no facts to suggest that PHE ever "suspended" the approval process.  However, even if it did, the covenant not to sue directly applies to the "failure or refusal to grant *any* approval *referred to in this Section 5.*"  (Exh. A, Sec. 5.1(8), p. 11) (emphasis added).  Since Section 5.2 is a subsection of Section 5, claims for improper suspensions are barred as well.

---

[13] Le Bonitas devotes a substantial portion of its argument to the fact that Beanstalk was PHE's agent and, therefore, PHE is responsible for Beanstalk's conduct. *See, e.g.,* Motion pp. 7-8.  Having taken this position, Le Bonitas must accept the fact that engagement in the approval process by Beanstalk is engagement by PHE.

4.      **The Rule Of *Contra Proferentem* Does Not Apply, Whereas Here, The Contract Expressly States That It does Not.**

Finally, Le Bonitas argues that the covenant not to sue, and other provisions in the License Agreement, are ambiguous and must be interpreted against PHE as drafter. However, as stated above, the License Agreement expressly provides that "[a]ny rule of law that would require interpretation of any provision against the party responsible for its inclusion herein shall have no effect on the interpretation of this agreement." (Exh. A, Sec. 21.)  Under New York law, this clause negates any application of the rule of *contra proferentum. See, e.g, Rockland Exposition, Inc. v. Alliance of Automotive Service Providers Of New Jersey*, 2009 WL 1154094, *6 fn. 9 (S.D.N.Y 2009) (court held that rule of *contra proferentum* did "not apply" where contract stated "any ambiguity shall not be construed against either party.")

B.      <u>**This Court Has Not Ruled Upon The Substantive Issues Herein.**</u>

In its "preliminary statement," Le Bonitas claims that the "issues in the case were distilled and framed by the court in its October 6, 2011 Endorsed Letter Order, in which it held that '[i]t shall be defendants burden to prove why failure to respond within 10 days . . . was excusable . . . " Motion p. 7. *By omitting the second half of the sentence quoted,* and the context in which it was made, Le Bonitas obviously seeks to imply that the Court has already ruled on the key contractual issues in the case.  While we do not presume to tell the Court how it will ultimately rule on these cross-motions, it seems clear that the relevant issues were not decided on October 6, 2011.

*In fact, none of the issues in Le Bonitas' Motion or this Opposition were either briefed in connection with, or ruled upon in, the Court's October 6, 2011 order*.  The letter brief resulting in that Order dealt solely with the issue of whether or not PHE was entitled to a protective order prohibiting Le Bonitas from misusing Ms. Hilton's deposition transcript.  Motion, Exh. 12.

Further, the portion of the ruling **omitted** by Le Bonitas states "and pl. may inquire as to the basis of any such reason." *Id.* When read in its entirety, it seems clear that the point being made by the Court was that Le Bonitas would be free, at Ms. Hilton's deposition, to inquire as to why PHE believes any alleged delay was excusable.

Since no evidence was presented as to whether or not PHE in fact responded in ten days (it did, through Beanstalk), the Court could not and was not making any factual determination that PHE did not respond in ten days. Nor did or could the Court rule on the meaning or import of the "deemed disapproval" clause or the covenant not to sue (of which no reference at all was made). In fact, to the extent Ms. Hilton is required to demonstrate that any alleged delay is excusable, the door is left wide open for the argument that these very contract clauses provide that excuse.

**C.** **Le Bonitas' Motion Should Be Denied For The Additional Reason That It Cannot, As A Matter Of Law, Establish A Breach.**

In order to establish a claim for breach of contract, a plaintiff must plead and prove: "(a) a contract; (b) performance of the contract by one party; (c) breach by the other party; and (4) damages." *First Investors Corp., et al. v. Liberty Mutual Insurance Co.*, 152 F.3d 162, 168 (2d Cir 1998). Here, Le Bonitas cannot as a matter of law establish **any** breach by PHE.

**1.** **A Failure To Respond In Ten Days Is Not A Breach Of Contract- It's A Deemed Disapproval.**

The premise of Le Bonitas' Complaint is that PHE breached by failing to approve its designs within a ten business day period. The contract, however, on its face, does not actually require PHE to "approve" or "disapprove" submissions within ten business days, or any time period for that matter. Rather, the contract states that PHE "**shall have**" up to ten business days to "**review and respond**" to submissions, but that if PHE "does not respond to such submission within such ten (10) business day period, such

28

submission shall be deemed disapproved." (Exh. A, Sec. 5.1(2), p. 11).  Importantly, the clause does not say that "PHE shall respond" in ten days, but rather is drafted in a manner granting PHE a certain amount of time to act before the designs are deemed disapproved.  The language is clearly a grant of rights to PHE, not to Le Bonitas.

In other words, the parties expressly contemplated that PHE might not **respond** to a submission within ten days and, in such event, the submission is disapproved. (Exh. C, Busanna depo pp. 14-15).  Thus, even assuming PHE did not respond in ten business days, and that is not the case, the result is that the designs are considered disapproved- not a claim for breach of contract.  This is supported by Mr. Busanna's own testimony, where he agrees that it would not have been a breach for PHE to respond in 12 or 15 business days.  (*Id.* at pp. 33-35).

### (a)   Le Bonitas' Interpretation Renders The "Deemed Disapproval Clause" Superfluous.

Any other interpretation, including that suggested by Le Bonitas, would render the second sentence of Section 5.1(2) superfluous.  *See J.A. Apparel Corp. v. Abboud,* No. 07-CV7787, 2008 WL 2329533, at *9 (S.D.N.Y. "[P]ursuant to a longstanding and unassailable rule of contract interpretation, the Court is required to give meaning to every term in the Agreement.").  Even *Graphic Scanning Corp.*, (on which Le Bonitas relies) acknowledges the fundamental premise that any "interpretation which renders a clause absolutely meaningless should be avoided."  116 A.D.2d at p. 25.  Obviously, if the Parties intended that a delay beyond ten days would be a breach, they would have said so, and not treated it as a "deemed disapproval."

### (b)   Le Bonitas' Reliance On Beanstalk's Protocol And Welcome Pack, Which Are Not Contractual Documents, Is Misplaced.

In support of its interpretation, and in disregard of the testimony of its principal witness, Le Bonitas claims that the Beanstalk Welcome Pack and Protocol are evidence that a failure to respond in ten days is a breach.  Motion p. 31.  Its reliance on these

documents is misplaced.  First and foremost, these documents post-date the License Agreement and were never signed by PHE.  As set forth in Section 17 of the License Agreement, "none" of its provisions (including the "deemed disapproval" provision) "may be waived or modified except in a writing signed by both parties."  (Exh. A, Sec. 17).

Regardless, nothing in either of these documents was either intended to, or in actuality does, negate the deemed disapproval language.  At most, these policies simply reiterate PHE's **goal** of responding in ten days, and that the licensee should wait that time before contacting Beanstalk about approvals.  (Sibbald Decl. ¶ 29; *See, also,* Motion p. 7, quoting language of protocol that states "If a response is not received within ten business days, please contact The Beanstalk Group.")  As Ms. Sibbald testified, it is always PHE's goal to try and turn things around in ten business days, but its failure to do so is not a breach of contract.  (*Id.*)  Nothing in Beanstalk's policies says otherwise.

### 2.    In Any Event, PHE Did Respond In Ten Days, Through Beanstalk.

Regardless, it is undisputable that in fact PHE, through its agent, did **respond** to the submission within ten business days.  As demonstrated by the testimony of Mr. Busanna, and emails between Le Bonitas and Beanstalk, Beanstalk responded to the submission immediately by asking for a meeting to go over the designs.  Moreover, it is further undisputed that Beanstalk continued to engage in a dialogue with Le Bonitas, which included a review of the designs at a November 4 meeting in London.

It is equally undisputed that Ms. Hilton too engaged in the process.  As soon as she actually received the designs on November 4, she reviewed them and expressly withheld her approval **as she was permitted to do under her contact.**  The fact that she subsequently decided to permit Le Bonitas to go forward, **as a favor**, is not and cannot be deemed evidence of a breach.

### 3.    Le Bonitas Cannot As A Matter Of Law Establish Breach Of The Implied Covenant.

As a fall back position, Le Bonitas claims that PHE breached the implied

30

covenant of good faith and fair dealing.  Specifically, Le Bonitas claims that the alleged delay in approvals prevented it from getting the product to market, thereby frustrating the purpose of the contract.  Since the covenant not to sue bars *any* claims related to approvals, whether based on express or implied terms of the contract, the claim is barred.  It fails for the additional reasons that it is trumped by specific contract terms and for lack of sufficient evidence.

### (a)   The Implied Covenant Is Trumped By Specific Contract Terms.

Under New York law, *specific* provisions of a contract govern over the *general.* *Green Harbour Homeowners' Ass'n, Inc. v. G.H. Development & Const., Inc.*, 789 N.Y.S.2d 319, 321 (2005) (Where a contract "employs contradictory language, specific provisions control over general provisions."); *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46 (1956) ("Even if there was an inconsistency between a specific provision and a general provision of a contract (we find none), the specific provision controls."); *Waldman v. New Phone Dimensions, Inc.*, 109 A.D. 702, 704 (1985) ("Where general and special provisions appear, special provisions control.")

Accordingly, as a matter of law, a *general* obligation to act in good faith, whether express or implied, cannot negate the very *specific* provisions that: (a) grant PHE "sole and absolute discretion" over approvals (Section 5.1), (b) permit PHE to disapprove a submission by not responding to it in ten days (Section 5.1(2)), and (c) preclude Plaintiff from suing for "any" failure or refusal to approve designs (Section 5.1(8)).  Indeed, the whole purpose of these provisions is to avoid litigation over whether or not PHE's exercise of its discretion over approvals was done timely, properly and/or in good faith.  Obviously, individual tastes may differ and the point of this contract is that PHE's decisions cannot be challenged *for any reason*.  Again, the results may be harsh for Le Bonitas, but that is exactly what it agreed to.

31

**(b)** **Le Bonitas Fails To Proffer Sufficient Admissible Evidence From Which A Reasonable Juror May Infer A Lack Of Good Faith on The Part Of PHE Or Beanstalk; The Mere Passage Of Time Is Not Evidence Of Bad Faith.**

While high on rhetoric, Le Bonitas' Motion is short on actual relevant admissible evidence. To make its case, Le Bonitas omits key undisputed evidence (of which it is aware) and simply misrepresents other evidence. When examined closely, Le Bonitas' entire case essentially boils down to the argument that the mere passage of time by itself is a breach of good faith. However, that cannot be the law, and Le Bonitas cites no case otherwise.

PHE's point-by-point response to Le Bonitas' so-called "evidence" of bad faith is set forth below and organized chronologically for ease of reference.

### i. The Period of October 8 (Boards Received by Beanstalk) to October 22 (Received by PHE)

LB Contention: Ms. Brambring "did nothing with the boards (i.e. committed complete nonfeasance)" from the time she received them until October 21. Motion p. 11, no citation to evidence.

PHE's Response: Completely false. As Ms. Sibbald testified, Beanstalk reviewed the boards on behalf of PHE and did not understand them. Ms. Brambring attempted to get answers from Busanna, and discussed the boards with him before sending them to PHE. (Sibbald Decl. ¶¶ 12-14; Exh. C, Busanna Depo pp. 66-67, 69.) *Le Bonitas cites no evidence to the contrary*.

LB Contention: Ms. Brambring lied in her October 20 email when she claimed she sent the boards to PHE, since the boards were not sent until the next day. Motion p. 11, citation to Exh. 6.

PHE's Response: There is no foundation for this statement, as Le Bonitas did not

32

bother deposing Ms. Brambring as to the basis for the statement in her email.  As Ms. Sibbald explains, it is most likely that Ms. Brambring put the boards into internal processing on the 20th, but the carrier picked them up the next day.  The email is evidence of nothing.  Sibbald Decl. ¶ 30.

LB Contention: Ms. Brambring was incompetent because she asked for a CD which explains the thoughts of the presentation, since there was no such CD and the boards themselves contained an explanation.  Motion p. 12, Exhs. 3 & 6.

PHE's Response:  The claim is patently false.  As Ms. Sibbald explained, Beanstalk did not understand the presentation and was seeking additional information.  (Sibbald Decl. ¶¶ 12-14).  Obviously, Ms. Brambring was asking Le Bonitas to put those thoughts onto a new CD.

### ii.     October 22 through November 3.

LB Contention: Ms. D'Amico, Ms. Hilton's assistant, did not even look at the boards until Beanstalk inquired on November 2.  Le Bonitas describes this as "incompetence (and/or indifference)."  Motion p. 15.

PHE's Response:  As Ms. D'Amico explained in her uncontroverted testimony, **Le Bonitas** failed to include the ***required***  approval form with its submission, ***although Beanstalk repeatedly asked them to***.  Thus, when she got the boards, she did not know they were an official submission requiring approval.  (D'Amico Decl. ¶ 3; Motion, Exh. 19 pp. 78: 22-25 – 79:1-11; Motion Exh. 22)  Ms. D'Amico had never before seen an inspiration board (Ms. Hilton's manager, Ami Manning, dealt with the boards on the Spring/Summer line).  ***All of this is supported by the very emails and testimony*** Le Bonitas cites as evidence of Ms. D'Amico's alleged incompetence.  If anything, the evidence is that Le Bonitas, not PHE, was negligent and caused the delay.  It certainly is not evidence of bad faith. To the contrary, Le Bonitas does not deny that Ms. D'Amico gave the boards to Ms. Hilton ***immediately*** after learning approval was required.

LB Contention: On November 2, Le Bonitas sent an email claiming that PHE's non-approval was "an unjustified suspension of the approval process" and that it was "suffering serious damages." "In reply, Ms. Brambring did not disagree. She just asked Mr. Busanna to call her." Motion p. 13, Exh. 8.

PHE Response: This self-serving email was in fact drafted by Le Bonitas counsel, Mr. Ceresi, on October 30 immediately *after* Le Bonitas had terminated almost all of its distributors of the Paris Hilton line. (Exh. C, Busanna Depo pp. 341-343). The email was obvious posturing in view of the fact that Le Bonitas was already in breach and unable to meet distribution requirements. Regardless, it is not evidence of bad faith by PHE, and there is nothing to suggest Ms. Brambring (a nonlawyer) *agreed* with Le Bonitas' position, only that she wanted to talk to Busanna.

Le Bonitas Contention: On November 3, 2009, Ms. Brambring lied to Busanna telling him that PHE had approved the boards. Motion p. 13, Busanna Decl. ¶ 33.

PHE Response: The claim is nonsense and immaterial anyway. Ms. Brambring sent Mr. Busanna an email that very day stating she did not have approval. Motion Exh. 8. Mr. Busanna either misunderstood Ms. Brambring's English, or he is not being truthful. What possible incentive could Ms. Brambring have to give a false approval?

### iii.    November 4 (Paris Disapproves Designs) to November 20 (Paris Approves As A Favor)

Le Bonitas Contention: At the meeting on November 4, Busanna told Beanstalk they needed the boards in the next day or so, or they could not proceed. Beanstalk assured Busanna that "PHE would approve the inspiration boards shortly." Motion p. 13, Busanna Decl. ¶ 34.

PHE Response: *If, as Busanna claims, Le Bonitas could not proceed unless the mood boards were approved by November 5, then any alleged delay*

34

*and/or actions by PHE after November 5 are immaterial.* [14] *Busanna's statement is further irrelevant since Ms. Hilton did review and reject the Boards on November 4- which she had every right to do.*

According to Ms. Sibbald, Mr. Busanna did not give a date by when approval was needed, and no-one at Beanstalk ever promised that PHE would actually approve anything.  (Sibbald Decl. ¶ 7.)  How could they?  There is nothing in the meeting minutes from November 4 that would suggest otherwise.  Motion, Exh. 24.  Obviously, if Busanna did in fact give a "drop dead" date for approvals, Beanstalk would not have bothered to follow up with PHE past that date.


Le Bonitas Contention:  "Beanstalk repeatedly advised PHE of the need for immediate approval." Motion p. 15.

PHE Response:  This contention directly undermines Le Bonitas' claim that Beanstalk acted with malfeasance and misfeasance.  The fact of the matter is that on November 2, Le Bonitas sent a posturing letter to Beanstalk *falsely* claiming damages. It was at this point, that Ms. Brambring began to send urgent emails to PHE *relaying* Le Bonitas' claim that time was of the essence.  PHE acted almost immediately and, at that point, Ms. Hilton received and rejected the boards.


Le Bonitas Contention:  Ms. Hilton was in Los Angeles and was available to approve the boards between November 9 and 18.  Her schedule shows only a limited number of engagements.  She had no legitimate excuse for not approving the boards. Motion pp. 20-22.

PHE Response:  The fact of the matter is that by this time Ms. Hilton had already

---

[14] Indeed, if it is true that Le Bonitas' schedule would not accommodate anything more than a two week delay, then Le Bonitas is grossly negligent for failing to send the mood boards earlier.

considered and rejected the boards.  She had no obligation to change her mind, and Le Bonitas knew the boards were disapproved, because they signed a contract that said they were disapproved if not approved within ten business days.  It was incumbent upon Le Bonitas to submit new designs, but of course, they are claiming it was already too late by November 9 to do anything further with this season.

Although this was **two years ago**, and there are no documents to say exactly what Ms. Hilton was doing on any particular day (Exh. 19, D'Amico Depo p. 58),[15] Ms. D'Amico recalled generally that in this period of time, Ms. Hilton was not available to meet with her to go through the boards.  (*Id.* at pp. 106, 111-112).  At the time, Ms. Hilton was working with roughly 17 different product lines (Motion Exh. 17, p. 47), which collectively take up a substantial amount of her time (e.g., personal appearances, photo shoots, business meetings, creative review, etc.).  Separate from this, Ms. Hilton has many other demands on her time including, among other things, film and television projects, a music career, a modeling career and charity work.

Le Bonitas Contention:  "The final act of nonfeasance—Beanstalk then took another two full days to copy and paste those comments into an email to Le Bonitas advising them of approval."  Motion p. 20.

PHE Response:  Le Bonitas again is not being truthful.  With the time difference between London and Los Angeles, Beanstalk did not receive the comments until after 11:00 PM on November 18th.  (Sibbald Decl. 19)  The comments were sent to Le Bonitas the morning of the 20th.  One business day is not an unreasonable amount of time for Beanstalk to have considered the comments before sending on. (*Id.*)

---

[15] The schedule referred to by Le Bonitas is only a snapshot of some of the things on Ms. Hilton's plate.  It was never intended to document everything Ms. Hilton is involved with on a daily basis.

In sum, there is no evidence whatsoever to suggest that anyone at Beanstalk or PHE were acting in bad faith.  The mere passage of time is evidence of nothing.

**D.**   **Whether Or Not The Alleged Delay Prevented Le Bonitas From Bringing The Collection To Market Is A Material Issue Of Fact.**[16]

To support a claim for breach of the implied covenant, Le Bonitas must prove that no triable issue exists as to whether or not the alleged delay prevented it from bringing the product to market.  If, as is demonstrated herein, Le Bonitas could have realized the fruits of the contract, then there could be no breach of the implied covenant. *See Ferguson v. Lion Holding, Inc.*, 478 F.Supp.2d 455, 479 (S.D.N.Y. 2007) (to establish breach of the implied covenant, it must be shown that one party "intentionally did something that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.")

The same holds true for Le Bonitas' breach claim regarding express contract terms since, as Le Bonitas admits, materiality of the breach turns on this very issue. Motion p. 23.  Le Bonitas cannot, however, meet this burden as substantial evidence exists that sufficient time remained within which to complete a Fall/Winter collection. *See* Sections I & J above.

**E.**   <u>**Le Bonitas' Motion May Be Denied For The Additional Reason That Le Bonitas Failed To Perform.**</u>

To establish breach of contract under New York law, Le Bonitas must necessarily "show that it performed its own obligations" under the License Agreement.  *Scott-Macon*

---

[16] While this disputed factual issue dooms Le Bonitas' Motion, it is not relevant to the disposition of PHE's Motion For Summary Judgment, which seeks judgment based upon the unambiguous meaning of a contract.

*Securities, Inc. v. Zoltek Companies*, 2005 WL 1138476, at *14 (S.D.N.Y. 2005). *See also Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 526 (2d Cir. 1994) ("Under New York law, an action for breach of contract requires proof of . . . performance of the contract by one party . . .") (emphasis added). It is equally "well established that where one party materially breaches a contract the other side is excused from its performance." *Care Environmental Corp. v. M2 Technologies Inc.*, 2006 WL 2265036, at *7 (E.D.N.Y. 2006). *See also Wechsler v. Hunt Health Systems, Ltd.*, 330 F.Supp.2d 383, 414 (S.D.N.Y. 2004) ("When one party commits a material breach, the other party is relieved, or excused, from its further performance obligations.")

In this case, it is indisputed that by the conclusion of the sales season for the Spring/Summer line around October 2009, Le Bonitas had: (a) failed to secure *any* sales in *most* of the countries under license, (b) failed to obtain distributors or sales agents for many important territories, and (c) made no effort at all to secure distributors in Africa and most of Asia. *See* Section B, above. Accordingly, Le Bonitas was already in direct breach of the "best efforts" to distribute clause, and anticipatory breach of its requirement to be actually selling in all licensed territories by January 1, 2010, since that was an impossibility. (Exh. A, Sec. 14.1. & Exh. 9) The fact that Le Bonitas was in breach is confirmed by Mr. Busanna's testimony that he fully understood the obligation to be actually selling in "all of the countries as per the contract" by January 1, 2010 (Exh. C, p. 377), and that he was "concerned" about this breach. (Exh. C., Busanna Depo p. 266).

In its Motion, Le Bonitas misleads the court with irrelevant arguments that it was poised to comply with *other* distribution obligations under *different* sections that have nothing to do with the issues at hand. By way of example, Le Bonitas refers to the

"obligation to launch" section in Exhibit 9 of the License Agreement which contains **additional** separate requirements to be met by a later date, i.e., June 30, 2011. That clause requires that, in addition to the obligations under 14.1, Le Bonitas must actually "launch" in "at least two (2) retailers" in certain listed countries. It goes on to say that if Le Bonitas fails to establish retail distribution in at least two stores in any of the named territories, Le Bonitas will automatically lose its license for the territories where it failed to comply. This is known as a "clawback" provision, and is completely separate and irrelevant to Le Bonitas' requirement to have commenced some level of distribution in every territory. (Herzfeld Decl. ¶ 7).

There is no inconsistency or ambiguity in these distribution requirements. Under Section 14.1, Le Bonitas was required to have achieved some level of actual sales and distribution in every licensed territory by January 1, 2010 (it did not have to have established retail distribution in two stores at this point). If it failed to do so, it was in breach and PHE had the express right (but not the obligation) to terminate under Section 13.1(vii).

Separately, in the event Le Bonitas did not achieve retail distribution in two stores in certain key countries by June 30, 2011, then the rights in those territories would automatically revert back to PHE. In other words, if Le Bonitas failed to meet its "distribution start date" requirements, PHE could exercise its right not to terminate on January 1, 2010, see how things went and "clawback" certain rights if Le Bonitas did not thereafter meet the "launch" milestones. Either through intentional deception, or plain ignorance, Le Bonitas is confusing a termination right (which is linked to the distribution start date) with a "clawback" right (which is linked to a retail launch requirement).

(Herzfeld Decl. ¶ 8).[17]

Le Bonitas' reference to Section 13.1(iv) is equally misplaced.  Motion p. 35.
This clause simply provides another basis for PHE to terminate.  Specifically, it permits
PHE to terminate the license in the event Le Bonitas, for a six month period, "does not
make every reasonable effort to commercially distribute the product within" a minimum
number of countries in Asia, Europe and the Middle East. (Exh. A Sec. 13.1(iv)).  It is a
separate right and poses no inconsistency with its obligation to begin selling in every
country by January 1, 2010.  It simply says that, even if Le Bonitas does meet its
distribution requirements by January 1, 2010 (or PHE elects to waive its right to
terminate for failure to do so), it has a continuing obligation to make every effort to sell
in these territories.  If it fails to do so, PHE can terminate. (Herzfeld Dec. ¶ 9).

In view of the fact that Le Bonitas breached this provision as well (it made
virtually no effort at all to achieve distribution in Asia over the *nine months* before it
abandoned the line altogether), it is somewhat puzzling that Le Bonitas would reference
this as evidence that it complied with its obligations.

**F.**     **PHE's Right To Attorneys Fees And Costs Is Unmistakably Clear.**

Finally, Le Bonitas seeks to prevent PHE from recovering its fees and costs in
this case, despite an unmistakable contractual right to those fees if PHE prevails.
Motion pp. 42-28.  Based on cases that are completely inapposite, *and in
contradiction with a previous sworn declaration by its counsel (Martin Garbus),*

---

[17] Le Bonitas' citation to Beanstalk counsel, Miri Frankel's, April 21, 2010 letter to Mr.
Garbus is unavailing.  Motion p. 36, Exh. 31. The letter neither supports Le Bonitas'
position, nor contradicts the explanation provided herein by Ms. Frankel's boss, Mr.
Herzfeld. *It is further disingenuous in that this letter was part of ongoing
settlement discussions between counsel.*  For that reason, PHE moves to strike the
letter from the record.

Le Bonitas claims that the fee provision only applies in the event PHE is sued by *a third party* and does not cover claims by PHE to recover monies owed under this contract.

Section 9.2 of the License Agreement, however, expressly provides that Le Bonitas will indemnify PHE "*from any breach*" by Le Bonitas and, in the event of a breach, PHE may recover "reasonable attorneys fees, costs and expenses which may be . . . incurred by [PHE], including *costs of collection of all amounts owed to [PHE] by LICENSEE* and *costs of all actions by [PHE] against LICENSEE to enforce LICENSEE'S compliance with this Agreement.*"  (Exh. A, Sec. 9.2, p. 17) (emphasis added).[18]

This language could not be more clear.  PHE is entitled to its fees and costs to collect "*all*" amounts "*owed to*" PHE by Le Bonitas, not just those owed as a result of claims made by third parties.  It also covers fees incurred in "*all*" actions by PHE against Le Bonitas to "*enforce compliance with this Agreement*," not just actions to enforce Le Bonitas' indemnity obligations.  If the parties truly intended to limit recovery to only those fees and costs associated with third party claims, they could and would have said so.  They did not, and there is no language anywhere from which this could be implied. *See Lopez v. Fernandito's Antique, Ltd.,* 305 A.D.2d 218, 220 (2003)   ("Clear and unambiguous terms should be understood in their plain, ordinary, popular and non-technical meaning."); *International Klafter Co., Inc. v. Continental Cas. Co., Inc.,* 869 F.2d 96, 99 (2d Cir. 1989) ("Where the parties' intent is 'clearly and unambiguously set forth, effect must be given to the intent as indicated by the language used.'")

---

[18] Significantly, this important language is expressly omitted from the separate indemnity provision running in favor of Le Bonitas. (*See* Exh A. Section 9.3.)  In fact, Section 9.3. does not refer at all to claims directly between the parties, but instead is intended to apply only to third party claims.

*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 178 (2d Cir. 2005) is instructive here, as that case similarly dealt with an ***indemnity*** provision which, in the Second Circuit's opinion, "unmistakably" provided for one party to recoup its attorneys fees incurred in ***first party disputes***. *See* 418 F.3d at 179.  Like the License Agreement in this case, the agreement at issue in *Mid-Hudson* contained two ***different*** indemnity provisions, one for each party.  The first provision, which the court found to apply only to third party disputes, required the defendant to indemnify the plaintiff for its attorneys' fees incurred only in actions "arising by the negligence of [the defendant]'s personnel." *Id.* at 178.

In contrast, the second provision more broadly stated:

> [plaintiff] shall be indemnified and held harmless from any actions resulting from the negligence of [defendant]; from any and all liabilities (i.e. bodily injury), damage (i.e. property), expenses (including reasonable attorney fees, court costs, and other costs) or actions of any kind or nature arising, growing out of, or otherwise connected with any activity under this Agreement.

*Id.* at 178.  The court held that "the second provision, when read in conjunction with the first provision, indicate[d] 'unmistakably' that the parties intended for the second provision to apply to 'actions of any kind or nature,' including ***actions between the parties***." *Id.* at 178-179 (emphasis added).

In light of this holding from *Mid-Hudson*, Le Bonitas cannot legitimately argue that the language of Section 9.2 applies only to third party disputes.  Rather, when Section 9.2 is read in conjunction with Section 9.3, it becomes apparent that the parties must have intended for PHE to be indemnified against first party claims.  If not, why would they have included the broader language referring to "***all actions by [PHE] against [Le Bonitas]***" in Section 9.2, but not in Section 9.3?  *See Sagittarius Broadcasting Corp. v. Evergreen Media Corp.*, 243 A.D.2d 325, 663 N.Y.S.2d 160 (1997) (Court held that

42

indemnity provision in contract was not limited to third party claims; such a reading would have rendered broader language in the first sentence of the indemnity provision as mere surplusage, since second sentence was clearly limited to third party claims).

Moreover, if the language in *Mid-Hudson*, **which did not expressly refer to disputes between the parties**, is sufficient to cover first party claims (and it is), then the language in Section 9.2 should apply with even stronger force here where **all** claims by PHE against Le Bonitas are expressly called out.

Importantly, **none** of the cases cited in Le Bonitas' MSJ dealt with an indemnity provision which, like Section 9.2, contained language specifically referring to disputes **between the parties.** Thus, those cases are inapposite to Section 9.2 and should be disregarded. If those cases serve any relevant purpose at all, it is to demonstrate why Le Bonitas, unlike PHE, is **not** entitled to recover its attorneys' fees in this action. For example, *Hooper Associates, Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487 (N.Y. 1989) dealt with an indemnity provision very similar to Le Bonitas' own indemnity provision in 9.3. That provision stated in relevant:

> [Defendant] shall at all times indemnify and hold harmless [Plaintiff]...from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees arising out of:
>
>> (i)    Any breach by [Defendant] of any express or implied warranty hereunder and any express representation or provision hereof;
>>
>> (ii)   The performance of any service to be performed hereunder;
>>
>> (iii)  Infringement of the patent rights, copyright or trademark...of any person, firm corporation as a result of any use by [Plaintiff]...

*Id.* at 490 n.1. The court held that because (like Le Bonitas' indemnity provision) none

43

of this language was "exclusively or unequivocally referable to claims **between the parties themselves**," it did not apply to first party claims.  *Id.* at 492.  Of course, because (as discussed above) PHE's indemnity provision "unequivocally" refers to claims **between PHE and Le Bonitas**, the holding from *Hooper* would not preclude PHE's recovery of its fees in this action, and would actually support PHE's argument.[19]

Finally, it should be noted that although Section 9.3 (Le Bonitas' indemnity right) does not contain the "magic" language of Section 9.2, or any similar language granting fees on first party claims, Mr. Garbus previous represented to this Court, **under penalty of perjury**, that "Section 9.3 of the License Agreement provides for the award of attorney's fees in favor of Le Bonitas as the result of any breach . . . by PHE." (Electronic Doc. No. 32, Decl. of Martin Garbus in Support of Mot. to Amend at ¶10). PHE obviously disagrees with Mr. Garbus.  However, he made the claim under oath and cannot now, in good faith, suggest that PHE has no right to fees under Section 9.2, a clause which indisputably contains more favorable language on the issue than 9.3.

---

[19] *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186 (2d Cir. 2003), discussed at length in Le Bonitas' MSJ, is also inapposite here.  The language at issue in that case merely provided for the recovery of attorneys' fees "including, without limitation, in connection with the enforcement of this Agreement *and the indemnification obligations set forth herein.*"  *Id.* at 199.  There was no language specifically referring to disputes between the parties, as is present in Section 9.2 of the License Agreement.  Rather, the language was more similar to that of Le Bonitas' indemnity provision, which contains no specific reference to first party claims.

44

**CONCLUSION**

For all the reasons stated above, PHE respectfully requests that this Court deny

Le Bonitas' motion for summary judgment in its entirety, and instead enter judgment in

favor of PHE in accordance with PHE's own motion for summary judgment.

Dated:    March 15, 2012

LAVELY & SINGER PC

By: _____
     Michael E. Weinsten

2049 Century Park East, Suite 2400
Los Angeles, CA, 90067
(310) 556-3501
mweinsten@lavelysinger.com

*Attorneys for Defendant*
*Admitted Pro Hac Vice*

FRANKFURT KURNIT KLEIN & SELZ PC

By: ____/s/ Maura J. Wogan_____
     Maura J. Wogan

488 Madison Avenue
New York, NY, 10022
(212) 980-0120
mwogan@fkks.com

*Attorneys for Defendant*

45